**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| EMPIRE FINANCIAL SERVICES, INC., | § | |
| | § | |
| PLAINTIFF, | § | CIVIL ACTION NO: |
| | § | |
| | § | 1:08-cv-00226-WHA-WC |
| VS. | § | |
| KENNETH L. TODD, III, | § | |
| MICHAEL D. BROCK, | § | |
| JAMES R. PAXTON,, | § | |
| DANIEL A. BAILEY, | § | |
| C. WAYNE ROBERTS, | § | |
| TIMOTHY L. EAKES, | § | |
| GARY L. ANDERSON and | § | |
| KEITH A. LAFERRIERE, | § | |
| | § | |
| DEFENDANTS. | § | |

## PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM

**1.    BACKGROUND**

On March 27, 2008, Plaintiff, Empire Financial Services, Inc., a Georgia corporation (hereinafter, "Empire"), filed a Complaint [Docket Item "2"], reference to which is hereby made and incorporated herein, against Defendants (hereinafter, "Guarantors") in this Honorable Court as a result of Guarantors' failure to pay Empire approximately $18,000,000.00 due from Lake Martin Partners, LLC (hereinafter, "Lake Martin"), pursuant to the terms of unlimited unconditional guaranties executed by Guarantors. The Construction Loan Agreement and the Guaranties in the instant case are to be construed under Georgia Law. (Guaranty Agreement page 3 of 6). On May 19, 2008, Guarantors filed an Answer, as well as a Counterclaim alleging (1) negligence, (2) breach of fiduciary duty, (3) breach of contract, (4) conversion, (5) conspiracy, and (6) negligent representation. Each Guarantor is either a member of Lake Martin or an owner of a controlling interest in an entity which is a member of Lake Martin.

The Counterclaim asserts violations by Empire alleging the following counts: (1) negligence, (2) breach of fiduciary duty, (3) breach of contract, (4) conversion, (5) conspiracy, and (6) negligent misrepresentation.  All counts arise out of alleged violations of the Construction Loan Agreement executed by Guarantors and the  unlimited unconditional guaranty agreements executed by Guarantors.

**2.       GROUNDS FOR MOTION**

Pursuant to Fed. R.Civ.P.12(b)(6), Empire moves this Court to grant its Motion to Dismiss the Counterclaim pursuant to Fed.R.Civ.P.12(b)(6) based on the following:

2.1    Guarantors, under Count One of the Counterclaim, failed to state a claim of negligence because Guarantors failed to allege that Empire breached any duty "imposed by law and not merely the breach of a duty imposed by the contract itself;"

2.2    Guarantors, under Count Two of the Counterclaim, failed to state a claim of breach of fiduciary duty because a joint venture does not exist between or among Empire, Lake Martin, Guarantors, Moore, Snead, The Profile Groups and Stoneview, and Guarantors cannot show any breach of fiduciary duty by Empire;

2.3    Guarantors, under Count Three of the Counterclaim, failed to state a claim of breach of contract, including but not limited to breach of implied covenants of good faith and fair dealing, because Guarantors' breach of contract claim is contradicted by the terms of the Construction Loan Agreement referenced in the Counterclaim. Guarantors have failed to allege facts showing Empire breached the Construction Loan Agreement; no such claim exists under Georgia or Alabama law.

2.4     Guarantors, under Count Four of the Counterclaim, failed to state a claim of conversion because Empire has acted in compliance with the terms of the Construction Loan Agreement and Guarantors have not and cannot prove the elements of conversion.  Further, Guarantors own only a membership interest in the limited liability company constituting Lake Martin, and there is no allegation of a conversion of such membership interest.

2.5     Guarantors, under Count Five of the Counterclaim, failed to state a claim of conspiracy because there is no evidence that Empire acted in concert with any other person or entity to accomplish an unlawful end or a lawful end by unlawful means, and an underlying tort claim is absent;

2.6     Guarantors, under Count Six of the Counterclaim, failed to state a claim of negligent misrepresentation because any obligations of Empire are set forth in the Construction Loan Agreement executed by Guarantors and the Guaranty Agreements executed by Guarantors; Guarantors' Counterclaim fails to assert the essential elements of negligent misrepresentation and alleges "justifiable reliance"; and Guarantors' alleged reliance on any *post-execution* representations by Empire did not cause Guarantors to do anything Guarantors were not already obligated to do under the Guaranty Agreements.  Guarantors are not obligated to Empire as to any new indebtedness of Lake Martin, subsequent to the revocation of their guaranties.

**3.     ARGUMENT AND CITATION OF LEGAL AUTHORITY**

In ruling on a motion to dismiss for failure to state a claim, the analysis "is limited primarily to the face of the complaint and attachments thereto." Med South Health Plans, LLC, v. Life of the South Insurance Company, 2008 WL 2119915 (M.D.Ga.2008); Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1368 (11th Cir.1997) (per curiam). "However, where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings...and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." Id. at 1369. The Court still must "constru[e] the complaint in the light most favorable to the plaintiff and accept as true all facts which the cause of action will not do.'" Id. Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir.2007) (quoting Bell Atl.Corp. v. Twombly, – U.S.– 127 S.Ct. 1955, 1965 (2007).

When considering a motion to dismiss, however, the Court must consider whether the "complaint's allegations...plausibly suggest that the [plaintiff] has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff's complaint should be dismissed." Boyd v. Peet, *1 WL 2781033 (11th Cir.2007) (citing Bell Atl.Corp. v. Twombly, – U.S.– 127 S.Ct. 1955, 1965 (2007) (heightening the pleading requirements under Rule 8)); accord Crutchfield v. State, * WL 2908270 (M.D.Ga.2007). Because the allegations in Guarantors' Counterclaim do not plausibly suggest that Guarantors are entitled to any relief in this matter, Empire's Motion to Dismiss is due to be granted.

The entire Counterclaim is barred by the express provision of the Promissory Note authorized

by Guarantors, a true and correct copy of which is attached is attached hereto and incorporated herein

as Exhibit "A," the unlimited unconditional guaranty agreements attached as Exhibits "5" and "7-13"

to Empire's Complaint, the Construction Loan Agreement referenced in Paragraphs 13, 16, 17, and

36, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "B," and

the Final Order Approving Post-Petition Financing Between Debtor and Empire [Docket Item "73"

in Chapter 11 Case No.07-11470 and attached to Empire's Complaint in the instant case as Exhibit

"4"].

        As noted by the Court in Fielbon Development Co., LLC v. Colony Bank of Houston County,

* WL 787720 (Ga.App.2008), a plaintiff seeking to enforce a promissory note establishes a prima

facie case by producing the note and showing that it was executed; once that prima facie case has

been made, the plaintiff is entitled to judgement as a matter of law unless the defendant can establish

a defense. Fielbon Development Co., LLC v. Colony Bank of Houston County, * WL 787720

(Ga.App.2008)  In Fielbon Development Co., LLC v. Colony Bank of Houston County, * WL

787720 (Ga.App.2008), the bank brought an action against a limited liability company, as borrower,

and co-owner to recover on a promissory note and guaranty, and the company and co-owner filed

counterclaims for negligence, attorney's fees, and punitive damages.  The trial court directed a

verdict against the company and the co-owner on the note, dismissed the co-owner's counterclaim,

and entered judgment on the jury verdict for the company on the counterclaim.  On appeal the Court

of Appeals held that the Bank could recover on the promissory note issued to the limited liability

company borrower and signed by one of the borrower's owners, even if the owner obtained the funds

for personal use.  In its analysis the court noted, that the Guarantor agreed in advance to the bank's

actions in unilaterally changing collateral on the loan's draw sheet, in failing to formally substitute

the collateral, and in relying upon inspections upon the wrong property to authorize draws under the

loan such that the bank's actions did not constitute an increase of risk or novation which discharged

guarantor's obligations under the guaranty , which provided that the bank could modify the guaranty

without notice to guarantor or approval by releasing or substituting collateral, failing to perfect any

security interest or otherwise impairing any collateral, waiving or impairing any right the bank may

have against the borrower, delaying or failing to exercise any rights to the bank had with respect to

the debt, or extending new credit.  Id.  Although a surety can be discharged by an increased of risk

or a novation under Georgia law, a party may consent in advance to the conduct of future

transactions and will not be heard to claim his own discharge (even) upon the occurrence of that

conduct. Id. Ga.Code Ann.§§ 10-7-21, 10-7-22.  In conclusion, the Court held the Bank did not owe

the limited liability company any duty independent of the loan contract as required for the company

to maintain a negligence action against the bank; while the bank in Fielbon could have been

negligent in managing and monitoring the loan, any duty the bank owed in connection with the loan

arose solely out of the contractual relationship.  Accordingly, the following clauses in the agreements

executed and authorized by Guarantors should be enforced under Georgia law:

> Page 2 of the Guaranty Agreement executed by each Guarantor provides:

>> Guarantor hereby waives and agrees not to assert or take advantage of (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligations hereby guaranteed; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of Lender to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceedings) of Borrower or any other person or entity; (c) any defense based on the failure of Lender to give notice of the existence, creation or incurring of any

new or additional indebtedness or obligation hereby guaranteed; (d) any defense based upon an election of remedies by Lender which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Borrower for reimbursement; or both; (e) any defense based on failure of Lender to commence an action against Borrower; (f) any duty on the part of Lender to disclose to Guarantor any facts it may now or hereafter know regarding Borrower; (g) acceptance or notice of acceptance of this Guaranty by Lender; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by Lender in collection, protection, or equitable defenses whatsoever to which Guarantor might otherwise be entitled. This Guaranty shall not be affected by any litigation between Borrower and Lender nor shall it be affected by any litigation between Borrower and Lender nor shall it be impaired because of termination of any relationship between Guarantor and Borrower.
(Guaranty Agreement Page 2 of 6).

Further, Pages 3 and 4 of the Guaranty Agreement executed by each Guarantor states:

Guarantor hereby authorizes Lender, without notice to Guarantor, to apply all payments and credits received from Borrower or from Guarantor or realized from any security in such manner and in such priority as Lender in its sole judgment shall see fit to the indebtedness, obligations and undertakings which are the subject of this Guaranty. (Page 3 of 6)

Nothing contained herein...shall prevent Lender from bringing an action or exercising any rights against any security or against Guarantors personally, or against any property of Guarantor, within any other state. Initiating such proceeding or taking such action in any other state shall in no event constitute a waiver of the agreement contained herein that the law fo the State of Gerogia shall govern the rights and obligations of Guarantor and Lender hereunder. (Page 3-4 of 6)

Under Section XI of the Construction Loan Agreement executed by each Guarantor:

Lender has **no obligations** in connection with the construction of the Project except to advance proceeds of the Loan as herein provided, and Lender shall not be liable for the performance of any contractor, subcontractor, or supplier of materials, fixtures, equipment and any other personal property, or for the quality of workmanship or the quality of such materials, fixtures, equipment and other personal property, or for the failure to construct, complete, protect or insure the improvements,

or for the payment of any cost or expenses incurred in connection there with, or for the performance or non-performance or delay in performance of any obligation of Borrower to Lender. Any inspection by Lender, approval of Plans and Specifications or other activities in the nature thereof shall only be for the sole benefit of Lender and for the purpose of protecting the security of the Lender, and the same shall *in no way be construed as a representation* on the part of Lender that there is compliance on the part of Borrower with the Plans and Specifications or that the construction of the improvements is free from faulty material, fixtures, equipment, and other personal property, or workmanship. The fact that Lender makes such inspections shall not relieve Borrower from its duty to independently ascertain that the Project is being completed in accordance with the Plans and Specifications and Borrower has *no right to rely* on any procedures required by Lender.
(Construction Loan Agreement, Section XI).

Moreover, Section III of the Construction Loan Agreement executed by each Guarantor

states:

Borrower hereby covenants and agrees with Lender as follows: (b) Construction of the Project will be done strictly in accordance with the Plans and Specifications and all applicable ordinances, statutes, building codes, zoning requirements, environmental rules and regulations. Without the prior written approval of Lender, no charges will be made in the Plans and Specifications where the cost, or cost savings thereof, exceeds $10,000.00 in any one instance, or $25,000.00 in the aggregate...(d) Borrower shall promptly correct or cause the correction of any structural or mechanical defect in the Project or any material deviation from the Plans and Specifications not previously approved by Lender. The disbursement of construction loan funds shall not constitute a waiver of Lender's rights to require compliance with this covenant. (Construction Loan Agreement, Section III).

Section IV of the Construction Loan Agreement executed by each Guarantor further reads:

(c) Borrower acknowledges and agrees that Lender shall not be obligated to disburse construction loan funds...(vii) if Lender shall not have received confirmation from any construction consultant and/or inspecting/supervising architect that the Project date of disbursement request has been constructed substantially in compliance with the Plans and Specifications, subject to any change orders approved by Lender. In the event the Lender is advised that the Project has not been constructed substantially in accordance with the Plans and Specifications, no disbursement of construction loan funds shall be made until such time as any corrective work as Lender shall deem necessary or desirable to bring such construction in compliance with the Plans and Specifications shall have been completed or commended in a manner acceptable to

Lender.  (Construction Loan Agreement, Section IV).

The Construction Loan Agreement executed by each Guarantor also explicitly provides:

> Pursuant to the terms of each Guarantor's Unconditional Guaranty of Payment and Performance, all dated September 26, 2005 the Guarantors, jointly and severally, ratify and confirm the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledge that their respective guarantees of performance encompass all such covenants, obligations, and undertakings.  (Construction Loan Agreement, Joinder By Guarantors)

In Paragraph 4 of the Final Order Approving Post-Petition Financing Between Debtor and Empire  [Docket Item "73" of Chapter 11 Case No.07-11470 in the United States Bankruptcy Court of the Middle District of Alabama and Exhibit "4"of Complaint filed by Empire in the instant case], the Court found and ordered as follows:

> ...the Financing Motion, as outlined on the record, is approved in its entirety on a final basis pursuant to rule 4001(c).  Debtor for itself and is successors and assigns is hereby deemed to waive its rights to challenge the pre-petition liens and secured claim of Empire Financial, and further waives all claims against Empire Financial, its participants, officers and other related parties under §506(c) of the Bankruptcy Code without prejudice of the rights of other parties in interest with regard to these matters.  The Debtor is hereby authorized to obtain from Empire Financial the full proposed post-petition financing amount, subject to this Order and the terms, conditions and Debtor releases set forth (a) the post-petition financing term sheet (the "Term Sheet") attached the Financing Motion and also attached hereto as Exhibit "A," and (b) and the existing construction loan agreement between Debtor and Empire Financial (except as modified by the Term Sheet and this Order and except to the extent that the obligations would be prevented by conditions existing as of the Petition Date).  (Final Order Paragraph 4).

Under the terms of Promissory Note authorized by Guarantors, the Construction Loan Agreement executed by Guarantors, and the unlimited unconditional guaranty agreements executed by Guarantors, Guarantors agreed to be responsible for the obligations of Lake Martin.

In asserting violations of the Construction Loan Agreement and the unlimited unconditional guaranty agreements against Empire, Guarantors must be subject to the terms and waivers of the Construction Loan Agreement, unlimited unconditional guaranty agreements, and the Final Order Approving Post-Petition Financing Between Debtor and Empire. Under the Bankruptcy Court Order, Lake Martin, has relinquished any claims against Empire.

Regardless of whether Guarantors attempt to stand in the shoes of Lake Martin, or whether they desire to stand only upon their rights and obligations under the guaranty agreements, the claims and defenses asserted in the Counterclaim are precluded by the express provisions of the Construction Loan Agreement and unlimited unconditional guaranty agreements. The position of Empire is fully exonerated under the unlimited unconditional guaranty agreements. Additionally, the status of Empire and the validity of the debt has been judicially established by Final Order Approving Post-Petition Financing Between Debtor and Empire [Docket Item "73" in Chapter 11 Case No.07-11470 and attached to Empire's Complaint in the instant case as Exhibit "4"]. Thus, the Counterclaim is barred by judicial estoppel.

In Ex parte First Alabama Bank, 883 So.2d 1236 (Ala.2003), the Alabama Supreme Court held that courts are to consider the following factors in determining whether to apply the doctrine of judicial estoppel: (1) whether a party's present position is "clearly inconsistent" with its earlier position; (2) whether the party succeeded in convincing the first court to accept its earlier position, so that judicial acceptance of the inconsistent position in a later proceeding creates an impression "that either the first or second court was misled"; and (3) whether the party seeking to assert an inconsistent position would "derive an unfair advantage or would impose an unfair detriment...if not

estopped." Id. at 1244-45. The Court also served notice to bankruptcy debtors that "play[ing] fast and loose" with the courts may result in dismissal of their civil claims. Id. at 1226. On October 19, 2007, Lake Martin, filed a voluntary Ch.11 bankruptcy petition. Thus, Guarantors cannot allege that "Plaintiff instigated, directed and managed the filing of the Chapter 11 Bankruptcy petition referenced in the Complaint's (alleged) breach of the loan agreement between it and the Company, to cover-up Plaintiff's breach of its other contractual duties and obligations owed to the Company, the Guarantors and the purchasers of the condominium units, and to aid Plaintiff in converting the assets of the Company and the Guarantors to Plaintiff's own use." Further, in Schedule B. Personal Property filed in Ch.11 Case No.07-11470, Lake Martin, listed as potential causes of action claims only against Stoneview Summit, Inc., and/or the Profile Group. Lake Martin did not list any potential cause of action against Empire. Guarantors, as members of Lake Martin, or as owners of entities which have a membership interest in Lake Martin, cannot assert contrary positions in connection with potential claims against Empire in two related proceedings.

Additionally, each count itself is subject to this Motion to Dismiss.

**3.1    Guarantors, under Count One of the Counterclaim, failed to state a claim of negligence because Guarantors failed to allege that Empire breached any duty "imposed by law and not merely the breach of a duty imposed by the contract itself."**

In Georgia, "[i]t is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well [.]" Med South Health Plans, LLC v. Life of South Ins. Co. 2008 WL 2119915, 5 (M.D.Ga. May 19.2008); Gillis v. Orkin Exterminating Co.,

172 Ga.App. 507, 507, 323 S.E.2d 695, 695 (1984). However, "a mere breach of a valid contract

amounting to no more than a failure to perform in accordance with its terms does not constitute a tort

or authorize the aggrieved party to elect whether he will proceed ex contractu or ex delicto." Id. Ga.

Farm Bureau Mut. Ins. Co. v. Croley, 263 Ga.App. 659, 663, 588 S.E.2d 840, 844 (2003) (internal

quotation marks and citation omitted); accord Lane v. Corbitt Cypress Co., 215 Ga.App. 388, 389,

450 S.E.2d 855, 857 (1994). Instead, "in order to maintain an action ex delicto because of a breach

of duty growing out of a contractual relation[,] the breach must be shown to have been a breach of

a duty imposed by law and not merely the breach of a duty imposed by the contract itself." Id.

Mauldin v. Sheffer, 113 Ga.App. 874, 879-80, 150 S.E .2d 150, 154 (1966); accord Constr. Lender,

Inc. v. Sutter, 228 Ga.App. 405, 409, 491 S.E.2d 853, 858 (1997).

Guarantors failed to allege that Empire breached any duty "imposed by law and not merely

the breach of a duty imposed by the contract itself." Id. Mauldin, 113 Ga.App. at 879-80, 150 S.E.2d

at 154.  Although Guarantors failed to state a breach of contract claim as addressed in Section 3.3

of this Motion to Dismiss, Guarantors additionally failed to state a claim for negligence and Empire

is entitled to have this claim dismissed as a matter of law.

**3.2**     **Guarantors, under Count Two of the Counterclaim, failed to state a claim of breach of fiduciary duty because a joint venture does not exist between or among Empire, Lake Martin, Guarantors, Moore, Snead, The Profile Groups and Stoneview, and Guarantors cannot show any breach of fiduciary duty by Empire.**

In Count Two - Breach of Fiduciary Duty of Guarantors' Counterclaim, Guarantors assert that Empire established and maintained a joint venture with Lake Martin, Guarantors, Moore, Snead, The Profile Groups and Stoneview.  Guarantors further claim that Empire "owed fiduciary duties to its alleged co-joint venturers to perform its duties it assumed on behalf of the alleged co-joint venturers in a commercially reasonable and professional manner."

Under Georgia law, "A joint venture arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control. Without the element of mutual control, no joint venture can exist." Gateway Atlanta Apartments, Inc. v. Harris, 2008 WL 624900, 4 (Ga.App.March 10, 2008).  In order for one party to be liable for the negligence of another under a joint venture theory, the party must have had the right to direct and control the conduct of the other party in the activity causing the injury. Id. "The mere existence of a business interdependency does not create a joint venture." Id.

Under Georgia law and the facts in the instant case, it is clear that no joint venture exists between Empire, on the one hand, or Lake Martin, the Guarantors, Moore, Snead, The Profile Groups or Stoneview or any combination thereof on the other hand.  Because a joint venture does not exist, the Guarantors' claim of breach of fiduciary duty against Empire in connection with the alleged joint venture is due to be dismissed.  The relationship  between Empire, Lake Martin, and the Guarantors under the Construction Loan Agreement and Guaranties was solely of Lender, Borrower, and Guarantor.  Empire was and is entitled to nothing more than the repayment of the principal balance of the loan and interest thereon.

Assuming that a confidential relationship is proved, a party, in order to recover for breach of fiduciary duty must show proof of three elements: (1) a duty between the parties; (2) breach of that duty; and (3) damage proximately caused by the breach. Premier/Georgia Management Co., Inc. v. Realty Management Corp., 272 Ga.App. 780, 787, 613 S.E.2d 112, 118 (Ga.App.2005). In its Counterclaim, Guarantors further allege that Empire breached its fiduciary duties by failing to adequately and properly monitor the progress and performance of the work on the Project. In accordance with Section XI of the Construction Loan Agreement, however, Empire owed no duty to Guarantors or Lake Martin to "adequately and properly monitor the progress and performance of the work on the Project in connection with Section XI of the Construction Loan Agreement." At present, the relationship between Guarantors and Empire is that of Debtor and Creditor. As no fiduciary duty exists in debtor/creditor relationships, Guarantors cannot show any breach of fiduciary duty by Empire.

3.3     **Guarantors, under Count Three of the Counterclaim, failed to state a claim of breach of contract, including but not limited to breach of implied covenants of good faith and fair dealing, because Guarantors' breach of contract claim is contradicted by the terms of the Construction Loan Agreement referenced in the Counterclaim. Guarantors have failed to allege facts showing Empire breached the Construction Loan Agreement. No such claim exists under Georgia or Alabama law.**

"A contract is an agreement between two or more parties for the doing or not doing of some specified thing." O.C.G.A. § 13-1-1. In order to sustain a breach of contract claim and survive a

12(b)(6) motion, Guarantors must allege facts showing Empire breached the contract executed by the parties in the instant case and that Guarantors suffered damages as a result of such breach. <u>Med South</u>, at *3 WL 2119915 (M.D.Ga.2008).   Guarantors' breach of contract claim, however, is contradicted by the terms of the Construction Loan Agreement previously referenced.

Because Guarantors' breach of contract claim is contradicted by the terms of the Construction Loan Agreement and Guarantors have failed to allege facts showing Empire breached the Construction Loan Agreement, Guarantors' breach of contract claim is due to be dismissed.

In Guarantors' Counterclaim, Guarantors further assert that Empire breached the implied covenants of good faith and fair dealing.  Under Georgia law, "[e]very contract implies a covenant of good faith and fair dealing in the performance of the terms of the agreement." <u>Med South Health Plans, LLC v. Life of South Ins. Co.</u>, 2008 WL 2119915, 5 (M.D.Ga..May 19, 2008); <u>Camp v. Peetluk</u>, 262 Ga.App. 345, 350, 585 S.E.2d 704, 708 (2003). This duty requires parties "to perform substantially within the spirit and letter of a contract."<u>Id.</u> <u>Stuart Enters. Int'l, Inc., v. Peykan, Inc.</u>, 252 Ga.App. 231, 233, 555 S.E.2d 881, 883 (2001). However, it is well-settled that the implied duty of good faith does not stand independent of the terms of the underlying contract; instead, "[t]he implied covenant of good faith modifies, and becomes part of, the provisions of the contract itself. *As such, the covenant is not independent of the contract.*" <u>Id.</u> at 234, 555 S.E.2d at 884. Thus, ***when a plaintiff cannot prevail on its underlying breach of contract claim, that plaintiff also "cannot prevail on a cause of action based on the failure to act in good faith in performing the contract."*** <u>Id.</u> <u>Heritage Creek Dev. Corp. v. Colonial Bank</u>, 268 Ga.App. 369, 374, 601 S.E.2d 842, 847 (2004); see also <u>Stuart Enters.</u>, 252 Ga.App. at 234, 555 S.E.2d at 884.  Because Guarantors failed to allege

facts supporting Empires' alleged bad faith performance, and since Guarantors cannot sustain a general bad faith claim disconnected from any breach of contract, Guarantors' claim for breach of the covenant of good faith performance also fails as a matter of law.

### 3.4    Guarantors, under Count Four of the Counterclaim, failed to state a claim of conversion because Empire has acted in compliance with the terms of the Construction Loan Agreement and Guarantors have not and cannot prove the elements of conversion.  Further, Guarantors own only a membership interest in the limited liability company constituting Lake Martin, and there is no allegation of a conversion of such membership interest.

In Guarantors' Counterclaim, Guarantors assert a claim of conversion.  Under Georgia law, conversion involves the unauthorized assumption and exercise of the right of ownership over personalty of another, contrary to the owner's rights. Multimedia Technologies, Inc. v. Wilding,262 Ga.App. 576, 578, 586 S.E.2d 74, 78 (Ga.App.2003). Any act of dominion wrongfully asserted over another's personal property which is in denial of his property rights, or inconsistent with them, is a conversion." Id. (Citations and punctuation omitted.) Pelletier v. Schultz, 157 Ga.App. 64, 65-66(3)(a), 276 S.E.2d 118 (1981).  In the instant case, Empire has acted in compliance with the terms of the Construction Loan Agreement and Guarantors have not and cannot provide evidence that Empire has "assumed and exercised the right of control and ownership over the Company's (Lake Martin's) assets...in contravention of the Company's and Guarantors' rights in such assets." Further, Guarantors have not and cannot show that Empire has "appropriated the Company's assets, specifically including, but not limited to, the Project and certain monies owned by the Company, in

contravention of the Company's and the Guarantors' rights in such assets."    Accordingly, Guarantors' claim of conversion is due to be dismissed.

Guarantors are merely holders of a membership interest in Lake Martin and have no personal ownership interest in the condominium project.  It is the Guarantors in the capacity as members of Lake Martin, who authorized the filing of a voluntary Chapter 11 Petition, who authorized the filing of a motion to obtain a post bankruptcy petition date financing to "complete Building 5...and, subject to the to the discretion of Empire, the completion of two other partially completed buildings," as noted in Paragraph 3 of the Final Order Approving Post-Petition Financing Between Debtor and Empire, attached as Exhibit "B,"and authorized the entry of the Order by the Bankruptcy Court to grant such motion.

### 3.5    Guarantors, under Count Five of the Counterclaim, failed to state a claim of conspiracy because there is no evidence that Empire acted in concert with any other person or entity to accomplish an unlawful end or a lawful end by unlawful means, and an underlying tort claim is absent.

A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. Hartsock, et al. v. Rich's Employees Credit Union, et al., 279 Ga.App.724, 632 S.E.2d 476 (Ga.App.2006); Premier/Georgia Management Co., Inc. v. Realty Management Corp., 272 Ga.App. 780, 787, 613 S.E.2d 112, 118 (Ga.App.,2005).  To recover damages for a civil conspiracy claim, Guarantors must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Id. Absent an underlying tort, there can be no liability for civil conspiracy. Id.  In the instant case, there is no evidence that Empire acted in concert

with any other person or entity to accomplish an unlawful end or a lawful end by unlawful means. Empire provided a construction loan, nothing else.  Furthermore, an underlying tort claim is absent, and thus Empire is not liable for conspiracy.  Accordingly, Guarantors' claim of conspiracy is due to be dismissed.

**3.6** **Guarantors, under Count Six of the Counterclaim, failed to state a claim of negligent misrepresentation because any obligations of Empire are set forth in the Construction Loan Agreement executed by Guarantors and the Guaranty Agreements executed by Guarantors; Guarantors' Counterclaim fails to assert the essential elements of negligent misrepresentation and alleges "justifiable reliance"; and Guarantors' alleged reliance on any *post-execution* representations by Empire did not cause Guarantors to do anything Guarantors were not already obligated to do under the Guaranty Agreements.  Guarantors are not obligated to Empire as to any new indebtedness of Lake Martin, subsequent to the revocation of their guaranties.**

Guarantors also asserts a claim for negligent misrepresentation. In order to state a claim for negligent misrepresentation, a plaintiff must allege: "'(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.'" Med South Health Plans, LLC v. Life of South Ins. Co., 2008 WL 2119915, 6 (M.D.Ga.. May 19, 2008); J.E. Black Constr. Co. v. Ferguson Enters., 284 Ga.App. 345, 348, 643 S.E.2d 852, 855 (2007) (quoting Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 267 Ga. 424, 426, 479

S.E.2d 727, 729 (1997)); see also Benefit Support, Inc. v. Hall County, 281 Ga.App. 825, 835, 637 S.E.2d 763, 772-73 (2006).

In Count Six of Guarantors' Counterclaim, Guarantors contend that Empire is liable for negligent representation.  Guarantors, however, have no "negligent misrepresentation" claim because any obligations between the parties are set forth in the Construction Loan Agreement executed by Guarantors and the Guaranty Agreements executed by Guarantors - for example, in  Section XI of the Construction Loan Agreement executed by Guarantors.  As acknowledged by Guarantors under the Construction Loan Agreement, Empire is not liable for any alleged "negligent misrepresentation."

Further, Section II(a) of the Construction Loan Agreement executed by Guarantors contains a merger clause that states: "The Plans and Specifications heretofore delivered to Lender constitute a complete and final set of all Plans and Specifications currently required for the Project." (Construction Loan Agreement, Section II(a)).  It is well settled in Georgia that such contract merger clauses preclude claims based upon alleged representations made by the parties prior to entering the contract. [The Georgia Supreme] Court has held that "the rational basis for merger clauses is that where parties enter into a final contract all prior negotiations, understandings, agreements on the same subject are merged into the final contract, and are accordingly extinguished." As recently noted by the United States Court of Appeals for the Seventh Circuit, merger clauses exist in written contracts specifically to "preclude any claim of deceit by prior representations...A person who has received written disclosure of the truth may not claim to rely on contrary oral falsehoods." First Data Pos., Inc. v. Willis, 273 Ga. 792, 795, 546 S.E.2d 781, 784-85 (2001); accord Rabun & Assocs.,

Const., Inc. v. Berry, 276 Ga.App. 485, 623 S.E.2d 691 (2005). To the extent Guarantors' claims are based on representations prior to the execution of the Construction Loan Agreement, Guarantors' negligent misrepresentation claim should be dismissed.

Moreover, any alleged statements occurring *after* the execution of the agreement could not support a negligent misrepresentation claim. See Fan v. Mills, 248 Ga.App. 460, 463, 546 S.E. 853, 857 (2001). Guarantors' Counterclaim fails to state the precise nature of (a) any allegedly made by Empire, (b) how Guarantors allegedly relied upon such representations, and (c) how Guarantors were allegedly damaged. These are essential elements of a negligent misrepresentation claim. Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 267 Ga. 424, 426, 479 S.E.2d 727, 729 (1997).

Guarantors' alleged reliance on any *post-execution* representations by Empire did not cause Guarantors to do anything they were not already obligated to do under the Contract. Thus, Guarantors cannot show that they meet, or could meet, the reliance prong of the negligent misrepresentation test.

Where a person is already obligated to act under the terms of a contract, that person cannot bring a negligent misrepresentation action claiming inducement to act by the other party's non-contractual representations. See Fann, 248 Ga.App. at 463, 546 S.E.2d at 857. Based on the terms of the Construction Loan Agreement and Guarantors' Counterclaim, Guarantors cannot show they relied on any statements of Empire to do what they were already obligated to do under the Guaranty Agreements. Accordingly, Guarantors' misrepresentation claim should be dismissed.

For all these reasons, the Counterclaim should be dismissed.

Case No.1:08-cv-00226-WHA-WC
Page 21

WHEREFORE, Plaintiff, Empire Financial Services, Inc., prays this Court to grant its Motion

to Dismiss Guarantors' Counterclaim in its entirety and grant to Plaintiff such further and other relief

to which it may be entitled._____

_____     /s/*Robert P. Reynolds*_____
                                    Robert P. Reynolds
                                    Code No. REY-007
                                    Attorney for Plaintiff, Empire Financial Services, Inc.

OF COUNSEL:
REYNOLDS, REYNOLDS & DUNCAN, LLC
Post Office Box 2863
Tuscaloosa, Alabama   35403
Telephone:  (205) 391-0073
E-mail: rreynolds@rrdlaw.com
File No. 358.11-F

Case No.1:08-cv-00226-WHA-WC
Page 22

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the above and foregoing Motion to Dismiss has

been made this 3rd day of June, 2008 electronically and/or U.S. Postal Service, First Class,

prepaid upon the following:


Dow T. Huskey, Esq.
Attorney for Defendants
P.O. Drawer 550
Dothan, Alabama 36302

/s/*Robert P. Reynolds*
Robert P. Reynolds
Of Counsel for Plaintiff



Blumberg No. 5118   EXHIBIT A

# ADJUSTABLE RATE NOTE

$22,000,000.00                                        September  26 , 2005

**FOR AND IN CONSIDERATION OF THE LOAN EVIDENCED BY THIS NOTE,** the undersigned promises to pay to the order of **EMPIRE FINANCIAL SERVICES, INC.**, at its main office in Milledgeville, Georgia, or at such place as the holder may designate, the principal sum of **TWENTY TWO MILLION AND NO/100 DOLLARS ($22,000,000.00)** plus interest from date on that part of the outstanding principal which has not been paid.

Beginning on the date of this Note, the undersigned will pay interest only at a yearly rate of seven and one-quarter percent (7.25%) based on a 365 - day year. Interest will accrue on all monies disbursed from closing and all monies thereafter advanced from the date of each such disbursement. A Construction – Interest Only Period will run from September  26 , 2005 through the Loan Maturity Date, August 31, 2007. During that period, Borrower shall pay, monthly, on or before the 15th day of each month, all interest accrued during the previous calendar month on monies disbursed, with the first payment (due October 1, 2005) to be paid on or before October 15, 2005. All such interest shall be fully paid on or before August 31, 2007. Between the first and fifth day of each month, Noteholder will notify Borrower of the amount of interest due on the 15th day of that month.

On the first day of October, 2006, the interest rate applicable to the principal balance then outstanding will be adjusted so as to equal the "Prime Rate" plus three-quarters of one percent (.75%). However, should this calculation of the interest rate result in an interest rate of less than seven percent (7.0%), the new interest rate will, nevertheless, be set at seven percent (7.0%) (the interest rate "floor"). The adjusted interest rate will be in effect from October 1, 2006, through August 31, 2007 (the Loan Maturity Date) with monthly interest only payments, at the adjusted rate, to continue to be due on the first day of each month, beginning on the first day of November, 2006 and continuing through the Loan Maturity Date. On the Loan Maturity Date, the entire principal balance, all accrued but unpaid interest, and all other sums due to Lender, will be due and payable, in full.

For purposes of this Note, the term "Prime Rate" means the interest rate published in the <u>Wall Street Journal</u>, Eastern Edition, identified therein as the "Prime Rate" and currently described as "the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks". The "Prime Rate" published on the last publication date prior to October 1, 2006 will be the index for the October 1, 2006 interest rate adjustment. In the event that the <u>Wall Street Journal</u> abandons the practice of publishing the Prime Rate, the Noteholder will designate a comparable reference or index which will thereafter be the Prime Rate for this Note. The Noteholder will round the amount of the change to the nearest one-eighth (1/8) of one (1) percentage point. Noteholder will notify Borrower of the adjustment to be made and such notification, even if given after the due date of the next monthly installment, will apply to all monthly installments due after the October 1, 2006 interest rate adjustment.

Each payment will be applied first to accrued interest and to other charges or fees accruing under this Note or the Mortgage of even date herewith and the residue to principal. Any amount may be prepaid on this Note at any time without premium or fee; however, the monthly payments will continue to be due without interruption. Time is of the essence of this contract. Lender may collect a late charge of five (5) cents for each One Dollar ($1.00) of each principal and interest payment, with a minimum charge of Five Dollars ($5.00), for each such payment fifteen (15) days or more in arrears to cover the extra expense involved in handling delinquent payment. In the event (a) of a default in the payment of principal and interest as stipulated herein (including, without limitation, non-payment upon maturity) or default in any other monetary obligation of the undersigned which such default(s) continue for a period of five (5) days after notice of such default by Noteholder, or (b) upon failure of the undersigned to comply with any other conditions or covenants contained in this Note or any instrument(s) securing it which such default(s) continue for a period of fifteen (15) days after notice of such default by Noteholder, or (c) upon the liquidation or dissolution of a Borrower, endorser or guarantor that is a corporation, partnership (general or limited) or limited liability company, then, and in any such event(s), the principal indebtedness evidenced hereby, all accrued interest and any other sums advanced hereunder or pursuant to any other loan documents will, at the option of Noteholder and, without further notice to the undersigned, at once become due and payable and may be collected forthwith, regardless of the stipulated date of maturity. No omission on the part of Noteholder to exercise such option, when entitled to do so, will be construed a waiver of such right. For purposes of this Note and all other documents or instruments evidencing or securing the Borrower's obligations to Lender, the terms "event of default" or "event(s) of default" (regardless of capitalization) mean: (a) the failure of Borrower, by act or omission, to comply with one or more of Borrower's obligations of payment or performance; (b) the occurrence of a prohibited or proscribed event; or (c) that any of Borrower's warranties and representations are, when given, or at any time thereafter, false, invalid, or materially inaccurate. For purposes of this Note and all other documents or instruments evidencing or securing Borrower's obligations to Lender, the terms "default" or "default(s)" (regardless of capitalization) mean that: (a) an event of default has occurred; (b) the Lender has given such notice, if any, as may be required; and (c) the event of default has not been cured during, or continues beyond any applicable grace or cure period and any extension thereof that the Lender, in its sole and absolute discretion, may elect to provide.

Upon the happening of any event of default the entire unpaid principal balance will bear interest at the contract rate then in effect until the entire amounts in default have been paid by the undersigned. If this Note is collected by law or through an attorney at law, the undersigned will pay all costs of collection, including reasonable attorney's fees. The undersigned (whether maker, endorser, surety, guarantor, or other party hereto) severally waives demand, protest and notice of demand, protest and non-payment. It is agreed that this Note may be renewed or extended from time to time, in whole or in part, without the consent of or notice to any endorser, maker, guarantor, surety, or other party hereto and without affecting or lessening the liability of any such person. The powers granted herein are coupled with an interest, and are irrevocable by death or otherwise. This Note is the joint and several obligation of all makers, sureties, guarantors, endorsers and other parties hereto, and will be binding upon them, their heirs, personal representatives and assigns. In this Note and any instrument securing it, the singular includes the plural, and the masculine includes the feminine and neuter.

If from any circumstances whatsoever, fulfillment of any provision of this Note or of any other instrument securing the indebtedness evidenced hereby, at the time performance of such provision is due, involves transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto, the obligation to be fulfilled will be reduced to the limit of such validity, so that in no event will any exaction be possible under

this Note or under any other instrument securing the indebtedness evidenced hereby, that is in excess of the current limit of such validity, but such obligation will be fulfilled to the limit of such validity.

This Note is secured by a Mortgage, Assignment of Leases and Rents, Assignment of Fees and Income, and Security Agreement of even date executed by the undersigned to Empire Financial Services, Inc.

> **CAUTION:  IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

Executed and given under the hand and seal of the undersigned.

**LAKE MARTIN PARTNERS, L.L.C.  [SEAL]**
An Alabama Limited Liability Company

By: _____
    James R Paxton
    **Manager**

By: _____
    C Wayne Roberts
    **Manager**

**The undersigned guarantors and sureties hereby guarantee payment and performance and, to the extent allowed by law, waive the right to require the Noteholder to proceed first against the Maker/Borrower.**

_____ [SEAL]
**GARY L. ANDERSON**

_____ [SEAL]
**DANIEL A. BAILEY**

_____ [SEAL]
**MICHAEL D. BROCK**

_____ [SEAL]
**TIMOTHY L. EAKES**

_____ [SEAL]
**JULIE GEORGE – HOWELL**

_____ [SEAL]
**KEITH A. LaFERRIERE**

### [SIGNATURES CONTINUED ON FOLLOWING PAGE

CEM/jdm/Adjustable Rate Note (Construction)
AL/05-40

If from any circumstances whatsoever, fulfillment of any provision of this Note or of any other instrument securing the indebtedness evidenced hereby, at the time performance of such provision is due, involves transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto, the obligation to be fulfilled will be reduced to the limit of such validity, so that in no event will any exaction be possible under this Note or under any other instrument securing the indebtedness evidenced hereby, that is in excess of the current limit of such validity, but such obligation will be fulfilled to the limit of such validity.

This Note is secured by a Mortgage, Assignment of Leases and Rents, Assignment of Fees and Income, and Security Agreement of even date executed by the undersigned to Empire Financial Services, Inc.

| CAUTION:  IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. |
| --- |

Executed and given under the hand and seal of the undersigned.

## LAKE MARTIN PARTNERS, L.L.C.  [SEAL]
**An Alabama Limited Liability Company**

By:  _____

The undersigned guarantors and sureties hereby guarantee payment and performance and, to the extent allowed by law, waive the right to require the Noteholder to proceed first against the Maker/Borrower.

_____  [SEAL]
GARY L. ANDERSON

_____  [SEAL]
DANIEL A. BAILEY

_____  [SEAL]
MICHAEL D. BROCK

_____  [SEAL]
TIMOTHY L. EAKES

_____  [SEAL]
JULIE GEORGE – HOWELL

_____  [SEAL]
KEITH A. LaFERRIERE

### [SIGNATURES CONTINUED ON FOLLOWING PAGE

CEM/jdm/Adjustable Rate Note (Construction)                                    3 of 4
AL/05-40

If from any circumstances whatsoever, fulfillment of any provision of this Note or of any other instrument securing the indebtedness evidenced hereby, at the time performance of such provision is due, involves transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto, the obligation to be fulfilled will be reduced to the limit of such validity, so that in no event will any exaction be possible under this Note or under any other instrument securing the indebtedness evidenced hereby, that is in excess of the current limit of such validity, but such obligation will be fulfilled to the limit of such validity.

This Note is secured by a Mortgage, Assignment of Leases and Rents, Assignment of Fees and Income, and Security Agreement of even date executed by the undersigned to Empire Financial Services, Inc.

---

**CAUTION: IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

---

Executed and given under the hand and seal of the undersigned.

**LAKE MARTIN PARTNERS, L.L.C.  [SEAL]**
**An Alabama Limited Liability Company**


By:  _____


**The undersigned guarantors and sureties hereby guarantee payment and performance and, to the extent allowed by law, waive the right to require the Noteholder to proceed first against the Maker/Borrower.**


_____  [SEAL]
**GARY L. ANDERSON**

_____  [SEAL]
**DANIEL A. BAILEY**

_____  [SEAL]
**MICHAEL D. BROCK**

_____  [SEAL]
**TIMOTHY L. EAKES**

_____  [SEAL]
**JULIE GEORGE – HOWELL**

_____  [SEAL]
**KEITH A. LaFERRIERE**

**[SIGNATURES CONTINUED ON FOLLOWING PAGE**

CEM/jdm/Adjustable Rate Note (Construction)                                                    3 of 4
AL/05-40

If from any circumstances whatsoever, fulfillment of any provision of this Note or of any other instrument securing the indebtedness evidenced hereby, at the time performance of such provision is due, involves transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto, the obligation to be fulfilled will be reduced to the limit of such validity, so that in no event will any exaction be possible under this Note or under any other instrument securing the indebtedness evidenced hereby, that is in excess of the current limit of such validity, but such obligation will be fulfilled to the limit of such validity.

This Note is secured by a Mortgage, Assignment of Leases and Rents, Assignment of Fees and Income, and Security Agreement of even date executed by the undersigned to Empire Financial Services, Inc.

> **CAUTION:  IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

Executed and given under the hand and seal of the undersigned.

## LAKE MARTIN PARTNERS, L.L.C.  [SEAL]
**An Alabama Limited Liability Company**

By:  _____

The undersigned guarantors and sureties hereby guarantee payment and performance and, to the extent allowed by law, waive the right to require the Noteholder to proceed first against the Maker/Borrower.

_____ [SEAL]
**GARY L. ANDERSON**

_____ [SEAL]
**DANIEL A. BAILEY**

_____ [SEAL]
**MICHAEL D. BROCK**

_____ [SEAL]
**TIMOTHY L. EAKES**

_____ [SEAL]
**JULIE GEORGE – HOWELL**

_____ [SEAL]
**KEITH A. LaFERRIERE**

### [SIGNATURES CONTINUED ON FOLLOWING PAGE

If from any circumstances whatsoever, fulfillment of any provision of this Note or of any other instrument securing the indebtedness evidenced hereby, at the time performance of such provision is due, involves transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto, the obligation to be fulfilled will be reduced to the limit of such validity, so that in no event will any exaction be possible under this Note or under any other instrument securing the indebtedness evidenced hereby, that is in excess of the current limit of such validity, but such obligation will be fulfilled to the limit of such validity.

This Note is secured by a Mortgage, Assignment of Leases and Rents, Assignment of Fees and Income, and Security Agreement of even date executed by the undersigned to Empire Financial Services, Inc.

---
**CAUTION:  IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

---

Executed and given under the hand and seal of the undersigned.

**LAKE MARTIN PARTNERS, L.L.C.  [SEAL]**
**An Alabama Limited Liability Company**


By: _____


**The undersigned guarantors and sureties hereby guarantee payment and performance and, to the extent allowed by law, waive the right to require the Noteholder to proceed first against the Maker/Borrower.**


_____  **[SEAL]**
**GARY L. ANDERSON**


_____  **[SEAL]**
**DANIEL A. BAILEY**


_____  **[SEAL]**
**MICHAEL D. BROCK**


_____  **[SEAL]**
**TIMOTHY L. EAKES**


_____  **[SEAL]**
**JULIE GEORGE – HOWELL**

_____  **[SEAL]**
**KEITH A. LaFERRIERE**


**[SIGNATURES CONTINUED ON FOLLOWING PAGE**

CEM/jdm/Adjustable Rate Note (Construction)                                        3 of 4
AL/05-40

_____ [SEAL]
SAMUEL E. LEE

_____ [SEAL]
JAMES R. PAXTON

_____ [SEAL]
C. WAYNE ROBERTS

_____ [SEAL]
KENNETH L. TODD, III

_____ [SEAL]
RICKEY WOODS

_____    [SEAL]
SAMUEL E. LEE

_____    [SEAL]
JAMES R. PAXTON

_____    [SEAL]
C. WAYNE ROBERTS

_____    [SEAL]
KENNETH L. TODD, III

_____    [SEAL]
RICKEY WOODS

CEM/jdm/Adjustable Rate Note (Construction)                        4 of 4
AL/05-40

_____ [SEAL]
SAMUEL E. LEE

_____ [SEAL]
JAMES R. PAXTON

_____ [SEAL]
C. WAYNE ROBERTS

_____ [SEAL]
KENNETH L. TODD, III

_____ [SEAL]
RICKEY WOODS

EXHIBIT
B
Blumberg No. 5118

# CONSTRUCTION LOAN AGREEMENT

**Date of Loan:** September 26, 2005          **Completion Deadline:** August 31, 2007

**Borrower: LAKE MARTIN PARTNERS, L.L.C.**

**Real Estate**: Property located in Tallapoosa County, Alabama described on Exhibit "A," attached hereto.

**Project**: Construction of Condominiums.

**Plans and Specifications**: On file with Empire Financial Services, Inc.

**Payment Schedule**: Based on percentage of completion as verified by Lender's inspections

**Project Budget:** See Exhibit "C" attached hereto.

| | |
|---|---|
| **Contract Price or Cost Estimate** | $16,000,000.00 |
| **Amount of Loan** | $22,000,000.00 |
| **Deductions from Loan** | $5,082,348.51 |
| **Net Loan Proceeds** | $16,917,651.49 |
| **Borrower's Deposit** | $ 0 |

**THIS AGREEMENT**, made on the date above stated, between the Borrower above named, and **Empire Financial Services, Inc.**, herein called "**Lender**," **WITNESSETH:**

|  I.  |
|---|

Simultaneously herewith, Lender has made a Loan (**"the Loan"**) to Borrower in the amount above stated for the purpose of constructing the Project and Borrower has executed and delivered to Lender a promissory note and a mortgage, security deed, or deed of trust, (**"Security Instrument"**)

CEM/jdm/05-40

encumbering the Real Estate as security for the payment thereof.  In consideration of the Loan, and the covenants, warranties and representations set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Borrower and Lender, the parties covenant, agree, warrant, and represent as follows:

| II. |
|-----|

Borrower hereby makes the following warranties and representations, which shall be deemed continuing:

(a) The Plans and Specifications heretofore delivered to Lender constitute a complete and final set of all Plans and Specifications currently required for the Project.

(b) The Borrower has received no notice of any alleged violation of, and, to the best knowledge of Borrower, Borrower is not in violation of any federal or municipal law or ordinance, order or requirement of the state in which the Project is located, or order or requirement of any municipal department or other governmental authority or agency having jurisdiction over the Real Estate, which violation(s) in any way relate to or affect the Project or the Real Estate.

(c) All utilities necessary for the construction, use, operation and maintenance of the Project are available through public rights-of-way or easements or through private easements inuring to the benefit of Lender in the event of a foreclosure of the Security Instrument or a sale under the power of sale contained therein, at or within the boundaries of the Real Estate including gas, electric, water, storm sewer, sanitary sewer, and telephone facilities; and that adequate quantities and capacities of water and of sanitary sewerage and waste disposal are present and available to serve the Project.

(d) All permits required for the construction of the Project have or will be obtained at the time required by law prior to construction of the portion of the Project covered by such permits, and copies of such permits and authorizations shall promptly be delivered to the Lender.

(e) Each submission of a request for disbursement of construction loan funds (**"Draw Request"**) shall constitute an affirmation that the warranties and representations of Borrower, whether contained in this Construction Loan Agreement, the Security Instrument, or other loan documents, remain true and correct as of the date thereof unless Lender is notified to the contrary and, unless Lender is notified to the contrary prior to the disbursement of the Draw Request, or any portion thereof, shall constitute an affirmation that the same remain true and correct on the date of such disbursement.

## III.

Borrower hereby covenants and agrees with Lender as follows:

**(a)** Borrower will commence the construction of the Project as soon as possible (but not more than 30 days after date hereof), will continue it without interruption or delay, and will complete it prior to the Completion Deadline.

**(b)** Construction of the Project will be done strictly in accordance with the Plans and Specifications and all applicable ordinances, statutes, building codes, zoning requirements, environmental rules and regulations. Without the prior written approval of Lender, no changes will be made in the Plans and Specifications where the cost, or cost savings thereof, exceeds $10,000.00 in any one instance, or $25,000.00 in the aggregate.

**(c)** Borrower shall perform, or caused to be performed, soil tests (including compaction), concrete tests, boring tests, steel weld tests, environmental assessments and such other testing procedures concerning the Real Estate and the Project as Lender shall reasonably request and deliver complete copies of the results of any such tests and assessments promptly to the Lender, whether or not such tests and assessments are specifically requested by Lender, and shall permit any construction consultant and/or inspecting/supervising architect, or other agent of Lender to perform or cause to have performed any such tests, assessments or studies and to review and verify any test results which Lender may reasonably request.

**(d)** Borrower shall promptly correct or cause the correction of any structural or mechanical defect in the Project or any material deviation from the Plans and Specifications not previously approved by Lender. The disbursement of construction loan funds shall not constitute a waiver of Lender's right to require compliance with this covenant.

**(e)** Construction shall occur entirely upon the Real Estate and wholly within any applicable building restriction lines, without unpermitted encroachment upon any easement or right-of-way, and Borrower will furnish to Lender from time to time, upon request, such evidence thereof as Lender may require, including a plat or plats prepared and certified by a registered engineer or surveyor.

**(f)** All labor, materials and services used in construction of the Project shall be paid for promptly, and Borrower will furnish to Lender from time to time such evidence of payment thereof as Lender may require. Upon request, Borrower will promptly obtain and provide to Lender lien releases, lien waivers, and/or lien subordinations from sub-contractors, suppliers, laborers, engineers, surveyors, architects and any other parties having lien rights, actual or inchoate, that have or could obtain priority over the Security Instrument. If authorized, or required, by the law of the state where the Real Estate is

located, Borrower will timely file and post Notice(s) of Commencement and furnish Lender with evidence of same.

**(g)** Borrower will immediately deposit with Lender the amount, if any, specified above as **"Borrower's Deposit,"** which amount together with the net proceeds of the Loan shall be held by Lender and disbursed in accordance with this Agreement.

**(h)** If, at any time, the undisbursed part of Borrower's Deposit and Net Loan Proceeds shall be insufficient in Lender's judgment to complete the Project in accordance with the Plans and Specifications, upon request of Lender, and from time to time, Borrower will immediately deposit such additional sums as in Lender's judgment are necessary for completion, the same to be held by Lender and disbursed in accordance with this Agreement.

**(i)** All funds disbursed hereunder shall be held by the person or persons receiving the same from Lender **IN TRUST** for the sole purpose of paying for labor, materials, appliances, fixtures and services used in construction of the Project and such funds shall not be used for any other purpose. Upon request of Lender, Borrower will promptly submit to Lender evidence of the proper application of such funds.

**(j)** Prior to any disbursement, Lender may require an updated title examination, showing no change in title, and the cost thereof shall be paid by Borrower.

**(k)** Title to all materials, appliances and fixtures delivered to the Real Estate for construction of the Project or paid for out of funds disbursed hereunder shall become vested in Lender, subject to the terms of the Security Instrument, when delivered to the Real Estate or paid for out of such funds; and no such materials, appliances, or fixtures shall be removed from the Real Estate without the prior written consent of Lender. Lender shall have no obligation to make disbursements for materials not yet incorporated into the Project. However, with permission of Lender, and under such conditions as Lender, in its sole discretion may require, including, at a minimum, proof of storage in secure, bonded warehouse(s), the costs of off-site stored materials may be disbursed.

**(l)** Lender, Lender's employees, agents, and representatives, to include, where applicable a construction consultant and/or inspecting/supervising architect, shall be permitted access to the Real Estate and the Project to make such inspections as it, or they, deem appropriate, provided, however, that this provision shall not be deemed to impose upon Lender any obligation to undertake such inspections or any liability for the failure to detect any defect or failure to act with respect to any defect which was or might have been disclosed by such inspection. Costs of all third-party inspections required by Lender will be paid by Borrower.

**(m)** No portion of the Real Estate or the Project will be occupied by anyone without first obtaining certificates of occupancy and other required governmental approvals and satisfying all insurance requirements.

**(n)** No work has been done and no materials have been delivered for construction of the Project prior to the execution of this Agreement except such as may be described on Exhibit "B" attached hereto.

**(o)** Lender shall be permitted, from time to time as it may desire, to inspect any and all books, records, contracts and sub-contracts of Borrower pertaining to the Project. Borrower will keep and maintain proper and accurate books, records, and accounts reflecting all items of income and expense in connection with the Project and the construction thereof, separate from any general accounting records which Borrower or any Affiliate may maintain in connection with Borrower's or any Affiliate's general business activities, and, upon reasonable notice from Lender will make such books, records, and accounts immediately available to Lender for inspection or independent audit. For purposes of this subparagraph, **"Affiliate"** means any corporation, partnership, or other entity in which Borrower, or any loan guarantor owns, directly or indirectly, a controlling interest (which shall be defined as the possession, directly or indirectly, of the power to direct or cause the direction of management and policies, whether through the ownership of partnership interest, limited liability company interest, voting securities, by contract or otherwise).

**(p)** Borrower shall pay Lender interest on the Loan as herein provided, promptly, when due.

**(q)** Borrower conditionally assigns to Lender all Borrower's right, title and interest in all construction contracts, architectural contracts, engineering contracts, plans, specifications, drawings, surveys, bonds, permits, licenses and other governmental approvals in order to further secure the indebtedness of Borrower to Lender, which assignment shall terminate upon full performance of all obligations of Borrower under each of said documents. Borrower will obtain consents for assignment of all contracts containing no-assignment clauses. Nothing contained herein shall be deemed to impose upon Lender any liability for performance of any obligation of Borrower under any construction document.

**(r)** Borrower shall obtain and keep in force during the Loan, comprehensive general liability insurance written in the name of Borrower naming Lender as an additional insured and providing that the coverage, which shall be in an amount approved by Lender, cannot be canceled without thirty (30) days prior written notice to Lender.

**(s)** Borrower shall obtain and keep in force during the Loan, builders risk insurance providing coverage equal to the full insurable value of the Real Estate as improved by the Project, providing that the insurance company will not cancel coverage without first giving Lender not less than thirty (30) days prior notice and containing all the other provisions of the standard "New York form" mortgagee endorsement.

**(t)** Borrower shall remove or bond off any mechanic's or materialmen's liens filed against the Real Estate within the earlier of (i) ten (10) days after actual notice of the claim of the lien or receipt of a notice of nonpayment, or (ii) fifteen (15) days after the filing thereof.

**(u)** Borrower shall not transfer (i) all or any part of the Real Estate or any interest therein or (ii) any of the beneficial interests in the Borrower if Borrower is not a natural person or persons but is a corporation, limited liability company, partnership, trust or other legal entity.

**(v)** Borrower will advise lender in writing within three (3) days of the initial occurrence of (i) all litigation known to Borrower, regardless of amount, affecting Borrower's interest in or any part of the Real Estate or the Project, and (ii) all notices of complaints and/or charges received by Borrower or Borrower's employees, agents, or representatives, from any governmental authority with respect to the Real Estate or the Project.

---

## IV.

The methods and conditions for the disbursement of construction loan funds shall be as follows:

**(a)** At such time as Borrower shall desire to obtain, subject to the other requirements hereof, a disbursement of any portion of the construction loan funds, Borrower shall complete and deliver to Lender a Draw Request together with a letter of transmittal from Borrower to Lender requesting disbursement of that portion of the construction loan funds set forth in the Draw Request and directing that said disbursement be made to Borrower in accordance with the terms, conditions and provisions of this Agreement. Such Draw Request shall include, with respect to any portion of such advance to be further disbursed to a general contractor, a Contractor's Application for Payment in form and substance reasonably satisfactory to Lender;

**(b)** Borrower's Draw Request shall be accompanied by evidence in form and content satisfactory to Lender (including, but not limited to, certificates and affidavits of Borrower, and such other persons as Lender may require) showing;

**(i)** The value at cost of that portion of the Project completed at that time;

**(ii)** Those claims for work, labor, materials, and fixtures which have been paid since the next preceding Draw Request and those claims which will be paid with the proceeds of the current Draw Request;

**(iii)** Copies of all bills or statements or canceled checks for any soft-cost expense for which the advance is requested shall be attached to such Draw Request;

(iv) Where the Certificate for Payment includes amounts to be paid to a general contractor, the contractor's Application for Payment submitted therewith shall include a copy of the "Schedule of Values" under the Construction Contract and shall show the breakdown of the requisition among the line items identified therein, as well as the amount theretofore funded by the Lender with respect to each such line item. In addition, upon request by Lender, Borrower shall provide Lender with copies of all bills or statements or canceled checks for any such hard cost expenses for which the advance is requested;

(v) A breakdown of all disbursements to that point in time in such detail as may be required by Lender;

(vi) That all funds previously disbursed by Lender have been applied directly to the cost of construction of the Project or such other incidental costs as Lender shall have approved in writing;

(vii) That the remaining non-disbursed portion of the construction loan funds, together with any equity previously deposited by Borrower with Lender, allocable to the Project for which such draw request is submitted, is adequate to complete the construction in accordance with the Plans and Specifications.

(c) Borrower acknowledges and agrees that Lender shall not be obligated to disburse construction loan funds:

(i) in excess of the lesser of actual hard costs incurred by Borrower or a percentage of the amount allocated to such hard costs in the Project Budget which corresponds to the percentage of completion of the Project; or

(ii) if Lender is of the opinion that construction of the Project cannot be completed on or before the Completion Deadline or within the Project Budget; or

(iii) if, in the opinion of Lender, the estimated remaining cost of construction of the Project exceeds the remaining undisbursed portion of the Loan allocable for payment of such costs of construction, unless Borrower shall have deposited the amount of such insufficiency with Lender; or

(iv) if the Project shall have been damaged by fire or other casualty, unless Lender shall have agreed or elected to make available for the purpose of restoration and repair the net proceeds of any fire or other casualty insurance policy; or

(v) if condemnation proceedings or any similar type of proceedings are commenced with respect to the Real Estate, unless Lender shall have elected to make available net condemnation proceeds to Borrower; or

**(vi)**   if Lender has not received the requested up-date or endorsement to the mortgagee title insurance policy; or

**(vii)**   if Lender shall not have received confirmation from any construction consultant and/or inspecting/supervising architect that the Project to the date of disbursement request has been constructed substantially in compliance with the Plans and Specifications, subject to any change orders approved by Lender.  In the event the Lender is advised that the Project has not been constructed substantially in accordance with the Plans and Specifications, no disbursement of construction loan funds shall be made until such time as any corrective work as Lender shall deem necessary or desirable to bring such construction into compliance with the Plans and Specifications shall have been completed or commenced in a manner acceptable to Lender; or

**(vii)**   if Borrower has not satisfied the Borrower equity requirement; or

**(viii)** if default has occurred or an event of default remains uncured.

|     |
| --- |
| **V.** |

The amounts deposited with Lender by Borrower and the Net Proceeds of the Loan shall be disbursed by Lender to Borrower (or at Lender's option jointly to Borrower and such other person or persons as Lender deems desirable) to assure payment for the labor, materials, appliances and fixtures and services used in the construction of the Project as the work progresses in accordance with the Payment Schedule, **PROVIDED HOWEVER** that Lender shall have the right to withhold "Retainage" in the amounts or percentages, and under the terms and conditions set forth below. Lender shall have the absolute right at its option at any time and from time to time to refuse to make any disbursement hereunder if Borrower is in breach of any covenant contained herein or in any other instrument securing or evidencing Borrower's indebtedness to Lender.

**Retainage.**     Lender shall withhold from each disbursement five percent (5%) of all amounts due to Borrower or any other contractor as retainage.

The Lender shall not be required to make a final disbursement, including the disbursement of retained funds, until it has made its final inspection and the Borrower has delivered or caused to be delivered to Lender the following: Fire Marshall's Approval Letter (if applicable), Certificate of Occupancy, Contractor's Affidavit, an endorsement to the Lender's title insurance policy without additional exceptions, evidence that no notices of lien have been filed against the Real Estate, certificates from Borrower and the Project architect evidencing that the Project has been completed substantially in accordance with the Plans and Specifications and that all mechanical and electrical systems are operational, and a complete set of the final Plans and Specifications for the Project, as built, incorporating all changes, modifications and alterations to such as were approved by Lender.

No advance or disbursement of construction loan funds hereunder shall constitute a waiver of any of the conditions of Lender's obligation to make further advances or disbursements nor, in the event Borrower is unable to satisfy any such condition, shall any such advance or disbursement have the effect of precluding Lender from thereafter declaring such inability to be an event of default.

Notwithstanding any other term or condition of this Agreement, Borrower acknowledges and agrees that Lender shall have no obligation to make advances for any items or category of items in excess of the amount provided for such item or category of items in the Project Budget unless Lender is satisfied that the remaining undisbursed balance of the Loan is sufficient to complete the construction of the Project in accordance with the requirements of this Agreement and pay all interest, costs, and other sums required to be paid under the loan documents. Should any aspect of the Project be completed at a cost less than the amount allocated to such item or category in the Project Budget, the surplus shall not be available to other items or categories of items without Lender's prior consent, which shall not be unreasonably withheld or denied. After occurrence of any default, Lender reserves the right to make advances of funds which are allocated to designated items or categories in the Project Budget for such other purposes or in such different proportions as Lender may, in its sole discretion, deem necessary or advisable.

So long as there shall be amounts available in the Project Budget for the purpose of funding interest, interest accruing on portions of disbursed construction loan funds shall be funded by Lender, either by funding same to Borrower with immediate payment by Borrower to Lender or by Lender directly funding same to itself (as Lender shall determine in its sole discretion) provided, however, that nothing contained herein shall be deemed to release or in any way relieve Borrower of its obligation under the note and the other loan documents to pay interest as therein provided.

---

## VI.

---

Prior to the time that the first monthly installment of principal and interest becomes due, Borrower shall pay Lender interest on the Loan, at the rate specified in the promissory note, on each disbursement of funds only from the time of disbursement. Such interest shall be paid monthly on the fifteenth day of each and every month commencing on the fifteenth day of the month following the Date of Loan and continuing until the first monthly installment of principal and interest becomes due. Thereafter, Borrower shall pay Lender interest on the entire amount of the Loan in accordance with the terms of the promissory note.

---

## VII.

---

(a) If Borrower is an individual and dies or becomes incompetent, Lender may in its sole discretion discontinue further disbursements hereunder or may at its option continue to make disbursements hereunder to Borrower's guardian, executor or administrator or to anyone else who is a Borrower hereunder.

**(b)** In the event Borrower's equity of redemption in the Real Estate or any part thereof becomes vested in a person other than Borrower, Lender may make disbursements hereunder to the person in whom such equity of redemption is then vested.

---

## VIII.

**(a)** Breach of any covenant of Borrower hereunder shall be an event of default under the promissory note and the Security Instrument. Upon default, Lender may (i) to exercise any of its remedies, including the acceleration of the indebtedness evidenced by the promissory note and foreclosure under terms of the Security Instrument or sale of the Real Estate under the powers contained therein, and (ii) cumulatively exercise all other rights, options and privileges provided by law or in equity. Lender shall be relieved of any and all further obligations hereunder.

**(b)** If any such default occurs Lender may, at its option, apply the undisbursed part of Borrower's Deposit and Net Loan Proceeds to the payment, pro tanto, of Borrower's indebtedness to Lender.

**(c)** Additionally, by the acceptance hereof, Borrower agrees that upon the occurrence of a default and whether or not foreclosure proceedings have commenced under the Security Instrument and at Lender's request, Borrower will vacate the Real Estate and permit Lender to: (i) enter into possession of the property; (ii) perform or cause to be performed any and all work and labor necessary to complete the construction of the Project in accordance with the Plans and Specifications, with such modifications thereto as Lender shall deem necessary or desirable; (iii) employ security watchmen to protect the Project; and (iv) disburse that portion of the loan proceeds and/or any equity contribution not previously disbursed to the extent necessary to complete the construction of the Project in accordance with the Plans and Specifications, and if such completion requires a larger sum than the remaining undisbursed portion of the Loan, to disburse such additional funds, all of which funds so disbursed by Lender shall be deemed to have been disbursed to Borrower, shall become part of the indebtedness, and shall be secured by the Security Instrument. Borrower hereby appoints Lender its attorney-in-fact to complete construction of the Project in Borrower's name, with full power of substitution, and with full power to do any and all things which may be necessary or desirable to complete the Project. These powers are coupled with an interest and are irrevocable by death or otherwise.

Any language of this instrument to the contrary notwithstanding, the terms "**default**" and "**event of default**" (whether such terms are capitalized or appear in lower case) shall have the same meaning and shall be construed so as to be consistent with their use and meaning as set forth in the promissory note and Security Instrument given by Borrower to Lender of even date herewith.

| IX. |
|-----|

Failure of Lender to exercise any option of Lender hereunder shall not be a waiver of Lender's right to exercise such option.

| X. |
|----|

If litigation arises out of this Agreement and Lender is the prevailing party, Lender will be entitled to recover from Borrower all costs, including, without limitation, attorneys' fees.

| XI. |
|-----|

Lender has no obligations in connection with the construction of the Project except to advance the proceeds of the Loan as herein provided, and Lender shall not be liable for the performance of any contractor, subcontractor, or supplier of materials, fixtures, equipment and any other personal property, or for the quality of workmanship or the quality of such materials, fixtures, equipment and other personal property, or for the failure to construct, complete, protect or insure the improvements, or for the payment of any cost or expenses incurred in connection therewith, or for the performance or non-performance or delay in performance of any obligation of Borrower to Lender. Any inspection by Lender, approval of Plans and Specifications or other activities in the nature thereof shall only be for the sole benefit of Lender and for the purpose of protecting the security of Lender, and the same shall in no way be construed as a representation on the part of Lender that there is compliance on the part of Borrower with the Plans and Specifications or that the construction of the improvements is free from faulty material, fixtures, equipment, and other personal property, or workmanship. The fact that Lender makes such inspections shall not relieve Borrower from its duty to independently ascertain that the Project is being completed in accordance with the Plans and Specifications and Borrower has no right to rely on any procedures required by Lender.

WITNESS Borrower's hand and seal.

**LAKE MARTIN PARTNERS, L.L.C. [SEAL]**
**An Alabama Limited Liability Company**

By: _James R Paxton_
James R Paxton
Manager

By: _C. Wayne Roberts_
C Wayne Roberts
Manager

## JOINDER BY CONTRACTOR

In consideration of the Lender named in the foregoing Construction Loan Agreement (herein referred to as "**Agreement**") making the Loan referred to therein, the undersigned contractor (who has contracted with the Borrower named in the Agreement to construct the Project) does hereby covenant and agree with Lender that:

(1)  The Project will be constructed in accordance with the Plans and Specifications and all applicable ordinances, statutes, building codes, zoning requirements, and environmental rules and regulations.  Without the prior written approval of Lender, no changes will be made in the Plans and Specifications where the cost, or cost savings thereof exceeds $10,000.00 in any one instance, or $25,000.00 in the aggregate.  In the event such approval is not obtained, the construction contract with the Borrower will, for the purposes of the undersigned's obligation to continue performance thereunder for the benefit of Lender, be deemed not to have been modified by such change order.

(2)  Construction of the Project shall occur entirely upon the Real Estate and wholly within any applicable building restriction lines, without encroachment upon any easement or right-of-way.

(3)  All labor, materials and services used in the construction of the Project shall be paid for promptly, and the undersigned contractor will furnish to Lender from time to time such evidence of payment as Lender may require, to include, without limitation, payment acknowledgments and lien waivers/releases/subordinations.

(4)  All funds disbursed under the Agreement which the undersigned contractor may receive will be held by the undersigned contractor **IN TRUST** for the sole purpose of paying for labor, material, appliances, fixtures and services used in the construction of the Project and such funds shall not be used for any other purpose. Upon request of Lender, the undersigned contractor will from time to time submit to Lender evidence of the proper application of such funds.

(5)  Title to all materials, appliances and fixtures delivered to the Real Estate for construction of the Project or paid for out of funds disbursed under the Agreement become vested in Lender, subject to the terms of the Security Instrument, when delivered to the Real Estate or paid for out of Loan funds.  All such materials, appliances and fixtures paid for out of Loan funds shall be promptly delivered to the Real Estate (or, with Lender's permission, placed in secured, off-site storage) and no such materials, appliances or fixtures shall be removed from the Real Estate without the prior written consent of Lender.

(6)  In the event of a default by Borrower under any of the loan documents, the undersigned shall, at Lender's request, continue performance on Lender's behalf under the construction contract with the Borrower in accordance with the terms thereof, provided that the undersigned will be reimbursed in accordance with the construction contract for all work, labor and materials rendered on Lender's behalf.

CEM/jdm/05-40

(7)   The undersigned further acknowledges the assignment to Lender of the construction contract and other construction documents without the delegation to Lender of the Borrower's responsibilities thereunder.

(8)   The undersigned will not terminate nor delay in performing its obligations under the construction contract, or suspend the construction contract on account of default by the Borrower unless it has given the Lender (a) concurrent notice, if notice to Borrower is required; or (b) five (5) days prior written notice of its intent to terminate, delay, or suspend performance, if no notice to Borrower is required or the contract notice period is less than five (5) days.

(9)   The undersigned hereby certifies that all necessary permits for the construction of the improvements have been or will be obtained.

(10) The undersigned shall maintain builder's risk insurance, public liability insurance and workmen's compensation insurance in amounts and types and with companies acceptable to Lender.

(11) The officer executing this instrument on behalf of the undersigned hereby personally certifies that the general contractor has full authority under all state or local laws and regulations to perform all of its obligations under the construction contract with the Borrower in accordance with the terms thereof, and where applicable, is licensed as a general contractor in the jurisdiction where the work will be done.

**WITNESS** the hand and seal of the contractor, this ⟨26⟩ day of September, 2005.

**STONEVIEW SUMMIT DEVELOPMENT, INC.  [SEAL]**

By: _____

Its: _PRESIDENT_____

CEM/jdm/05-40

## JOINDER BY GUARANTORS

Pursuant to the terms of each Guarantor's Unconditional Guaranty of Payment and Performance, all dated September _26_, 2005 the Guarantors, jointly and severally, ratify and confirm the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledge that their respective guarantees of performance encompass all such covenants, obligations, and undertakings.

**WITNESS** the hand and seal of the Guarantors, this _26_ day of September, 2005.

_____  [SEAL]
**GARY L. ANDERSON**

_____  [SEAL]
**DANIEL A. BAILEY**

_____  [SEAL]
**MICHAEL D. BROCK**

_____  [SEAL]
**TIMOTHY L. EAKES**

_____  [SEAL]
**JULIE GEORGE – HOWELL**

_____  [SEAL]
**KEITH A. LaFERRIERE**

_____  [SEAL]
**SAMUEL E. LEE**

_____  [SEAL]
**JAMES R. PAXTON**

_____  [SEAL]
**C. WAYNE ROBERTS**

_____  [SEAL]
**KENNETH L. TODD, III**

_____  [SEAL]
**RICKEY WOODS**

CEM/jdm/05-40

## JOINDER BY GUARANTORS

Pursuant to the terms of each Guarantor's Unconditional Guaranty of Payment and Performance, all dated September __26__, 2005 the Guarantors, jointly and severally, ratify and confirm the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledge that their respective guarantees of performance encompass all such covenants, obligations, and undertakings.

**WITNESS** the hand and seal of the Guarantors, this __26__ day of September, 2005.

_____ [SEAL]
**GARY L. ANDERSON**

_____ [SEAL]
**DANIEL A. BAILEY**

_____ [SEAL]
**MICHAEL D. BROCK**

_____ [SEAL]
**TIMOTHY L. EAKES**

_____ [SEAL]
**JULIE GEORGE – HOWELL**

_____ [SEAL]
**KEITH A. LaFERRIERE**

_____ [SEAL]
**SAMUEL E. LEE**

_____ [SEAL]
**JAMES R. PAXTON**

_____ [SEAL]
**C. WAYNE ROBERTS**

_____ [SEAL]
**KENNETH L. TODD, III**

_____ [SEAL]
**RICKEY WOODS**

CEM/jdm/05-40

## JOINDER BY GUARANTORS

Pursuant to the terms of each Guarantor's Unconditional Guaranty of Payment and Performance, all dated September 26, 2005 the Guarantors, jointly and severally, ratify and confirm the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledge that their respective guarantees of performance encompass all such covenants, obligations, and undertakings.

WITNESS the hand and seal of the Guarantors, this 26 day of September, 2005.

_____ [SEAL]
GARY L. ANDERSON

_____ [SEAL]
DANIEL A. BAILEY

_____ [SEAL]
MICHAEL D. BROCK

_____ [SEAL]
TIMOTHY L. EAKES

_____ [SEAL]
JULIE GEORGE – HOWELL

_____ [SEAL]
KEITH A. LaFERRIERE

_____ [SEAL]
SAMUEL E. LEE

_____ [SEAL]
JAMES R. PAXTON

_____ [SEAL]
C. WAYNE ROBERTS

_____ [SEAL]
KENNETH L. TODD, III

_____ [SEAL]
RICKEY WOODS

CEM/jdm/05-40

## JOINDER BY GUARANTORS

Pursuant to the terms of each Guarantor's Unconditional Guaranty of Payment and Performance, all dated September 2⁶, 2005 the Guarantors, jointly and severally, ratify and confirm the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledge that their respective guarantees of performance encompass all such covenants, obligations, and undertakings.

WITNESS the hand and seal of the Guarantors, this 2⁶ day of September, 2005.

_____ [SEAL]
**GARY L. ANDERSON**

_____ [SEAL]
**DANIEL A. BAILEY**

_____ [SEAL]
**MICHAEL D. BROCK**

_____ [SEAL]
**TIMOTHY L. EAKES**

_____ [SEAL]
**JULIE GEORGE – HOWELL**

_____ [SEAL]
**KEITH A. LaFERRIERE**

_____ [SEAL]
**SAMUEL E. LEE**

_____ [SEAL]
**JAMES R. PAXTON**

_____ [SEAL]
**C. WAYNE ROBERTS**

_____ [SEAL]
**KENNETH L. TODD, III**

_____ [SEAL]
**RICKEY WOODS**

CEM/jdm/05-40

## JOINDER BY GUARANTORS

Pursuant to the terms of each Guarantor's Unconditional Guaranty of Payment and Performance, all dated September 26 , 2005 the Guarantors, jointly and severally, ratify and confirm the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledge that their respective guarantees of performance encompass all such covenants, obligations, and undertakings.

WITNESS the hand and seal of the Guarantors, this 26 day of September, 2005.


_____ [SEAL]
**GARY L. ANDERSON**

_____ [SEAL]
**DANIEL A. BAILEY**

_____ [SEAL]
**MICHAEL D. BROCK**

_____ [SEAL]
**TIMOTHY L. EAKES**

_____ [SEAL]
**JULIE GEORGE – HOWELL**

_____ [SEAL]
**KEITH A. LaFERRIERE**

_____ [SEAL]
**SAMUEL E. LEE**

_____ [SEAL]
**JAMES R. PAXTON**

_____ [SEAL]
**C. WAYNE ROBERTS**

_____ [SEAL]
**KENNETH L. TODD, III**

_____ [SEAL]
**RICKEY WOODS**


CEM/jdm/05-40

## JOINDER BY GUARANTORS

Pursuant to the terms of each Guarantor's Unconditional Guaranty of Payment and Performance, all dated September ~~26~~, 2005 the Guarantors, jointly and severally, ratify and confirm the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledge that their respective guarantees of performance encompass all such covenants, obligations, and undertakings.

WITNESS the hand and seal of the Guarantors, this ~~26~~ day of September, 2005.

_____ [SEAL]
**GARY L. ANDERSON**

_____ [SEAL]
**DANIEL A. BAILEY**

_____ [SEAL]
**MICHAEL D. BROCK**

_____ [SEAL]
**TIMOTHY L. EAKES**

_____ [SEAL]
**JULIE GEORGE – HOWELL**

_____ [SEAL]
**KEITH A. LaFERRIERE**

_____ [SEAL]
**SAMUEL E. LEE**

_____ [SEAL]
**JAMES R. PAXTON**

_____ [SEAL]
**C. WAYNE ROBERTS**

_____ [SEAL]
**KENNETH L. TODD, III**

_____ [SEAL]
**RICKEY WOODS**

CEM/jdm/05-40

Exhibit A

Lots 6 and 7
ALL THAT TRACT or parcel of land lying and being in Section 1 , Township 20 North, Range 22 East, Tallapoosa County, Alabama, being more particularly described as follows:

BEGINNING at the intersection of the southeasterly right-of-way line of Sunset Point Drive (right-of-way varies) and the westerly right-of-way line of Lakeview Drive (right-of-way varies); Run thence along the right-of-way of Lakeview Drive the following two ) courses and distances:  (1) Along a curve to the right (said curve having a radius of 649.30 feet, a chord direction of South 8°37'49" East, and a chord length of 362.63 feet) 367.52 feet to a Point, and (2) South 07°24'54" East a distance of 326.24 feet to a Point on the property line of Church of the Living Waters; Run thence along the property line of Church of the Living Waters South 40°14'13" West a distance of 215.97 feet to a Point; Continue thence along the property line of Church of the Living Waters South 08°33'16" East a distance of ±197 feet to the edge of Martin Lake;   Run thence along the edge of Martin Lake southwesterly, westerly, and northerly, a distance of 1598 feet to a Point on the property line of Sunset Point Condominium IV Phase I; Run thence along said property line North 34°24'55" East a distance of ±96 feet to a 1/2" rebar pin with cap; Continue thence along said property line North 10°58'29" East a distance of 96.39 feet to a 1/2" rebar pin with cap on the southerly right-of-way line of Sunset Point Drive; Run thence along said right-of-way line the following eight (8) courses and distances: (1) North 57°51'42" East a distance of 74.40 feet to a Point, (2) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 85°29'42" East, and a chord length of 15.76 feet) 15.76 feet to a Point, (3) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 76°39'35" East, and a chord length of 146.42 feet) 146.89 feet to a point, (4) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 64°40'05" East, and a chord length of 73.81 feet) 73.87 feet to a Point, (5) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 65°00'56" East, and a chord length of 80.19 feet) 80.27 feet to a Point, (6) along a curve to the right (said curve having a radius of 527.40 feet, a chord direction of North 71°11'32" East, and a chord length of 33.43 feet) 33.44 feet to a Point, 7) along a curve to the left (said curve having a radius of 146.36 feet, a chord direction of North 46°41'25" East, and a chord length of 135.37 feet) 140.73 feet to a Point, and (8) North 19°08'42" East a distance of 99.48 feet to the POINT OF BEGINNING.

This is intended to be the same property as Lot 7 and the portion of Lot 6 east of the 20' drainage easement centerline of Sunset Point Subdivision Phase 4 recorded in Plat Book 10 Page 45 of the Tallapoosa County records. (Now Lot 6B and Lot 7 of that resubdivision of Lot 6 of Sunset Point Subdivision Phase 4 recorded at Plat Book 10, Page 65, Office of the Judge of Probate of Tallapoosa County, Alabama

Lot 1
ALL THAT TRACT or parcel of land lying and being in Section 2, Township 20 North, Range 22 East, Tallapoosa County, Alabama, being more particularly described as follows:

To find the POINT OF BEGINNING, Commence at the southeast corner of Section 2, Township 20 North, Range 22 East; Run thence North 02°47'35" West a distance of 1817.00 feet to a 1/2" rebar found on the northerly right-of-way line of Sunset Point Drive and the POINT OF BEGINNING.

From the POINT OF BEGINNING, run thence along a curve to the right (said curve having a radius of 166.00 feet, a chord direction of North 63°02'17" West, and a chord length of 168.72 feet) 176.99 feet to a Point; Run thence along a curve to the right (said curve having a radius of 358.40 feet, a chord direction of North 21°22'53" West, and a chord length of 142.82 feet) 143.78 feet to a Point; Run thence North 09°53'18" West a distance of 244.81 feet to a Point; Run thence along a curve to the left (said curve having a radius of 285.37 feet, a chord direction of North 31°18'01" West, and a chord length of 208.36 feet) 213.29 feet to a Point; Run thence along a curve to the left (said curve having a radius of 237.84 feet, a chord direction of North 52°54'57" West, and a chord length of 1.65 feet) 1.65 feet to a 1/2" rebar pin found; Run thence North 35°36'31" East a distance of 33.15 feet to a 1/2" rebar pin on the southerly edge of Lake Martin; Run thence along said southerly edge of Lake Martin a distance of ±342 feet to a 1/2" rebar pin found at the property corner of Lot 2, Sunset Point Subdivision Phase 4; Run thence along the property line of Lot 2 South 15°03'22" East a distance of 440.61 feet to the POINT OF BEGINNING.

This is intended to be the same property as Lot 1 of Sunset Point Subdivision Phase 4 recorded in Plat Book 10 Page 45 of the Tallapoosa County records.

## EXHIBIT B

The following work has been done on the Property and/or the following services have been provided in connection with the proposed construction:

CLEARING TREES AND STUMPS

SILT FENCE INSTALLATION

CEM/jdm

| LAKE MARTIN - STONEVIEW SUMMIT | | PHASE 1 | FUTURE PHASE | TOTAL |
|---|---|---|---|---|
| DEVELOPMENT COST TO BE FUNDED BY LOAN | | | | |
| JUNE 21, 2005 | | | | |
| | | | | |
| COSTS: | | | | |
| | | | | |
| AMENITIES | | | | |
| | POOL | $280,000 | | $280,000 |
| | BATHHOUSE | $173,000 | | $173,000 |
| | TRELLIS | $145,000 | | $145,000 |
| | AMPHITHEATER | $230,000 | | $230,000 |
| | PLAYGROUND | $95,000 | | $95,000 |
| | TRAILS | $67,000 | | $67,000 |
| | WALLS | $110,000 | | $110,000 |
| ROAD | | | | |
| | CLEARING | $90,000 | | $90,000 |
| | GRADING | $180,000 | | $180,000 |
| | PAVING | $50,000 | | $50,000 |
| SANITARY SEWER | | $120,000 | | $120,000 |
| RETAINING WALLS | | $200,000 | | $100,000 |
| SEWER OUTFALL | | $175,000 | | $175,000 |
| LIFT STATION | | $120,000 | | $120,000 |
| WATER | | $250,000 | | $250,000 |
| PARKING LOT | | $110,000 | $140,000 | $250,000 |
| STORM SEWER | | $100,000 | | $100,000 |
| DOCKS | | $200,000 | $150,000 | $375,000 |
| SEA WALL | | $300,000 | | $300,000 |
| LANDSCAPING | | $270,000 | $50,000 | $300,000 |
| SIGNAGE | | $125,000 | | $125,000 |
| MARKETING | | $140,000 | $160,000 | $400,000 |
| COMMISSIONS | | $0 | | $0 |
| INTEREST | | $500,000 | $1,460,000 | $1,960,000 |
| ATTORNEY FEES | | $10,000 | $25,000 | $35,000 |
| BANK FEES | | $22,000 | $28,000 | $50,000 |
| PERMITS | | $63,000 | $110,500 | $172,500 |
| TAP FEES | | $225,000 | $225,000 | $345,000 |
| ARCHITECT | | $100,000 | | $100,000 |
| ENGINEER | | $120,000 | $30,000 | $150,000 |
| INSPECTIONS | | $30,000 | $70,000 | $100,000 |
| LAND | | $4,800,000 | | $4,800,000 |
| | | | | |
| TOTAL COST | | $9,400,000 | $2,448,500 | $11,747,500 |

Ex. C

LAKE MARTIN
COST BREAKDOWN - 25 UNIT BUILDING
JUNE 24, 2008

| ITEM DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPL PREV APPL | WORK COMPL THIS APPL | STORED MATERIALS | TOTAL COMPL AND STORED TO DATE | % | BALANCE TO FINISH |
|---|---|---|---|---|---|---|---|
| FOOTINGS AND SLAB | $125,000 | $0 | $0 | $0 | $0 | 0% | $125,000 |
| STEEL FRAME | $550,000 | $0 | $0 | $0 | $0 | 0% | $550,000 |
| CONCRETE FLOORS 2 - 5 | $200,000 | $0 | $0 | $0 | $0 | 0% | $200,000 |
| PORCHES | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| ROOFING | $35,000 | $0 | $0 | $0 | $0 | 0% | $35,000 |
| WINDOWS | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| EXTERIOR DOORS | $45,000 | $0 | $0 | $0 | $0 | 0% | $45,000 |
| PLUMBING | $150,000 | $0 | $0 | $0 | $0 | 0% | $150,000 |
| ELECTRICAL | $100,000 | $0 | $0 | $0 | $0 | 0% | $100,000 |
| HVAC | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| CORNICE/TRIM | $40,000 | $0 | $0 | $0 | $0 | 0% | $40,000 |
| SIDING/VENEER | $120,000 | $0 | $0 | $0 | $0 | 0% | $120,000 |
| INSULATION | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| INTERIOR FRAME AND DRYWALL | $875,000 | $0 | $0 | $0 | $0 | 0% | $875,000 |
| SPRINKLER | $125,000 | $0 | $0 | $0 | $0 | 0% | $125,000 |
| INTERIOR TRIM | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| CABINETS | $100,000 | $0 | $0 | $0 | $0 | 0% | $100,000 |
| SAUNA | $20,000 | $0 | $0 | $0 | $0 | 0% | $20,000 |
| EXTERIOR PAINT | $90,000 | $0 | $0 | $0 | $0 | 0% | $90,000 |
| INTERIOR PAINT | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| LIGHT FIXTURES | $10,000 | $0 | $0 | $0 | $0 | 0% | $10,000 |
| GUTTERS | $20,000 | $0 | $0 | $0 | $0 | 0% | $20,000 |
| FIREPLACES | $120,000 | $0 | $0 | $0 | $0 | 0% | $120,000 |
| FLOORING | $50,000 | $0 | $0 | $0 | $0 | 0% | $50,000 |
| TILE | $25,000 | $0 | $0 | $0 | $0 | 0% | $25,000 |
| CLEANUP | $55,000 | $0 | $0 | $0 | $0 | 0% | $55,000 |
| MIRRORS, SHELVES, ETC | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| APPLIANCES | $96,000 | $0 | $0 | $0 | $0 | 0% | $96,000 |
| STAIRS | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| TOTAL | $3,600,000 | $0 | $0 | $0 | $0 | 0% | $3,600,000 |

LAKE MARTIN
COST BREAKDOWN - 35 UNIT BUILDING
JUNE 21, 2005

| ITEM/DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPL PREV APPL | WORK COMPL THIS APPL | STORED MATERIALS | TOTAL COMPL AND STORED TO DATE | % | BALANCE TO FINISH |
|---|---|---|---|---|---|---|---|
| FOOTINGS AND SLAB | $187,500 | $0 | $0 | $0 | $0 | 0% | $187,500 |
| STEEL FRAME | $825,000 | $0 | $0 | $0 | $0 | 0% | $825,000 |
| CONCRETE FLOORS 2 - 5 | $300,000 | $0 | $0 | $0 | $0 | 0% | $300,000 |
| PORCHES | $97,500 | $0 | $0 | $0 | $0 | 0% | $97,500 |
| ROOFING | $52,500 | $0 | $0 | $0 | $0 | 0% | $52,500 |
| WINDOWS | $112,500 | $0 | $0 | $0 | $0 | 0% | $112,500 |
| EXTERIOR DOORS | $67,500 | $0 | $0 | $0 | $0 | 0% | $67,500 |
| PLUMBING | $225,000 | $0 | $0 | $0 | $0 | 0% | $225,000 |
| ELECTRICAL | $150,000 | $0 | $0 | $0 | $0 | 0% | $150,000 |
| HVAC | $127,500 | $0 | $0 | $0 | $0 | 0% | $127,500 |
| CORNICE/TRIM | $60,000 | $0 | $0 | $0 | $0 | 0% | $60,000 |
| SIDING/VENEER | $180,000 | $0 | $0 | $0 | $0 | 0% | $180,000 |
| INSULATION | $112,500 | $0 | $0 | $0 | $0 | 0% | $112,500 |
| INTERIOR FRAME AND DRYWALL | $1,312,500 | $0 | $0 | $0 | $0 | 0% | $1,312,500 |
| SPRINKLER | $187,500 | $0 | $0 | $0 | $0 | 0% | $187,500 |
| INTERIOR TRIM | $127,500 | $0 | $0 | $0 | $0 | 0% | $127,500 |
| CABINETS | $150,000 | $0 | $0 | $0 | $0 | 0% | $150,000 |
| INTERIOR PAINT | $127,500 | $0 | $0 | $0 | $0 | 0% | $127,500 |
| SAUNA | $30,000 | $0 | $0 | $0 | $0 | 0% | $30,000 |
| EXTERIOR PAINT | $135,000 | $0 | $0 | $0 | $0 | 0% | $135,000 |
| LIGHT FIXTURES | $112,500 | $0 | $0 | $0 | $0 | 0% | $112,500 |
| GUTTERS | $15,000 | $0 | $0 | $0 | $0 | 0% | $15,000 |
| FIREPLACES | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| FLOORING | $180,000 | $0 | $0 | $0 | $0 | 0% | $180,000 |
| TILE | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| CLEANUP | $37,500 | $0 | $0 | $0 | $0 | 0% | $37,500 |
| MIRRORS, SHELVES, ETC | $82,500 | $0 | $0 | $0 | $0 | 0% | $82,500 |
| APPLIANCES | $112,500 | $0 | $0 | $0 | $0 | 0% | $112,500 |
| STAIRS | $142,500 | $0 | $0 | $0 | $0 | 0% | $142,500 |
| TOTAL | $5,400,000 | $0 | $0 | $0 | $0 | 0% | $5,400,000 |