**UNITED STATES DISTRICT COURT**

MIDDLE DISTRICT OF ALABAMA

OFFICE OF THE CLERK

POST OFFICE BOX 711

MONTGOMERY, ALABAMA 36101-0711

DEBRA P. HACKETT, CLERK

TELEPHONE (334) 954-3600

July 17, 2008

# NOTICE OF CORRECTION

**From:    Clerk's Office**

**Case Style:    Empire Financial Services, Inc. vs. Kenneth Todd, et al**
**Case Number: 1:08cv226-WHA**

**Re: #42 Response in Opposition to Motion to Sever**
**      #43 Brief in Opposition to Motion to Dismiss Counterclaim**

**Notice of Correction is filed this date to correct the following deficient pleading which  was filed on 7/10/2008 filed electronically by counsel which did not contain his electronic signatures.**

**The corrected pdf document is attached to this Notice.**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

EMPIRE FINANCIAL SERVICES, INC.          *

     Plaintiff          *

v.          *          Case No.: 1:08-cv-00226-WHA-WC

KENNETH L. TODD, III, *et. al.*          *

     Defendants          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**THIRD-PARTY PLAINTIFFS' OPPOSITION TO
PLAINTIFF'S MOTION TO SEVER THIRD PARTY COMPLAINT**

Third Party Plaintiffs, Kenneth L. Todd, III, Michael D. Brock, James R. Paxton, Daniel

A. Bailey, C. Wayne Roberts, Timothy L. Eakes, Keith A. LaFerriere and Gary L. Anderson

(collectively "Investors"), by their undersigned counsel, oppose the Motion to Sever Third Party

Complaint filed by Plaintiff, Empire Financial Services, Inc. ("Empire") and state as follows:

    1. This action arises from a failed joint venture among Empire, Lake Martin Partners,

LLC ("LMP"), Investors and Third Party Defendants, John Moore, Bruce Snead, The Profile

Group and Stoneview Summit Development, Inc.

    2. Empire's Complaint against Investors alleges default under an Unconditional

Guaranty of Payment and Performance executed by each Investor, relating to a Promissory Note

and Construction Loan Agreement between LMP and Empire.

    3. Investors filed a Counterclaim against Empire asserting various breaches of duties

Empire owed Investors and Empire's failure to satisfy obligations it undertook to Investors as a

joint venturer in connection with the development of a condominium project in Lake Martin,

Alabama (the "Project").

4. Empire does not dispute that the Third Party Complaint arises from the very same circumstances as the Complaint and the Counterclaim.

5. Empire's Motion to sever is subject to Fed.R.Civ.P. 42(b) (2008) which provides as follows:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third party claims.

6. Regardless of whether the Complaint, the Counterclaim or the Third Party Claim is considered, the same witnesses and documents will be relevant to all of the following issues:

a. that Empire, LMP, Investors and Third Party Defendants formed a joint venture to develop and build 85 condominium units and related facilities as part of the Project, and that Empire and the Third Party Defendants' actions confirm the existence of the joint venture;

b. that prior to LMP and Investors' involvement in the Project, Empire and Third Party Defendants were already working together on the Project and its funding, and had agreed upon virtually all aspects of the Project;

c. that prior to LMP and Investors' involvement in the Project, Empire had engaged an inspection company to perform all inspections on the Project, and that inspection company performed its services during the construction with the assistance of Third Party Defendants;

d. that pursuant to the joint venture, Empire and Third Party Defendants undertook numerous responsibilities relating to oversight, management and construction of the Project but failed to perform them;

e. that Empire and Third Party Defendants were aware that the

2

Project had significant problems including substantial cost overruns, lengthy construction delays and problems with performance and payment of subcontractors;

f. that Empire and the Third Party Defendants concealed the problems from LMP and Investors, and failed to advise LMP and Investors of the problems in a timely manner;

g. that Empire and the Third Party Defendants manipulated and reallocated budgeted funds, including increasing fees to Empire from $22,000 to $220,000 without informing LMP or Investors or obtaining their approval. These reallocations caused a significant shortfall in construction funds;

h. that Empire and Third Party Defendants were working together on the Project before LMP and Investors became involved and were aware that the budget presented to LMP and Investors was not sufficient to cover the cost of the Project;

i. that Empire and Third Party Defendants processed the payment requests and approvals for disbursing loan proceeds without input from Investors;

j. that Empire and Third Party Defendants made misrepresentations to Investors to induce them to become involved in the Project; and

k. that Empire and the Third Party Defendants caused the Project to fail by their actions and omissions.

7. The Counterclaim includes a count for Conspiracy and alleges that Empire and the Third Party Defendants acted in concert and conspired to defraud Investors. The allegations in the Counterclaim involve acts and omissions of the Third Party Defendants.

8. Because the facts, witnesses and documents related to the allegations in the Complaint and Counterclaim are the same as those related to the Third Party Complaint, none of the factors set forth in Rule 42(b) is present.

9. For these reasons, it will be most efficient, cost effective and convenient to consider and try the Third Party Complaint at the same time as the Complaint and Counterclaim.

10. While Empire baldly contends that it will suffer prejudice unless the Third Party Complaint is severed and tried separately from the Complaint and Counterclaim, Empire asserts no facts to support that contention.

WHEREFORE, Third Party Plaintiffs respectfully request that the Motion to Sever Third Party Complaint filed by Plaintiff, Empire Financial Services, Inc., be DENIED.


Respectfully submitted,


/s/ Dow T. Huskey
Dow T. Huskey        (HUS002)
P.O. Drawer 550
Dothan, Alabama  36302
T:  334-794-3366
F:  334-794-7292

_____/s/ Benjamin Rosenberg_____
Benjamin Rosenberg  (00263)

_____/s/ T. Christine Pham_____
T. Christine Pham     (25466)

_____/s/ John A. Roberts_____
John A. Roberts        (04969)
Rosenberg Martin Greenberg, LLP
25 South Charles Street, Suite 2115
Baltimore, Maryland  21201
T:  410-727-6600
F:  410-727-1115

Attorneys for Defendants
  Kenneth L. Todd, III
  Michael D. Brock
  James R. Paxton
  Daniel A. Bailey
  C. Wayne Roberts
  Timothy L. Eakes
  Keith A. LaFerriere
  Gary L. Anderson


## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of July, 2008, a copy of the foregoing Third-Party Plaintiffs' Opposition to Plaintiff's Motion to Sever Third Party Complaint was served via electronic filing upon:  Robert Payne Reynolds, Esquire, Michael Stewart Jackson, Esquire, Thomas Cowan Knowles, Esquire, Benjamin Saxon Main, Esquire, Ryan Wesley Shaw, Esquire and Rachel L. Webber, Esquire.

_____/s/ Benjamin Rosenberg_____
Benjamin Rosenberg

282385.03

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

EMPIRE FINANCIAL SERVICES, INC.    *

     **Plaintiff**                  *

**v.**                              *   **Case No.: 1:08-cv-00226-WHA-WC**

**KENNETH L. TODD, III,** *et. al.*     *

     **Defendants**           *

*    *    *    *    *    *    *    *    *    *    *    *

## <u>MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS COUNTERCLAIM</u>

Defendants, Kenneth L. Todd, III, Michael D. Brock, James R. Paxton, Daniel A. Bailey, C. Wayne Roberts, Timothy L. Eakes, Keith A. LaFerriere and Gary L. Anderson (collectively "Investors"), by their undersigned counsel, submit this Memorandum in Opposition to the Motion to Dismiss Counterclaim filed by Empire Financial Services, Inc. ("Empire").

### INTRODUCTION

This case involves a condominium project in Lake Martin, Alabama (the "Project") that was initially owned and planned by Third Party Defendants, The Profile Group ("Profile"), John Moore ("Moore") and Bruce Snead ("Snead"). In late 2004, Moore and Snead approached Investors and others to see if they would be interested in acquiring the Project from Profile, an entity controlled by Moore and Snead that owned the land on which the Project was to be built. Moore and Snead also proposed to the Investors that Moore and Snead act as the contractor for the Project. Shortly thereafter, Investors formed Lake Martin Partners, LLC ("LMP") to acquire the Project. Moore and Snead introduced Empire to LMP to finance the Project, and Moore and Snead formed Third Party Defendant, Stoneview Summit Development, Inc. ("Stoneview") to be the contractor for the Project. As described more fully below, Empire, LMP, the Investors and

the Third Party Defendants subsequently formed a joint venture in which Empire assumed

responsibilities for the day-to-day management and supervision of the construction of the Project

that ordinarily would have been the responsibilities of the owner. The Counterclaim alleges

numerous breaches of various duties and obligations that Empire owed to Investors as a result of

their joint venture relationship.

The Counterclaim alleges that Empire was not merely a lender to the Project. Before the

Investors were even aware of the Project, Empire had been involved with Moore and Snead in

their efforts to develop the Project and was aware of the fact that Moore and Snead did not have

the financial means to build the Project. Empire presented the Project to several financial

institutions in an effort to obtain their participation in funding a loan for the Project, and was

responsible for aggregating the ultimate financing. Empire did not provide any of its own funds

to finance the Project.

In addition, Empire controlled the development of the Project by assuming many of the

responsibilities of the developer and, together with Moore, Snead and Stoneview, all of the

obligations of the Investors. But having assumed the obligation to properly manage the Project,

Empire failed to appropriately carry out its obligations. It permitted substantial cost overruns

and approved inordinately slow progress in building the Project. Empire also allowed funds to

be disbursed prematurely, did not obtain lien releases from subcontractors and failed to properly

oversee the construction process. As a result of Empire's actions, nearly two years after

construction was to have been completed, two out of three planned buildings are not even 50%

complete, and the cost of completing the third building was approximately $1.1 million over the

budget for the building. The Loan Documents on which Empire heavily relies in its Motion to

Dismiss do not exculpate Empire for the wrongs alleged in the Counterclaim. Quite the contrary, Empire actually undertook to perform the obligations of LMP contained in the Loan Documents.

The Motion to Dismiss should be denied because the allegations set forth in the Counterclaim[1] are legally sufficient to state causes of action against Empire in accordance with the notice pleading requirements of the Federal Rules. Empire's frequent refrain that Investors did not present any "evidence" of Empire's failures and wrongdoing highlights Empire's misapprehension of the purpose of pleadings under the Federal Rules of Civil Procedure -- to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.Pro. 8(a)(2) (2008). The sufficiency of evidence is an issue for trial, but it is not relevant to a Motion to Dismiss. The Counterclaim complies with Rule 8(a)(2).

## STATEMENT OF FACTS SUPPORTING COUNTERCLAIM

In late 2004, several of the Investors were approached by Moore and Snead, the principals of Profile, who asked them to participate in the Project, a real estate venture at Lake Martin, Alabama. Counterclaim, ¶7, 8, 10. The Project involved development of an 18 acre parcel known as Stoneview Summit at Stillwaters Condominium. The master plan for the development called for the construction of a total of 200 condominium units in eight buildings, together with an amphitheater, clubhouse and pool as well as facilities for piers and boat slips. The Investors were advised by Moore and Snead that in the first phase of the development, the recreational facilities and three residential buildings would be constructed, one with 35 units and two with 25 units each. Moore, Snead and Profile had already discussed the financing of the Project with Empire before they approached the Investors. Moore, Snead and Profile had also been involved in pre-selling the condominium units. In fact, Empire advised Moore, Snead and

---

[1] In order to provide context, the Statement of Facts in this Memorandum fleshes out the allegations in the Counterclaim.

Profile that they could not use the deposits they received from purchasers of the condominium units to fund construction of the Project. All 85 units in the first three planned buildings were sold before construction began and most of them were sold before Moore and Snead approached the Investors. Pursuant to those purchase contracts, the majority of which were executed on December 22, 2004, construction was to have been completed by December 2006. By the time Moore and Snead discussed the Project with the Investors, virtually every aspect of the deal had been agreed upon by Empire, Moore, Snead and Profile. Investors were brought into the transaction in order to make the Project "bankable".

Moore, Snead and Profile formed Stoneview and Investors formed LMP to represent their respective interests in the Project. Counterclaim, ¶8, 9. On January 25, 2005, Stoneview and LMP entered into a Development Agreement whereby Stoneview and LMP would each receive 50% of the profit from the Project. Counterclaim, ¶10. LMP and Stoneview entered into a Construction Contract dated June 22, 2005. Counterclaim, ¶11. Construction was to commence on August 1, 2005 and be substantially completed within 360 days. Stoneview represented to the Investors that construction would cost approximately $16,000,000. Profile, the owner of the land, agreed to sell the land to LMP for approximately $6,000,000. Counterclaim, ¶10, 11. At the recommendation of Moore and Snead, Empire agreed to provide financing in the amount of $22,000,000 from a number of financial institutions, including Alpharetta Community Bank of Georgia ("Alpharetta Bank"). Counterclaim, ¶¶12, 13. Investors were required to guarantee the loan. The Loan Agreement and Guaranties were executed on September 26, 2005. Counterclaim, ¶13.

Unbeknownst to Investors, Profile had recently purchased the land from Alpharetta Bank out of a bankruptcy for approximately $1.2 million. By the time LMP agreed to acquire the

Project, Profile owed Alpharetta Bank almost $5 million on various loans. From the proceeds Profile received from the sale of the Lake Martin real estate to LMP, Profile was able to pay its debt to Alpharetta Bank in full. Empire was aware that Alpharetta Bank held the note on the Lake Martin real estate, and certainly knew of the relationship between Alpharetta Bank and Profile through its due diligence investigation.

In December 2004, well before LMP entered into any agreement relating to the Project, Empire was aware that approximately $2.5 million had been collected by Moore, Snead and Profile as deposits from pre-sales of the condominium units. Moore, Snead and Profile asked Empire whether the deposits could be used for construction expenditures. Empire's counsel advised Moore and Snead that they could not. However, Empire did not insist that the deposits be placed in an escrow account or otherwise secured. In fact, Empire never even requested an accounting of the deposits from Moore, Snead and Profile. The inquiry regarding the use of the deposits was a clear signal to Empire that Moore, Snead and Profile did not have either the wherewithal or the competence to develop the Project, and these funds have never been accounted for by Moore, Snead, Profile or Empire.

Prior to the execution of the loan documents, Moore, Snead, Profile and Stoneview ("Stoneview Entities"), Empire, and the president of Alpharetta Bank represented to the Investors and LMP that they did not have to worry about the Project because the Stoneview Entities and Empire would handle all aspects of the development in a satisfactory and commercially reasonable manner and would protect the interests of LMP and the Investors. Counterclaim, ¶15. These representations induced LMP and the Investors to acquire the Project from Profile and execute the loan documents with Empire. They were also the basis of the joint venture that was subsequently formed among Empire, the Stoneview Entities, LMP and the

Investors. The joint venturers agreed that LMP would fund the Project with the proceeds of the $22,000,000 loan from Empire, the Stoneview Entities would handle the construction, and Empire would be responsible for oversight of the Project and management of the loan proceeds. Empire was also responsible for coordinating the construction draw procedure with Moore and Snead.

LMP used approximately $4,800,000 in loan proceeds plus $1,200,000 in capital invested by its members to purchase the Lake Martin land from Profile. Counterclaim, ¶14. Profile represented to the Investors and LMP that it did not profit from this sale. This representation was not true and Empire knew it was not true. From its due diligence, Empire was aware that Profile made almost $5,000,000 on the sale of the real estate to LMP.

Empire undertook the following responsibilities in connection with the use of the proceeds of the construction loan:

1.      hiring USA Inspection Services, LLC ("USA Inspection") to inspect and certify the percentage of completion of the Project on a regular basis;

2.      receiving and reviewing draw requests;

3.      receiving and reviewing invoices submitted with the requests;

4.      receiving and reviewing the inspection reports from USA Inspection;

5.      determining and approving the amount of construction loan funds to disburse;

6.      advancing funds in response to each draw request;

7.      sending its own representatives to inspect the progress of the work;

8.      coordinating the construction; and

6

9.      allowing the Stoneview Entities to determine if construction conformed to

the plans and specifications.

Counterclaim, ¶16.  By undertaking these responsibilities, Empire assumed a much greater role

in the development of the Project than is normally undertaken by a construction lender and

thereby demonstrated that it was acting in accordance with the joint venture agreement.

Counterclaim, ¶17.

From as early as December 2005 Empire knew that there were problems with the cost,

progress and quality of work on the Project.  Counterclaim, ¶19.  Although there were warnings

raised in each USA Inspection report, Empire continued to fund each draw requested by the

Stoneview Entities.  Counterclaim, ¶19.  USA Inspection had been involved in the Project with

Empire even before LMP and the Investors executed the loan documents and had attended a pre-

closing meeting.  USA Inspection performed its services solely for Empire and sent its reports

only to Empire.  Each USA Inspection report expressly states that, "The preceding Progress

Report is intended for the sole use of Empire Financial Services.  It is not intended for use by any

third party and may only be used with the prior consent of USA Inspection Services, LLC."

On December 28, 2005, USA Inspection submitted its first inspection report to Empire,

noting that construction was to be completed 360 days from commencement.  The inspection

report discussed a $200,000 discrepancy between the construction agreement and the contract

amount set forth in the first payment application.  It also noted that a considerable amount of

rock was encountered but that no change order for additional rock removal was requested in the

payment application.  USA Inspection advised that, "cost increases are being incurred for rock

blasting but no increases are reflected on the contractor's payment application.  With the

developer [i.e., Stoneview] also being the contractor, it does not appear the true cost of the

7

project will be shown. As such it will be tough to say with any degree of certainty that the hard

costs budgeted will be sufficient to complete the project." The Investors were not provided with

this report nor were they advised by Empire of any issue related to removal of rock. Instead, a

"Rock Contingency" of $315,000 (that was not reflected in the Proposed Budget attached as

Exhibit C to the Construction Loan Agreement) was added to the AIA Draw Schedule Summary

attached to the Application and Certification for Payment number 2. No change order was

submitted regarding this significant extra cost. Over time, the Rock Contingency was increased

to $565,000 with no change order.

The second inspection report, dated March 2, 2006, revealed that Stoneview's second

application for payment was overdrawn in almost every area. In the second inspection report,

USA Inspection addressed the initial $315,000 Rock Contingency which required reductions in

the wall ($70,000), retaining wall ($120,000) and sewer outfall ($125,000) budgets. No

explanation was given for these drastic modifications of the budget and no change orders were

processed. Neither the Stoneview Entities nor Empire attempted to address the effect of the

Rock Contingencies on the overall cost of the Project nor did they inform the Investors of the

problem. USA Inspection noted that, "We had expected to see a change order instead of this

[budget] reallocation. This reallocation is more indicative of an owner-builder situation than that

of an independent, third-party general contractor."

Empire itself benefited from a similar budget reallocation under the first payment

application. Although Empire's fees were estimated to be $22,000 according to the Proposed

Budget attached as Exhibit C to the Construction Loan Agreement, its fee was increased tenfold

to $220,000 as set forth in the AIA Draw Schedule Summary attached to the Application and

Certification for Payment number 1. In "overseeing" and "managing" the Project, Empire and

Stoneview revised the construction budget as they saw fit, without the knowledge of LMP or any of the Investors, without considering the effect the shortfalls created, without any change orders and for the sole benefit of Empire and Stoneview, and to the detriment of their co-venturers, LMP and Investors. In fact, not a single change order was created or presented to LMP, although there were numerous, significant changes to the budget for the Project. Empire was aware of and participated in these changes, required no documentation for them, and continued to approve every draw request submitted by the Stoneview Entities.

The second inspection report also revealed that three months into a twelve month construction schedule, the Project was only about 5% complete and construction was moving much slower than expected. No building construction had yet commenced. USA Inspection advised Empire that, "water pressure will likely not be sufficient to serve the entire project" and that, consequently, a new water main would have to be installed. Additionally, Stoneview billed $65,000 for the pool and lift station even though those items had not been completed and $325,000 for soft costs (engineering, architectural and tap fees) without any backup documentation. Nevertheless, Empire funded Stoneview's entire draw request, apparently with no questions asked.

USA Inspection's third report is dated April 18, 2006 and notes that "no sign-offs [by county officials] are being marked on the permit cards or plans." The Investors learned after the fact that the required county inspections had not been performed during construction. The third inspection report noted additional reallocations of budgeted funds, continued failures to provide soil and concrete testing results, and the extremely slow pace of construction. The Project was only 11% completed nearly halfway into the twelve month construction schedule. In this third report, USA Inspection noted that building construction had finally commenced, that EAS

9

Contractors had been contracted to handle the vertical construction and stated, "We recommend a copy of the contract with EAS Contractors, Inc. be provided." Empire requested and received the EAS contract but did not send a copy to LMP or the Investors. The Investors later discovered that the contract with EAS Contractors was a cost plus contract even though the Construction Agreement was a fixed price contract.

USA Inspection submitted its fourth inspection report on July 26, 2006 and again found that Stoneview's payment application overstated the job progress and the amount of materials stored at the site requiring Stoneview to revise its draw application. The Project was only 14% complete, which represented only a 3% increase in progress from the inspection three months earlier. Neither LMP nor the Investors were made aware of the utter lack of progress even though the condominium purchase contracts required completion of the three buildings by December 2006.

The fifth inspection report was dated September 12, 2006 and noted that progress remained slow with the Project being only 19% complete. USA Inspection alerted Empire that "significant reductions were made to the walls, site retaining walls, sewer outfall, landscaping, bathhouse, trellis, and amphitheater line items to create the rock contingency. It is not known if there were actual savings in these line items to dedicate to rock removal or if these line items have been shorted." Empire never made inquiry in this regard nor did it inform LMP or the Investors of the issue.

The sixth inspection report dated October 13, 2006 revealed that progress continued to be at a snail's pace, and the Project was only 25% completed. The problems described in the prior reports were reiterated.

The next inspection report dated December 1, 2006 again revealed an alarming lack of progress. The Project was estimated to be only 30% completed. The problems set forth in the prior reports had not been addressed or corrected.

At the next inspection, USA Inspection discovered that Stoneview was using wood instead of steel beams and studs in the building. Empire contacted the Investors and informed them of this discrepancy. This was the first time that Empire had made the Investors aware of any problem with the Project, despite the fact that Empire had known for nearly a year that there were serious problems with the Project. Empire did not send the Investors the inspection report until the Investors requested it. Thereafter, the Investors would only occasionally receive inspection reports and only after they were requested.

Because Empire had undertaken to oversee the Project, it was incumbent upon Empire to advise LMP and the Investors of the slow pace of construction and the significant reallocations of budgeted funds. Instead, Empire and the Stoneview Entities concealed these problems from the Investors. Counterclaim, ¶20. LMP and the Investors did not become aware of the serious problems with the Project until the Spring/Summer 2007 timeframe when they learned for the first time that subcontractors were not being paid by the Stoneview Entities and liens against the property had been threatened. Counterclaim, ¶21. When some of the Investors met with Moore and Snead at the Project site in or around August 2007, they discovered that Empire and the Stoneview Entities had totally failed to perform their obligations under the joint venture agreement. Counterclaim, ¶21. Prior to that time, the Investors reasonably assumed that bills were being paid and that construction of the Project was progressing in a timely manner.

Under the joint venture agreement, LMP was to release funds only when Empire asked it to do so. LMP was not responsible for making or reviewing draw requests, inspecting the

progress of the construction or otherwise overseeing the Project or construction. All of those

tasks were Empire's responsibility pursuant to the joint venture agreement. LMP and the

Investors relied upon Empire to ensure that applications for payment were proper, that work was

being performed consistent with the construction agreement and that the construction proceeded

on time and on budget.

Except for signing checks at the request of Empire, LMP was excluded from any

substantive role in the draw request process. The Stoneview Entities would submit payment

application forms to Empire, Empire would approve them, Empire would release proceeds of the

loan to an account in the name of LMP, and notify Stoneview of the disbursement. Empire

approved payments to subcontractors and never required lien releases from those subcontractors.

Stoneview controlled the LMP account, including maintaining the checkbook. When Empire

notified Stoneview that funds would be disbursed, Stoneview would prepare a check made

payable to Stoneview in the amount approved by Empire and send it to James Paxton, one of the

Investors, for signature. Mr. Paxton would sign the check and return it to Stoneview, assuming

that Stoneview would pay whatever bills were incurred and reflected on the draw request for that

period. LMP and the Investors did not regularly receive the payment applications from

Stoneview. It was not until approximately February or March 2007, after LMP was alerted by

Empire that Stoneview was using wood instead of steel beams and studs, that LMP began

receiving payment applications from Stoneview. Even then, LMP would have to make repeated

requests for the documents and sometimes would not receive them at all or not until after Empire

had approved and funded the draw request to Stoneview.

When the Investors met with Empire in the late summer of 2007 to discuss the serious

problems of which Investors had only been recently made aware, Empire declared LMP in

12

default of the Note.  Counterclaim, ¶22.  Empire advised the Investors that if they did not

commence a voluntary bankruptcy for LMP, Empire would immediately file actions against each

of them on their guaranties and would seek involuntary bankruptcy for LMP.  The Investors had

no choice but to acquiesce to Empire's demand that LMP file a voluntary bankruptcy.

Counterclaim ¶23.  Even so, Empire filed this action against the Investors.  Empire also hired a

new contractor to complete building 5 in an attempt to finish the first 35 condominium units so

that they could be sold.  Counterclaim, ¶24.

All of the contracts on the units that had been pre-sold have long since expired and most

of those purchasers have canceled their contracts.  Since LMP's bankruptcy was filed, Empire

has continued to fail to properly oversee construction of the Project.  The cost to complete

building 5 was more than $1,100,000, exceeding the budget for that building by over 20%.

While approximately $4 million of the loan proceeds has not yet been disbursed, that amount is

grossly insufficient to complete the Project.  The completed units have significant problems

including mold and standing water.  Empire's failures to properly oversee the Project continue to

impair the value of the Project.

## STANDARD OF REVIEW

"A court may dismiss a complaint for failure to state a claim only if it is clear
that no relief could be granted under any set of facts that could be proven
consistent with the allegations in the complaint.  *Hishon v. King & Spalding*, 467
U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).  In evaluating a motion to
dismiss, the court will accept as true all well-pleaded factual allegations and will
view them in a light most favorable to the non-moving party.  *Id. at* 73; *Jackson
v. Birmingham Bd. of Educ.*, 309 F.3d 1333, 1335 (11th Cir. 2002).  'The issue is
not whether a plaintiff will ultimately prevail but whether the claimant is entitled
to offer evidence to support the claims.'  *Scheuer v. Rhodes*, 416 U.S. 232, 236,
94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).  The threshold for a complaint to survive a
motion to dismiss for failure to state a claim is 'exceedingly low.'  *Ancata v.
Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).  Additionally, a
motion to dismiss may be granted as to only part of a complaint and denied as to

the remainder. *See, e.g., Chepstow Ltd. v. Hunt*, 381 F.2d 111, 115 (2$^d$ Cir. 1982)."

*Jeter v. Montgomery County*, 480 F.Supp.2d 1293, 1297 (M.D. Ala. 2007).

## ARGUMENT AND CITATION OF AUTHORITY

**A.    Empire's contention that Investors have failed to present *evidence* that they are entitled to the requested relief fails to recognize the appropriate legal standard.**

As stated above, "[i]n evaluating a motion to dismiss, the court *will accept as true* all well-pleaded factual allegations and *will view them in a light most favorable to the non-moving party*." *Jeter, supra*, 480 F.Supp.2d at 1297 (emphasis added). Nevertheless, Empire argues repeatedly in its Motion to Dismiss that Investors have failed to present sufficient *evidence* to support their claims. At this stage of the litigation, however, the appropriate legal standard is not whether Investors have presented sufficient evidence to support their claims, but whether Investors have *alleged* sufficient facts to support their claims.

For example, in *Jeter*, the plaintiff's one-page statement of facts in her complaint alleged that Montgomery County, Alabama had violated the Fair Labor Standards Act by failing to pay her at the overtime rate for her work in excess of forty (40) hours per week. *Id.* at 1298. The Court held that these allegations were sufficient to withstand the county's motion to dismiss because the Court was required to construe the allegations as true at this stage of the litigation, and therefore the facts would entitle the plaintiff to the relief requested. *Id.* In response to the county's motion to dismiss, Jeter was not required to present evidence of her pay stubs showing work in excess of forty (40) hours per week or evidence of the amounts she was paid.

Accordingly, the Court should not look to whether there is *evidence* to support Investors' claims, but should instead look to whether Investors have alleged facts which would indicate they are entitled to relief in accordance with the previously cited and appropriate legal standard.

Investors have met this standard and alleged facts which, if true, demonstrate they are entitled to the relief requested.

**B.    Empire's reliance on the written contracts as the exclusive source of its duties and responsibilities is misplaced.**

In a lengthy "prelude" to its merits arguments, Empire appears to argue that the parties' written contractual agreements contain the sole and exclusive representations made by Empire and the sole and exclusive source of its duties and responsibilities. However, it is important to note that neither the Construction Loan Agreement nor the Personal Guarantees executed by LMP and Investors contain a merger or integration clause. That is, none of the contractual agreements contain a clause which "merges" the parties' pre-contractual representations or warranties into the agreement or which would prohibit a subsequent oral modification of the parties' written agreement.[2]

Furthermore, subsequent to the execution of the parties' written agreements, Empire made further representations and assurances to LMP and Investors and formed a joint venture with LMP, Investors and the Stoneview Entities. The subsequent entry into the joint venture modified the parties' prior written agreement, as the parties re-allocated the contractual duties and obligations which each of them would undertake. The subsequent entry into the joint venture by oral agreement and by the actions of the parties ratifying the joint venture resulted in the assumption of additional duties and responsibilities on the part of Empire and was created by

---

[2] Empire's argument in Section 3.6 of its Motion to Dismiss that Section II(a) of the Construction Loan Agreement constitutes a merger clause, merging all prior agreements and representations between the parties, is simply not credible. The section quoted by Empire in its brief states, "The Plans and Specifications heretofore delivered to Lender constitute a complete and final set of all Plans and Specifications currently required for the Project." A fair reading of this section clearly indicates that, at most, the only item intended to be integrated or merged was the plans and specifications for the work; this clause utterly fails to indicate that the written documents contain the entire agreement between the parties. Thus, while any claim regarding the plans and specifications may arguably be barred by this merger clause, it is clear that this merger clause does not apply to the entirety or remainder of the parties' agreement.

Empire's subsequent representations to LMP and Investors. When a written agreement does not contain a merger or integration clause, a subsequent oral modification or creation of a new, oral agreement is enforceable. *See, e.g., S. Atl. Produce Credit Ass'n v. Gibbs*, 257 Ga. 521, 523, 361 S.E.2d 167, 169 (1987) ("Here, it is argued that the alleged oral agreement was entered into subsequent to the execution of the promissory note. Under these circumstances, the parol-evidence rule does not stand as a barrier to the agreement's enforcement.") (cits. omit.)[3].

Because the parties subsequently entered into a joint venture by their oral statements and actions, Empire's argument that the Construction Loan Agreement and Personal Guarantees contain the sole representations made by it and the sole source of its duties and responsibilities is misplaced.

    **C.**    **Investors have alleged facts which, if true, would entitle them to relief against Empire as alleged in their Counterclaim.**

        **1.**    **Investors have alleged facts which, if true, would entitle them to relief against Empire due to Empire's negligence as alleged in Count One of their Counterclaim.**

Count One of Investors' Counterclaim alleges Empire was negligent in failing to adequately and properly monitor the progress and performance of the work on the Project. Empire argues that Investors have failed to state a claim of negligence, "because [Investors] failed to allege that [Empire] breached any duty 'imposed by law and not merely the breach of a duty imposed by the contract itself.'" Thus, Empire appears to take the position that the only duties it owed to Investors were those duties imposed upon it by the Construction Loan Agreement. As previously discussed, this argument is without merit because, as a joint venturer, Empire subsequently assumed certain duties and responsibilities regarding the Project.

---

[3] Although this action is taking place in Alabama and generally concerns a real estate development located within the State of Alabama, the parties appear to agree that Georgia law should control this action, as the parties' agreements were made in the State of Georgia. Empire relied almost exclusively upon Georgia case law in support of its Motion to Dismiss.

"Georgia law 'imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken.'" *Allstate Ins. Co. v. Sutton*, 290 Ga. App. 154, 158, 658 S.E.2d 909 (2008), *citing Blossman Gas Co. v. Williams,* 189 Ga. App. 195, 197, 375 S.E.2d 117 (1998); *see also Constr. Lender, Inc. v. Sutter*, 228 Ga. App. 405, 407, 491 S.E.2d 853 (1997). Investors' claim for negligence against Empire is not based upon the Construction Loan Agreement. Rather, Investors' negligence claim against Empire is based upon Empire's assumption of certain responsibilities regarding the Project for the benefit of LMP and Investors. Among these responsibilities were those to:

1.    hire an inspection company to inspect and certify the percentage completion of the project on a regular basis;

2.    receive and review draw requests;

3.    receive and review invoices submitted with the draw requests;

4.    receive and review the inspection reports;

5.    determine and approve the amount of construction loan funds to advance;

6.    advance funds in response to each draw request;

7.    send its own representatives to inspect the work;

8.    coordinate the construction of the work; and,

9.    allow the Stoneview Entities to determine if construction conformed to the plans and specifications.

Counterclaim, ¶16. Empire undertook these additional responsibilities knowingly, voluntarily and for the benefit of LMP and Investors. In fact, Empire's knowing and voluntary assumption of these extra responsibilities was in direct contradiction to Section IV of the Construction Loan

17

Agreement, which required LMP, in many instances, to undertake the foregoing responsibilities. Nevertheless, Empire represented to LMP and Investors that it would undertake these responsibilities in order to minimize potential losses to LMP and Investors and to ensure that the Project was developed and completed in an appropriate matter. In fact, Empire's knowing and voluntary assumption of these duties actually prevented LMP and Investors from performing their contractual duties.

Under similar circumstances in *Constr. Lender, supra*, 228 Ga. App. 405, 491 S.E.2d 853, the Georgia Court of Appeals held that where the facts indicate that a construction lender voluntarily undertook the duty to obtain the owner's approval before disbursing loan proceeds to the builder, the construction lender owed a duty to the owner to perform such obligations with ordinary and reasonable care. *Id.* Similarly in this instance, Investors have alleged that Empire voluntarily and knowingly undertook to perform the foregoing duties and Empire failed to perform such duties with reasonable care. Investors have further alleged that Empire's failure to perform such assumed duties damaged Investors. Accordingly, Count One of Investors' Counterclaim is sufficient to state a claim for negligence against Empire.

> **2.    Investors have alleged facts which, if true, would entitle them to relief against Empire due to Empire's breach of its fiduciary duties to the parties' joint venture as alleged in Count Two of their Counterclaim.**

Count Two of Investor's Counterclaim alleges Empire breached the fiduciary duties owed by it to its co-venturers in the Project. Empire summarily denies a joint venture existed and contends that the parties' relationship was solely one of debtor, creditor and Investors. However, Investors have alleged facts which, if true, would entitle them to relief against Empire due to Empire's breach of its fiduciary duties. The allegations contained in Count Two of Investors' Counterclaim are sufficient to defeat Empire's Motion to Dismiss.

Under Georgia law, "[a] joint venture arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control...." *Gateway Atlanta Apartments, Inc. v. Harris*, 290 Ga. App. 772, 778, 660 S.E.2d 750 (2008), *citing Williams v. Chik-Fil-A*, 274 Ga. App. 169, 170, 617 S.E.2d 153 (2005). The "question of whether or not the facts proved a joint adventure between the parties ... is generally a jury question." *Bowman v. Fuller*, 84 Ga. App. 421, 425-26, 66 S.E.2d 249, 253 (1951). A party to a joint venture owes fiduciary duties to its co-venturers under Georgia law. *See Clement A. Evans & Co. v. Waggoner*, 197 Ga. 857, 865, 30 S.E.2d 915, 920 (1944).

As discussed previously, Empire knowingly and voluntarily assumed additional duties and responsibilities in managing and controlling the Project through its representations to LMP and Investors and through its actions. Empire's contribution of its labor and services with the services and property of LMP, Investors and the Stoneview Entities created a joint venture. Contrary to Empire's contention that it owed no duties to the Investors independent of the Construction Loan Agreement, Investors have alleged that Empire knowingly and voluntarily assumed and undertook additional duties to manage and control the Project pursuant to the parties' joint venture. Investors have further alleged that Empire failed to perform these duties in accordance with the appropriate standard of care and such breach caused damage to its co-venturers, including Investors.

Furthermore, the allegations also indicate that Empire engaged in self-dealing by allowing the "bank fees" line item for construction to be increased from $22,000, as stated in the initial schedule attached to the Construction Loan Agreement[4], to a total of $220,000 as indicated in the first payment application. Neither LMP nor Investors were made aware of this ten-fold

---

[4] *See* Plaintiff's Motion to Dismiss Counterclaims, Ex. "B", Construction Loan Agreement, Ex. "C" thereto, p. 22 of 24.

increase in Empire's fees which was unilaterally imposed by Empire and the Stoneview Entities.

Under Georgia law, "[a] fiduciary's duty of good faith prohibits him from appropriating for

himself the assets and property of the corporation, to the exclusion of minority shareholders."

*Parks v. Multimedia Techs.*, 239 Ga. App. 282, 289, 520 S.E.2d 517, 525 (1999). This equitable

principle is equally applicable in this situation where one joint-venturer has appropriated nearly

$200,000 in additional fees to itself without the knowledge or consent of its co-venturers.

Because Investors have alleged facts sufficient to show a joint venture existed and that

Empire breached its fiduciary duties by failing to perform its duties with the requisite degree of

care and engaged in self-dealing, Count Two of Investors' Counterclaim states a claim for breach

of fiduciary duty against Empire.

> 3. **Investors have alleged facts which, if true, would entitle them to relief against Empire due to Empire's breach of the implied covenants of good faith and fair dealing implicit in the parties' contract as alleged in Count Three of their Counterclaim.**

Count Three of Investors' Counterclaim alleges Empire breached the implied covenants

of good faith and fair dealing implicit in the parties' joint venture agreement. Specifically,

Investors contend Empire acted in bad faith in failing to properly monitor the progress and

performance of the Project, which Empire and the participating lenders represented to LMP and

the Investors they would undertake and assume on behalf of the joint venture. In response,

Empire contends Investors' breach of contract claim is contradicted by the Construction Loan

Agreement and that Investors have failed to show Empire breached the terms of the Construction

Loan Agreement or acted in bad faith in the performance of its joint-venture obligations.

Under Georgia law,

> "Every contract implies a covenant of good faith and fair dealing in the
> performance of the terms of the agreement. This implied duty 'requires both
> parties to a contract to perform their promises and provide such cooperation as is
> required for the other party's performance.' And, 'where the manner of

> performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith.' Finally, 'the question of good faith is for the jury.'"

*Camp v. Peetluk*, 262 Ga. App. 345, 350, 585 S.E.2d 704, 708 (2003) (citations omitted). In *Camp*, the Georgia Court of Appeals held that where the record contained evidence from which a jury could find the defendant failed to exercise good faith in its performance of its contractual obligations, it was inappropriate to grant summary judgment to the defendant.

In this instance, the facts alleged demonstrate Empire agreed to undertake and assume certain duties necessary to monitor the performance of the work on the Project on behalf of the joint venture. While Empire again argues its duties were limited solely to those contained in the Construction Loan Agreement, as stated earlier, the Construction Loan Agreement *does not* contain a merger or integration clause which would void any prior oral representations by Empire or require that any subsequent modifications of the parties' agreement be in writing. Thus, Empire's oral representations to its co-venturers that it would undertake these duties created valid and binding obligations upon Empire.

Investors have further alleged that Empire failed to exercise good faith in the performance of these contractual duties. That is, Empire was made aware and put on notice as early as the first inspection report issued on December 28, 2005 that there were serious issues with the Project. Subsequent inspection reports reinforced these concerns, yet Empire failed to alert its co-venturers to these serious issues and concealed these problems from its co-venturers, LMP and Investors. Thus, Empire cannot be said to have acted in good faith, and accordingly, Investors have stated a claim for breach of the implied covenants of good faith and fair dealing by Empire.

**4.    Investors have alleged facts which, if true, would entitle them to relief against Empire due to Empire's conversion of Investor's property as alleged in Count Four of their Counterclaim.**

Count Four of Investors' Counterclaim alleges Empire converted Investors' property by exercising control and dominion over LMP, the Project and their funds. Empire has converted these assets by taking control over LMP and the Project, knowingly and voluntarily undertaking certain duties in regards to the joint venture and by forcing and coercing LMP and Investors into filing a bankruptcy petition which has rendered Investors' interest in LMP and LMP's interest in the Project virtually worthless.

> "Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation. Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion."

*Decatur Auto Center, Inc. v. Wachovia Bank,* 276 Ga. 817, 819, 583 S.E.2d 6, 7 (2003).

While Empire contends it has not converted Investors' assets because it has acted in compliance with the terms of the Construction Loan Agreement, it is clear that nowhere in the Construction Loan Agreement is Empire given the right to force, coerce or threaten Investors into placing LMP into bankruptcy. Similarly, nothing in the Construction Loan Agreement gives Empire the right to exercise dominion and control over the Project and LMP as it has. Rather, Empire essentially undertook management of the Project pursuant to the parties' joint venture and, when Empire's abject failure to properly manage the Project or perform its joint venture duties came to light, Empire forced, coerced and threatened Investors into filing for bankruptcy protection for LMP, thus making Investors' membership interests in LMP, and LMP's interest in the Project, virtually worthless. Furthermore, Empire has continued to exercise control over

LMP and the Project since the bankruptcy filing, further diminishing the value of Investors' investment in LMP.

Accordingly, Investors have alleged facts sufficient to support a claim of conversion against Empire due to Empire's exercise of control and dominion over LMP, which has caused significant loss and damage to the value of the Investors' membership interests in LMP.

> **5.    Investors have alleged facts which, if true, would entitle them to relief against Empire due to Empire's engaging in a conspiracy with the Stoneview Entities to defraud Investors as alleged in Count Five of Investors' Counterclaim.**

Count Five of Investors' Counterclaim alleges Empire engaged in a conspiracy with the Stoneview Entities to defraud the Investors. To recover on a claim for civil conspiracy, a party is "required to show 'that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Absent the underlying tort, there can be no liability for civil conspiracy.'" *Argentum Int'l, LLC v. Woods*, 280 Ga. App. 440, 444, 634 S.E.2d 195, 200 (2006), *citing Premier/Ga. Mgmt. Co. v. Realty Mgmt. Corp.*, 272 Ga. App. 780, 783, 613 S.E.2d 112 (2005). Moreover, "[b]ecause civil conspiracy is by its very nature a secret endeavor, concert of action, amounting to a conspiracy, is best suited for jury resolution." *Id., citing Traub v. Washington*, 264 Ga. App. 541, 546, 591 S.E.2d 382 (2003).

Empire argues Investors' conspiracy claim should be dismissed because there is no *evidence* Empire acted in concert with another party or committed any underlying tort. As discussed earlier, however, Investors are not required to present *evidence* of a civil conspiracy at this time, but instead the Court must accept as true all well plead allegations. *Jeter v. Montgomery County, supra.* Furthermore, as stated earlier, a conspiracy "is by its very nature a secret endeavor … [and therefore] best suited for jury resolution." *Argentum, Int'l, supra*, 280 Ga. App. at 444, 634 S.E.2d at 195. Investors have alleged Empire acted in concert with the

Stoneview Entities to defraud Investors, and fraud is a tort. Accordingly, Investors have stated a claim for civil conspiracy sufficient to withstand Empire's Motion to Dismiss. Investors should be allowed to pursue discovery on their conspiracy claim against Empire.

> **6.    Investors have alleged facts which, if true, would entitle them to relief against Empire due to Empire's negligent misrepresentations to Investors as alleged in Count Six of their Counterclaim.**

Count Six of Investors' Counterclaim alleges Empire negligently misrepresented to the Investors that it would adequately and properly monitor the performance of the work on the Project for the Investors' benefit. Empire's contention that Investors have failed to state the precise nature and elements of a negligent misrepresentation claim is also without merit. "The essential elements of negligent misrepresentation are '(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.'" *Marquis Towers, Inc. v. Highland Group*, 265 Ga. App. 343, 346, 593 S.E.2d 903, 906 (2004), *citing Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.,* 267 Ga. 424, 426, 479 S.E.2d 727 (1997). Investors have alleged that (1) Empire negligently supplied false information to LMP and the Investors concerning what actions Empire would undertake; (2) Investors relied upon this false information; and (3) Investors have been damaged as a result of such reliance. *See* Counterclaim, ¶¶ 49-51.

Finally, Empire's apparent contention that Investors were already obligated to guarantee the loan and that no subsequent representations made by Empire affected this guarantee is also incorrect. That is, had Investors been made aware of the substantial problems with the Project (which were plainly apparent as early as the first inspection report and continued with each subsequent inspection report), Investors could have cancelled their guarantees and limited their potential liability and losses. Instead, Empire concealed these problems from Investors,

represented to Investors that Empire was effectively managing the Project and failed to alert Investors of any problems until Empire had advanced more than $18 million to the project and Investors were potentially liable for this entire amount.

As such, Investors have alleged facts which, if true, would show that Empire is liable for negligently misrepresenting information to LMP and Investors. That is, Investors have alleged that Empire negligently supplied false information to LMP and the Investors, that Investors relied upon this information and that such reliance resulted in damages to them. Accordingly, Investors have stated a claim for negligent misrepresentation against Empire and Empire's Motion to Dismiss should be denied.

## CONCLUSION

Because Investors have alleged facts which support their claims against Empire under the liberal pleading rules established by the Federal Rules of Civil Procedure, and because the Court must construe such allegations as true for purposes of Empire's Motion to Dismiss, Empire's Motion to Dismiss Investors' Counterclaims should be denied.

Respectfully submitted,

/s/ Dow T. Huskey
Dow T. Huskey        (HUS002)
P.O. Drawer 550
Dothan, Alabama  36302
T:  334-794-3366
F:  334-794-7292

_____/s/ Benjamin Rosenberg_____
Benjamin Rosenberg  (00263)

_____/s/ T. Christine Pham_____
T. Christine Pham    (25466)

_____/s/ John A. Roberts_____
John A. Roberts     (04969)
Rosenberg Martin Greenberg, LLP
25 South Charles Street, Suite 2115
Baltimore, Maryland 21201
T: 410-727-6600
F: 410-727-1115

Attorneys for Defendants
 Kenneth L. Todd, III
 Michael D. Brock
 James R. Paxton
 Daniel A. Bailey
 C. Wayne Roberts
 Timothy L. Eakes
 Keith A. LaFerriere
 Gary L. Anderson

## CERTIFICATE OF SERVICE

    I hereby certify that on this 10th day of July, 2008, a copy of the foregoing Memorandum in Opposition to Motion to Dismiss Counterclaim was served via electronic filing upon: Robert Payne Reynolds, Esquire, Michael Stewart Jackson, Esquire, Thomas Cowan Knowles, Esquire, Benjamin Saxon Main, Esquire, Ryan Wesley Shaw, Esquire and Rachel L. Webber, Esquire.

_____/s/ Benjamin Rosenberg_____
Benjamin Rosenberg

282998.01