**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| EMPIRE FINANCIAL SERVICES, INC. § | | |
| § | | |
| PLAINTIFF, § | CIVIL ACTION NO: | |
| § | | |
| VS. § | 1:08-cv-00226-WHA-WC | |
| § | | |
| KENNETH L. TODD, III, *et al.* § | | |
| § | | |
| DEFENDANTS. § | | |
| § | | |

**PLAINTIFF'S REPLY TO MEMORANDUM IN OPPOSITION**
**TO MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM**

Plaintiff, Empire Financial Services, Inc., by and through its attorney of record and in reply to Defendants' Memorandum in Opposition to Motion to Dismiss Counterclaim states as follows:

**INTRODUCTION**

As set forth in Plaintiff's Motion to Dismiss Counterclaim, Empire Financial Services, Inc. (hereinafter, "Empire") a Georgia corporation, filed a Complaint [Docket Item "2"] against Defendants as a result of Defendants' failure to pay approximately $18,000,000.00 due from Lake Martin Partners, LLC (hereinafter, "Lake Martin"), pursuant to the terms of unlimited unconditional guaranties executed by each Defendant. Each Defendant is either a member of Lake Martin or an owner of a controlling entity which is a member of Lake Martin. Although Defendants now assert many factual allegations in their Response to Plaintiff's Motion to Dismiss Defendants' Counterclaim, three issues remain clear:

(1)     Defendants impliedly concede that the Counterclaim is due to be dismissed unless a joint venture for their benefit exists with Plaintiff;

(2)     Defendants falsely represent to the Court multiple factual allegations including but not limited to that "Profile...purchased the land from Alpharetta Bank out of a bankruptcy" (Memorandum in Opposition to Motion to Dismiss Counterclaim, Page 4 of 26); that the "guaranty agreements do not contain a merger and integration clause" (Id. Page 15 of 26);  that Empire provided the purchase money loan to enable Lake Martin to purchase the undeveloped land from The Profile Group (Id. Page 4 of 26); and that Empire altered the construction budget to increase its loan origination fee from $22,000 to $220,000 (Id. Pages 5-6 and 19-20 of 26) when in fact the Loan Commitment executed by each Defendant specifically provides for a $220,000 fee equal to 1% of the loan.

(3)     Defendants fail to address the issue of judicial estoppel and the fact that the status of Empire and the validity of the debt has been judicially established by the Final Order Approving Post-Petition Financing Between Debtor and Empire [Bk. Doc. 73 in Chapter 11 Case No.07-11470 and attached to the Complaint in the instant case as Exhibit "4"] under which Lake Martin waived **any** potential claims against Empire and thus waived any claim based upon an alleged joint venture.

Because judicial estoppel precludes the Counterclaim, Plaintiff will address that issue first.

## ARGUMENT AND CITATION OF LEGAL AUTHORITY

### 1.     Defendants' Counterclaim is precluded by the doctrine of judicial estoppel.

Under the doctrine of judicial estoppel, a party is precluded from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.  Ex Parte

First Alabama Bank, 883 So.2d 1236, 1241 (2003); Chandler v. Samford University, 35 F. Supp. 2d

861 (N.D. Ala.1999);   Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1288 (11th Cir. 2002).

Judicial estoppel strives to preserve the sanctity of the oath. First Alabama, 883 So.2d 1236 (2003);

Chandler, 35 F.Supp.2d 861 (N.D. Ala.1999). The purpose of this doctrine is to protect the integrity

of the judicial process by prohibiting parties from deliberately changing positions according to the

exigencies of the moment.  Id. Also see (Citing New Hampshire v. Maine, 532 U.S. 742, 749-50

(2001)).  The United States Supreme Court, in New Hampshire v. Maine, 532 U.S. 742 (2001)

discussed the issue of judicial estoppel and created a three (3) pronged test for the application of this

doctrine:

> (1) "a party's later position must be 'clearly inconsistent' with its earlier position";
> (2) the party must have been successful in the prior proceeding so that "judicial
> acceptance of an inconsistent position in a later proceeding would create 'the
> perception that either the first or second court was misled'" (quoting Edwards v.
> Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir.1982));  and (3) the party seeking to
> assert an inconsistent position must "derive an unfair advantage or impose an unfair
> detriment on the opposing party if not estopped."

First Alabama, 883 So. 2d 1236, 1244-45 (Ala. 2003) (quoting New Hampshire, 532 U.S. at 750-51,

121 S. Ct. 1808)).  These three (3) factors were expressly adopted by the Alabama Supreme Court

in First Alabama, supra.

    In First Alabama, the Alabama Supreme Court addressed the issue of judicial estoppel when

a customer of First Alabama Bank had failed to disclose that he had $500,000.00  located in a safe

deposit box with the bank in a prior bankruptcy proceeding and in a state court divorce proceeding.

Id. at 1240.  Plaintiff later learned, upon inspection of the safe deposit box, that the $500,000.00 was

missing.  Id.  Plaintiff subsequently sued the bank for allowing his wife access to the funds, and his

ex-wife for taking the funds without his knowledge. Id. at 1238.  The Alabama Supreme Court held

that all three (3) of the judicial estoppel factors were met in this case:

> Application of the formulation in New Hampshire v. Maine yields a result that is not
> offensive to the judicial system.  With reference to the requirement of clear
> inconsistency, [plaintiff]'s testimony in the divorce proceeding and his filings in the
> bankruptcy proceeding were completely inconsistent with the position he takes in the
> complaint in this action.  In the earlier proceedings, he said that he did not have
> $500,000 in cash and certificates of deposit in a safe-deposit box; in this proceeding,
> he said that he did.  Success of the prior proceedings cannot be challenged, because
> both proceedings concluded on a state of facts consistent with [plaintiff]'s not having
> $500,000 in cash and certificates of deposit.  Finally, [plaintiff], if allowed to assert
> the inconsistent position in this proceeding, satisfies both alternative prongs set forth
> under the third factor of New Hampshire v. Maine – he would derive an unfair
> advantage *and* impose an unfair detriment on the Bank if not estopped.

Id. at 1245. The Court found for the bank and dismissed the plaintiff's claim on the basis of judicial

estoppel.  Additionally, the Court served notice to bankruptcy debtors that "playing[ing] fast and

loose with the courts may result in dismissal of their civil claims." Id. at 1226.

A.    **The position asserted by Defendants, who claim ownership of the assets of Lake
      Martin and attempt to stand in Lake Martin's shoes in the current case, is
      clearly inconsistent with their prior position in the Chapter 11 bankruptcy
      proceeding.**

"Courts of various jurisdictions have held that a debtor's assertion of legal claims not

disclosed in earlier bankruptcy proceedings constitutes an assumption of inconsistent positions."

Chandler, 35 F. Supp. 2d at 863 (citing In re Tippins, 221 B.R. 11, 26-27 (Bankr. N.D. Ala. 1998);

Bertrand v. Handley, 646 So. 2d 16, 19 (Ala. 1994);  Luna v. Dominion Bank of Middle Tennessee,

Inc., 631 So. 2d 917, 918 (Ala. 1993); Underwood v. First Franklin Financial Corp., 710 So. 2d 424,

426 (Ala. Civ. App. 1997), reh'g denied, cert. denied (1998). See Payless Wholesale Distributors,

Inc. v. Alberto Culver, 989 F.2d 570, 571 (1st Cir. 1993), cert. denied, 510 U.S. 931, 114 S. Ct. 344,

126 L. Ed.2d 309 (1993); Oneida Motor Freight, Inc. v. New Jersey Bank, 848 F.2d 414, 419 (3rd

Cir. 1988); Brassfield v. Jack McLendon Furniture, Inc., 953 F. Supp. 1424, 1432-33 (M.D. Ala.

1996)).

While Defendants claim the assets of Lake Martin and attempt to stand in Lake Martin's

shoes in Defendants' Counterclaim, it is clear that Defendants, much like the plaintiffs in First

Alabama and Chandler, did not assert in the bankruptcy proceeding any potential claims against

Empire. In Schedule D. Creditors Holding Secured Claims filed in Ch.11 Case No.07-11470, Lake

Martin listed Empire as a creditor holding a secured claim. [Bk. Doc. 44, Ch.11 Case No.07-11470].

In Schedule B. Personal Property filed in Ch.11 Case No.07-11470 [Bk. Doc. 44, Ch.11 Case No.07-

11470], however, Lake Martin listed as potential causes of action claims only against Stoneview

Summit, Inc., and/or The Profile Group under penalty of perjury. No claim against Empire is listed

in Lake Martin's bankruptcy schedules and, more importantly, the Defendants as members of Lake

Martin authorized the filing of the voluntary Chapter 11 case of Lake Martin, the various schedules

filed as a part of the petition, the execution of the post financing term sheet and the filing of the post

petition financing motion by Lake Martin which specifically released any such claims and ratified

and consented to the validity, amount and priority of the obligations due Empire. The Final Order

Approving Post-Petition Financing Between Debtor and Empire [Ch.11 Case No.07-11470, Bk.

Doc.73 and attached to the Complaint in the instant case as Exhibit "4"] (hereinafter, "Financing

Order") through which such claims were waived was entered by **consent**. Only after Empire filed

suit as a result of Defendants' failure to pay Empire approximately $18,000,000.00 due from Lake

Martin pursuant to the terms of unlimited unconditional guaranties executed by Defendants and

established by the Financing Order did Defendants attempt to allege claims against Empire. These

positions are clearly inconsistent.

    **B.**    <u>**The acceptance of Defendants' current position by this Court would create the**</u>
<u>**perception that the bankruptcy court was misled regarding the potential claims**</u>
<u>**of Lake Martin**</u>**.**

    "Debtors filing Chapter 11 or 13 must disclose all legal or equitable interest in property as

of the commencement of the case as well as any interest in property the bankruptcy estate acquires

after the commencement of the case." <u>Chandler</u>, 35 F. Supp. 2d at 864, Footnote Three (Citing

<u>Brassfield v. Jack McLendon Furniture, Inc.</u>, 953 F. Supp. 1424, 1432-1433 (M.D. Ala. 1996)). "The

success of our bankruptcy laws requires a debtor's full and honest disclosure." <u>Burnes</u>, 291 F.3d at

1288.

    The Alabama Supreme Court held in <u>First Alabama</u>: "Success of the prior proceedings cannot

be challenged, because both proceedings concluded on a state of facts consistent with [plaintiff]'s

not having [the money]." <u>First Alabama</u>, 883 So. 2d at 1245. In Ch.11 Case No.07-11470, Lake

Martin listed as potential causes of action claims only against Stoneview Summit, Inc., and/or The

Profile Group under penalty of perjury. Further, in paragraph 4 of the Financing Order, Lake Martin,

"for itself and its successors and assigns" was "deemed to waive its rights to claims to challenge the

pre-petition liens and secured claim of Empire Financial." Accordingly, any recognition of alleged

claims against Empire by Lake Martin or Defendants, who claim the assets of Lake Martin and

attempt to stand in Lake Martin's shoes, would give the appearance that the bankruptcy court was

misled in its earlier proceeding.

**C.**     **Defendants would obtain an unfair benefit in the form of a potential monetary recovery from Empire if not judicially estopped from asserting their claims.**

Much like the plaintiffs in <u>Chandler</u> and <u>First Alabama</u> who would have obtained an unfair benefit in the form of monetary recovery if not judicially estopped, Defendants would unfairly benefit from any damages the Court might award to Defendants and against Empire if Defendants prevail in any respect with regard to their Counterclaim.

> The success of our bankruptcy laws requires a debtor's full and honest disclosure. Allowing [a debtor] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them. This so-called remedy would only diminish the necessary incentive to provide the bankruptcy court with a truthful disclosure of the debtor's assets. See <u>Traylor v. Gene Evans Ford, LLC</u>, 185 F.Supp. 2d 1338, 1340 (N.D. Ga. 2002) (denying a debtor's request to back up and disclose a previously undisclosed claim to the bankruptcy court in the face of an adversary's challenge); <u>Scoggins v. Arrow Trucking Co.</u>, 92 F. Supp.2d 1372, 1376 (S.D. Ga. 2000) (same); <u>Chandler v. Samford University</u>, 35 F.Supp.2d 861, 863-65 (N.D. Ala. 1999) (applying the doctrine of judicial estoppel to a bar a plaintiff from a asserting a previously undisclosed tort claim, even though she eventually informed her attorney and the bankruptcy court of the claim). <u>Burnes</u>, 291 F.3d at 1288.

Although Defendants fail to state claims against Empire and the claims they attempt to allege on behalf of Lake Martin are without merit, Lake Martin did not list any potential claims against Empire and failed to disclose the same to the bankruptcy court.  By recognizing any of the claims Defendants attempt to allege against Empire, this Honorable Court would thus allow Defendants to "derive an unfair advantage" from an inconsistent position or "impose an unfair detriment" on Empire resulting from Defendants' inconsistent position.  Accordingly, Defendants, who claim the assets of Lake Martin and attempt to stand in Lake Martin's shoes, should be estopped from prevailing with regard to any claims they attempt to assert against Lake Martin. In reliance upon the

Financing Order, Empire has advanced in excess of $1,500,000 to complete Building 5 of the Lake

Martin project for the benefit of Lake Martin.

2.    **The status of Empire and the validity of the debt has been judicially established by the Final Order Approving Post-Petition Financing Between Debtor and Empire [Bk. Doc. 73 in Chapter 11 Case No.07-11470 and attached to the Complaint in the instant case as Exhibit "4"] under which Lake Martin waived any potential claims against Empire, and the Financing Order constitutes _res judicata_.**

In bankruptcy proceedings, an order is final and appealable if it resolves a particular

adversary proceeding or controversy rather than the entire bankruptcy litigation. In re Martin, 490

F.3d 1272 (2007); In re Charter Co., 778 F.2d 617, 621 (11th Cir.1985).  In any case, a court retains

the authority to enforce its orders and judgments. Id. That residual authority does not render the

court's orders and judgments disposing of a case non-final. Id. A prior judgment must meet four

criteria to be given preclusive effect:

> First, the prior judgment must be valid in that it was rendered by a court of competent jurisdiction and in accordance with the requirements of due process.  Second, the judgment must be final and on the merits. Third, there must be identity of both parties or their privies. Fourth, the later proceeding must involve the same cause of action as involved in the earlier proceeding. Id. In re Justice Oakes II, Ltd., 898 F.2d 1544 (11th Cir.1990).

In In re Martin, 490 F.3d 1272 (2007), an appellant debtor sought review of the decision of a United

States District Court, which affirmed a bankruptcy court's order finding the debtor bound by its

previous orders compelling and then approving the bankruptcy trustee's settlement of a state court

action brought against the debtor by appellee creditor.  On review, the appellate court affirmed the

bankruptcy court's ruling and held that the order approving the settlement agreement barred the

debtor from re-litigating issues pertaining to its preclusive effect.  The order approving the settlement

agreement was entered in a court of competent jurisdiction in accordance with due process.  The

trustee's abandonment of any interests in the state litigation was a ministerial act under 11 U.S.C.S.

§544(a) in that the estate's right after the settlement became of inconsequential value.  The order

approving settlement provided a final determination on the merits.  Thus, the doctrine of res judicata

precluded the debtor from re-litigating defenses waived in the settlement agreement and considered

at the proper time by the bankruptcy court. In re Martin, 490 F.3d 1272 (2007).

Similar to the debtor in In re Martin who waived settlement defenses and was thus precluded

from re-litigating defenses waived, Lake Martin waived any potential claims against Empire under

the Financing Order and is, thus, precluded from re-litigating the claims it waived by the doctrine

of res judicata.  Consequently, Defendants, who claim the assets of Lake Martin and attempt to stand

in Lake Martin's shoes, likewise, waived and are precluded from asserting any potential claims

against Empire under the Financing Order.  On November 21, 2007 the United States Bankruptcy

Court for the Middle District of Alabama, Chapter 11 Case No. 07-11470 ordered as follows:

> "Debtor for itself and its successors and assigns, is hereby deemed to waive its rights to
> challenge the pre-petition liens and secured claims of Empire Financial, and further waives
> all claims against Empire Financial, its participants, officers and other related parties in
> interest with regard to these matters."    [Bk. Doc. 73, Chapter 11 Case No.07-11470;
> Complaint, Exhibit "4"; Also see page 10 of the Motion to Dismiss].

The Financing Order was issued in accordance with due process and, like the bankruptcy court's

order in In re Martin, is sufficiently final such that it is entitled to preclusive effect.  Satisfying the

third prong of preclusive effect, it is beyond dispute that the parties in the instant case and the

bankruptcy case are identical.  Finally, it is similarly indisputable that the causes of action involved

in both matters are identical since both cases arise from the same nucleus of operative facts and

involve the same factual predicates. Id. See Citibank, N.A. v. Data Lease Financial Corp., 904 F.2d

1498, 1503 (11th Cir.1990). The doctrine of res judicata precludes Lake Martin and Defendants, who

claim the assets of Lake Martin and attempt to stand in Lake Martin's shoes, from re-litigating the

defenses waived in the Financing Order and which waivers were requested in the motion of Lake

Martin and considered appropriate by the bankruptcy court.  Under the Financing Order, both Lake

Martin and Defendants have relinquished any claims against Empire.

3.      **The analysis in a ruling on a motion to dismiss for failure to state a claim is limited
        primarily to the face of the complaint and the attachments thereto, and Empire's
        Motion to Dismiss is due to be granted because the allegations in Defendants'
        Counterclaim do not plausibly suggest that Defendants are entitled to any relief in this
        matter.**

        While Defendants may allege virtually anything in a pleading or memorandum, in ruling on

a motion to dismiss for failure to state a claim, the analysis "is limited primarily to the face of the

complaint and attachments thereto." Med South Health Plans, LLC v. Life of the South Insurance

Company, 2008 WL 2119915 (M.D.Ga.2008); Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116

F.3d 1364, 1368 (11th Cir.1997) (per curiam).   "However, where the plaintiff refers to certain

documents in the complaint and those documents are central to the plaintiff's claim, then the court

may consider the documents part of the pleadings...and the defendant's attaching such documents

to the motion to dismiss will not require conversion of the motion into a motion for summary

judgment." Id. at 1369.  The court still must "constru[e] the complaint in the light most favorable

to the plaintiff and accept as true all facts which the plaintiff alleges." Day v. Taylor, 400 F.3d 1275.

A formulaic recitation of the elements of a cause of action will not do.  Id. Watts v. Fla. Int'l Univ.,

495 F.3d 1289, 1295 (11th Cir.2007) (quoting  Bell Atl.Corp. v. Twombly, – U.S.– 127 S.Ct. 1955,

1965 (2007).

When considering a motion to dismiss, the Court must consider whether the "complaint's allegations...plausibly suggest that the [plaintiff] has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff's complaint should be dismissed." Boyd v. Peet, 2007 WL 2781033 (11th Cir.2007) (citing Bell Atl.Corp. v. Twombly, – U.S.– 127 S.Ct. 1955, 1965 (2007) (heightening the pleading requirements under Rule 8)); accord Crutchfield v. State, 2007 WL 2908270 (M.D.Ga.2007). Because the allegations in Defendants' Counterclaim do not plausibly suggest that Defendants are entitled to any relief in this matter, Empire's Motion to Dismiss is due to be granted.

In Med South Health Plans, LLC, v. Life of the South Insurance Company, 2008 WL 2119915 (M.D.Ga.2008), Med South filed suit against Life of the South Insurance Company (hereinafter, "LOTS") asserting, *inter alia*, common law claims for breach of contract, negligence, and negligent misrepresentation. Pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), LOTS filed a motion to dismiss Med South's Complaint for failure to state a claim upon which relief could be granted. The diversity action arose from the contract and resulting business relationship between Med South and LOTS. Id. Despite Med South's nineteen (19) page Complaint and four-and-a-half-page Statement of Facts, the court held that Med South failed to state viable claims for relief under state law.   The court also ruled that LOTS did not expressly or impliedly breach the contract. Because no contractual breach occurred, the court further held that a breach of the duty of good faith and fair dealing did not occur. Id. As LOTS did not allege that the insurer breached a duty imposed by law, its general negligence claim failed. LOTS' negligent misrepresentation claim failed because LOTS did not assert allegations sufficient to state a claim for negligent misrepresentation. Id.

Accordingly, the United States District Court for the Middle District of Georgia dismissed Med South's Complaint. Much like Med South's Complaint, Lake Martin's Counterclaim in the instant case is due to be dismissed.

**4.     The entire Counterclaim is barred by the express provision of the Promissory Note authorized by Defendants, the unlimited unconditional guaranty agreements executed by Defendants, and the Construction Loan Agreement executed by Defendants; and Defendants have failed to state a claim of negligence.**

*A plaintiff seeking to enforce a promissory note establishes a prima facie case by producing the note and showing that it was executed.* Fielbon Development Co., LLC v. Colony Bank of Houston County, 2008 WL 787720 (Ga.App.2008). *Once that prima facie case has been made, the plaintiff is entitled to judgment as a matter of law unless the defendant can establish a defense.* Id. Collins v. Regions Bank, 282 Ga.App.725, 726 (639 SE2d 626) (2006). A guaranty or suretyship is primarily one to pay the debt of another which may be due and payable by the principal debtor to the creditor upon default. Id. The contract of suretyship is one of strict law; and the surety's liability will not be extended by implication or interpretation. Id. The undertaking of a surety being strict-juris, he cannot, in law or equity, be bound further than the very terms of his contract. Id. The party relying on the guaranty bears the burden of proving the existence of the guaranty and its terms. Id. Although a surety can be discharged by an increase of risk or a novation, under O.C.G.A. §10-7-21 and §10-7-22, a party may consent in advance to the conduct of future transactions and will not be heard to claim his own discharge upon the occurrence of that conduct. Id. Accordingly, Defendants are bound under Georgia law by the following clauses in the agreements executed by Defendants:

Page 2 of the Guaranty Agreement executed by each Defendant provides:

> Guarantor hereby waives and agrees not to assert or take advantage of (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligations hereby guaranteed; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of Lender to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceedings) of Borrower or any other person or entity; (c) any defense based on the failure of Lender to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation hereby guaranteed; (d) any defense based upon an election of remedies by Lender which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Borrower for reimbursement; or both; (e) any defense based on failure of Lender to commence an action against Borrower; (f) any duty on the part of Lender to disclose to Guarantor any facts it may now or hereafter know regarding Borrower; (g) acceptance or notice of acceptance of this Guaranty by Lender; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by Lender in collection, protection, or equitable defenses whatsoever to which Guarantor might otherwise be entitled. This Guaranty shall not be affected by any litigation between Borrower and Lender nor shall it be affected by any litigation between Borrower and Lender nor shall it be impaired because of termination of any relationship between Guarantor and Borrower.
> (Guaranty Agreement Page 2 of 6).

Further, Pages 3 and 4 of the Guaranty Agreement executed by each Defendant states:

> Guarantor hereby authorizes Lender, without notice to Guarantor, to apply all payments and credits received from Borrower or from Guarantor or realized from any security in such manner and in such priority as Lender in its sole judgment shall see fit to the indebtedness, obligations and undertakings which are the subject of this Guaranty. (Guaranty Agreement, Page 3 of 6)

> Nothing contained herein...shall prevent Lender from bringing an action or exercising any rights against any security or against Guarantors personally, or against any property of Guarantor, within any other state. Initiating such proceeding or taking such action in any other state shall in no event constitute a waiver of the agreement

contained herein that the law fo the State of Gerogia shall govern the rights and obligations of Guarantor and Lender hereunder.
(Guaranty Agreement, Page 3-4 of 6)

The Construction Loan Agreement executed by each Defendant also explicitly provides:

> Pursuant to the terms of each Guarantor's Unconditional Guaranty of Payment and Performance, all dated September 26, 2005 the Guarantors, jointly and severally, ratify and confirm the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledge that their respective guarantees of performance encompass all such covenants, obligations, and undertakings. (Construction Loan Agreement, Joinder By Guarantors)

Under the terms of Promissory Note authorized by Defendants, the Construction Loan Agreement executed by Defendants, and the unlimited unconditional guaranty agreements executed by Defendants, Defendants agreed to be responsible for the obligations of Lake Martin. In asserting violations of the Construction Loan Agreement and the unlimited unconditional guaranty agreements against Empire, Defendants must be subject to the terms and waivers of the Construction Loan Agreement, unlimited unconditional guaranty agreements, and, as previously addressed, the Final Order Approving Post-Petition Financing Between Debtor and Empire.

A defendant's mere negligent performance of a contractual duty does not create a tort cause of action; rather, a defendant's breach of a contract may give rise to a tort cause of action only if the defendant has also breached an independent duty created by statute or common law. Fielbon Development Co., LLC v. Colony Bank of Houston County, 2008 WL 787720 (Ga.App.2008). In Fielbon Development Co., LLC v. Colony Bank of Houston County, 2008 WL 787720 (Ga.App.2008), the bank brought an action against a limited liability company, as borrower, and co-owner to recover on a promissory note and guaranty, and the company and co-owner filed counterclaims for negligence, attorney's fees, and punitive damages. The trial court directed a

verdict against the company and the co-owner on the note, dismissed the co-owner's counterclaim, and entered judgment on the jury verdict for the company on the counterclaim. On appeal the Court of Appeals held that the Bank could recover on the promissory note issued to the limited liability company borrower and signed by one of the borrower's owners, even if the owner obtained the funds for personal use. In its analysis, the court noted that the Guarantor agreed in advance to the bank's actions in unilaterally changing collateral on the loan's draw sheet, in failing to formally substitute the collateral, and in relying upon inspections upon the wrong property to authorize draws under the loan such that the bank's actions did not constitute an increase of risk or novation which discharged guarantor's obligations under the guaranty , which provided that the bank could modify the guaranty without notice to guarantor or approval by releasing or substituting collateral, failing to perfect any security interest or otherwise impairing any collateral, waiving or impairing any right the bank may have against the borrower, delaying or failing to exercise any rights to the bank had with respect to the debt, or extending new credit. Id. In conclusion, the court held the bank did not owe the limited liability company any duty independent of the loan contract as required for the company to maintain a negligence action against the bank. Id.

While the bank in Fielbon could have been negligent in managing and monitoring the loan, any duty the bank owed in connection with the loan arose solely out of the contractual relationship. Accordingly, the Georgia Court of Appeals affirmed the lower court's judgment entered in favor of the bank on the debtor's counterclaim for negligence, punitive damages and attorney fees against the bank. Just as the bank in Fielbon did not owe the limited liability company any duty independent of the loan contract, Empire did not owe Lake Martin and/or Defendants any duty independent of

the express provisions of the promissory note authorized by Defendants, the unlimited unconditional

guaranty agreements executed by Defendants, and the Construction Loan Agreement executed by

Defendants.  Defendants, thus, fail to state a claim of negligence.

In their Memorandum in Opposition to Motion to Dismiss Counterclaim, Defendants state:

"Investors' negligence claim against Empire is based upon Empire's assumption of certain

responsibilities regarding the project for the benefit of LMP and Investors."   Each of the allegations

in connection with the alleged "responsibilities" enumerated by Defendants, however, is covered by:

(a)     the terms of the Construction Loan Agreement dated September 26, 2005 (*the sole parties to which are Empire and Lake Martin*), a true and correct copy of the Construction Loan Agreement is attached as Exhibit "B" to the Motion to Dismiss; or

(b)     the terms of the Development Agreement dated January 25, 2005 (*the sole parties to which are Lake Martin and Stoneview Summit Development, Inc.* (hereinafter, "Stoneview"), reference to which was made in paragraph 10 of Defendants' Counterclaim.  A true and correct copy of the Development Agreement is attached hereto and incorporated herein as Exhibit "A."

Under Section XI of the Construction Loan Agreement executed by Defendants:

"Lender has **no obligations** in connection with the construction of the Project except to advance proceeds of the Loan as herein provided, and Lender shall not be liable for the performance of any contractor, subcontractor, or supplier of materials, fixtures, equipment and any other personal property, or for the quality of workmanship or the quality of such materials, fixtures, equipment and other personal property, or for the failure to construct, complete, protect or insure the improvements, or for the payment of any cost or expenses incurred in connection there with, or for the performance or non-performance or delay in performance of any obligation of Borrower to Lender. *Any inspection by Lender, approval of Plans and Specifications or other activities in the nature thereof shall only be for the sole benefit of Lender and for the purpose of protecting the security of the Lender*, and the same shall *in no way be construed as a representation* on the part of Lender that there is compliance on the part of Borrower with the Plans and Specifications or that the construction of the improvements is free from faulty material, fixtures, equipment, and other personal property, or workmanship. *The fact that Lender makes such inspections shall not relieve Borrower from its duty to independently ascertain that the Project is being completed in*

*accordance with the Plans and Specifications* and Borrower has *no right to rely* on any procedures required by Lender.  (Construction Loan Agreement, Section XI).

On page 12 of 26 of Defendants' Memorandum in Opposition to Motion to Dismiss Counterclaim,

Defendants state:

> "Except for signing checks at the request of Empire, LMP was excluded from any substantive role in the draw request process.  The Stoneview Entities would submit payment application forms to Empire, Empire would approve them, Empire would release proceeds of the loan to an account in the name of LMP, and notify Stoneview of the disbursement..."

Contrary to the allegations of Defendants, Lake Martin specifically required Stoneview to act on its

behalf.  Section IV of the Construction Loan Agreement to which Empire and Lake Martin were the

sole parties provides:

> (a) At such time as Borrower shall desire to obtain, subject to the other requirements hereof, a disbursement of any portion of the construction loan funds, *Borrower shall complete and deliver to Lender a Draw Request* together with a letter of transmittal *from Borrower to Lender requesting disbursement of that portion of the construction loan funds set forth in the Draw Request* and *directing that said disbursement be made to Borrower* in accordance with the terms, conditions and provisions of this Agreement. Such Draw Request shall include, with respect to any portion of such advance to be further disbursed to a general contractor, a Contractor's Application for Payment in form and substance reasonably satisfactory to Lender.
>
> (b) Borrower's Draw Request shall be accompanied by evidence in form and content satisfactory to Lender (including, but not limited to, certificates and affidavits of Borrower, and such other persons as Lender may require) showing...

Section 3.2 of the Development Agreement to which Empire was not a party provides:

> (A) Generally, progress and final payments to the contractors will be made in accordance with the terms and conditions of the construction contract and each additional construction contract negotiated with the contractors.  *Developer* (Stoneview) *shall be responsible for preparing a monthly draw request (each a (sic) "Draw Request") for submission to the construction lender, and shall include therein all appropriate applications for payment received from the contractors.*

(B) ...Owner (Lake Martin) shall cause the funds disbursed by the construction lender under the construction loan to be deposited in the Project Account. One or more agents or employees of Developer, as approved by Owner, shall be authorized signatories on the Project Account and shall be authorized by Owner to make disbursements from the Project Account in accordance with each Draw Request and other approved disbursements. Developer shall administer the Project Account in accordance with prudent accounting principles and shall at all times maintain accurate books and records for the Project Account. Owner shall have the right, upon reasonable notice to Developer, to review the books and records for the Project Account and Developer agrees to make such books and records available to Owner.

Clearly, the responsibilities Defendants allege Empire assumed are covered under the terms of the Construction Loan Agreement, the sole parties to which are Empire and Lake Martin, and the Development Agreement, the sole parties to which are Lake Martin and Stoneview. Under the Development Agreement, Lake Martin specifically authorized Stoneview to act on its behalf. Empire, as required under the Construction Loan Agreement, disbursed money only to Lake Martin; Lake Martin, thereafter, gave the money to Stoneview.

5.    **Defendants have undermined their credibility by falsely representing to the Court that the guaranty agreements do not contain a merger and integration clause (Memorandum in Opposition to Motion to Dismiss Counterclaim, Page 15 of 26), and parol evidence is not admissible to vary or contradict the unconditional promises to pay provided in the note authorized by Defendants or the guaranties executed by Defendants.**

On page 15 of 26 of their Memorandum in Opposition to Motion to Dismiss Counterclaim, Defendants asserted the Personal Guaranties executed by Lake Martin and Defendants did not contain a merger or integration clause. As evidenced by the unlimited unconditional guaranties executed by each of Defendants, true and correct copies of which are attached to the Complaint and incorporated therein as Exhibits 5, 7-13, such assertion by Defendants is false. On the contrary, page 6 of 6 of each of the guaranty agreements provides:

"This Unconditional Guaranty and Payment of Performance contains the entire agreement between the parties hereto and there are no promises, agreements, conditions, undertakings, warranties and representations, whether written or oral, express or implied, between the parties other than as set forth herein."

Page 4 of 6 of the guaranty agreements also provides:

"This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by Lender or any officer or agent of Lender, except by a writing signed by a duly authorized officer of Lender and bearing the seal of Lender. This Guaranty shall be irrevocable by Guarantor so long as the Loan Agreement shall remain in effect and until all indebtedness guaranteed hereby has been completely repaid and all obligations and undertakings of Borrower under, by reason of, or pursuant to the Loan Documents have been completely performed."

The parol evidence rule prohibits the introduction of parol evidence of a prior or contemporaneous oral agreement to alter, vary or change the unambiguous terms of a written contract. Dolanson Company et al.v. Citizens & Southern National Bank, 242 Ga. 681 (251 S.E.2d 274 (1978); Ga. Code Ann. §§ 20-704; Ansley v. Forest Services, Inc., 135 Ga.App. 745 (218 S.E.2d 914) (1975). A promissory note is an unconditional contract whereby the maker engages that he will pay the instrument according to its tenor. Id. Code Ann. §109A-3--413; Tatum v. Bank of Cumming, 135 Ga.App. 675 (218 S.E.2d 677) (1975).

In the absence of fraud, accident or mistake an unconditional promissory note cannot be changed into a conditional obligation by parol evidence. Lee v. Garland, 208 Ga.251 (66 S.E.2d 223) (1951); Harper v. Harper, 138 Ga.App. 575 (226 S.E.2d 804) (1976); See also First Nat. Bank & Co. in Macon v. Thompson, 240 Ga.494 (241 SE 2d 253) (1978). In Dolanson Company et al. v. Citizens & Southern National Bank, 242 Ga. 681, 251 S.E.2d 274 (1978), appellants executed a promissory note on behalf of their partnership to provide financing for the purchase of investment real estate. The partnership note, similar to the notes in the instant case, was guaranteed by appellant

partners individually.   Appellee filed suit against appellants seeking a judgment on the note. Thereafter, appellants filed suit seeking damages for appellee's alleged breach of an oral agreement to also provide construction financing for the property.  The actions were later consolidated, and the Supreme Court of Georgia affirmed the trial court's grant of summary judgment to the appellee.  The Court held that appellants could not recover for breach of an alleged oral contract, because in the absence of fraud, accident, or mistake, an unconditional promissory note cannot be changed into a conditional obligation by parol evidence. Dolanson Company et al. v. Citizens & Southern National Bank, 242 Ga. 681, 251 S.E.2d 274 (1978).  Since appellants promised to pay the promissory note according to its terms and failed to do so, they were liable.   As Defendants in the instant case promised to pay the Promissory Note according to its terms, and failed to do so, they are liable.

Parol evidence is not admissible to vary or contradict an unconditional promise to pay provided in a note or a guaranty agreement. Rizk et al. v. Jones et al., 148 Ga.App. 473 (1978). (Even) failure to fund money or lend to a principal additional sums does not operate to discharge a guarantor from liability for the amount which was actually advanced by the lender. Id. Colodny v. Dominion Mtg. &c. Trust, 141 Ga.App. 139 (232 S.E.2d 601) (1977). Fraud cannot be predicated upon statements, which are promissory in nature as to future acts. Id.  A promise, even a false promise, to perform an act in the future is not a false pretense or false representation, and does not constitute the basis for an action for fraud. Id.

A complete and unambiguous instrument cannot be varied or contradicted by reliance upon inconsistent parol statements. Rizk et al. v. Jones 148 Ga.App. 473 (1978).  In Rizk et al. v. Jones 148 Ga.App. 473 (1978), borrowers obtained a loan from the lender, and executed guaranty

agreements. The lender issued to the borrowers a conditional loan commitment for a second loan

for development of some property if certain preconditions were satisfied. Subsequently, the lender

refused to make the second loan on the basis that the borrowers failed to satisfy the express

conditions. The borrowers sued to compel the lender to make the second loan or in the alternative

for damages due to the lender's failure to make the additional loan. The lender counterclaimed.

Ultimately, the Georgia Court of Appeals affirmed the ruling the Georgia Supreme Court, finding

that parol evidence was not admissible. The Court found that the note and guaranty agreements were

unambiguous and clear, contained unconditional promises to repay the lender, and did not refer to

the second. Rizk et al. v. Jones 148 Ga.App. 473 (1978). Further, the Court held that the lender's

refusal to make the second loan did not bar the lender's recovery of the amount owed under the first

loan. Id. As the Promissory Note and guaranty agreements in the instant case are unambiguous and

clear and contain unconditional promises to repay Empire, parol evidence is not admissible to vary

or contradict the unconditional promises to pay provided in the Promissory Note and guaranty

agreements under which Defendants are liable to Empire.

**6.** **Defendants failed to allege a breach of fiduciary duty claim under any theory, including but not limited to a joint venture theory, and Defendants have undermined their credibility by falsely representing to the Court that Empire "engaged in self-dealing by allowing the 'bank fees' line item for construction to be increased from $22,000 to a total of $220,000 as indicated in the first payment application."**

In Defendants' Counterclaim and Memorandum in Opposition to Motion to Dismiss

Counterclaim, they impliedly concede that Counter Two - Breach of Fiduciary Duty is due to be

dismissed unless a joint venture for their benefit has been created. Under Georgia law, "A joint

venture arises where two or more parties combine their property or labor, or both, in a joint

undertaking for profit, with rights of mutual control. Without the element of mutual control, no joint

venture can exist." <u>Gateway Atlanta Apartments, Inc. v. Harris</u>, 2008 WL 624900, 4 (Ga.App. March

10, 2008). In the instant case, it is clear that no joint venture exists between or among Empire, Lake

Martin, the Defendants, Moore, Snead, The Profile Group (hereinafter, "Profile") or Stoneview or

any combination thereof as Empire did not share in the profits or the losses of Lake Martin or

Stoneview/Profile. Under the terms of the Promissory Note authorized by Defendants, Empire, as

lender, was entitled to repayment of the loan and interest as provided under the terms of the

Promissory Note. (See Promissory Note, Page 1 of 4). There was and never has been a joint venture

agreement in existence. All rights and responsibilities of Empire were enumerated in the loan

documents authorized and executed by Defendants. Empire cannot be held to be a joint venturer

with any party to these actions. Empire was nothing more than a construction loan lender.

Moreover, Defendants have undermined their credibility by falsely representing to the Court

that Empire "engaged in self-dealing by allowing the 'bank fees' line item for construction to be

increased from $22,000 to a total of $220,000 as indicated in the first payment application."

(Memorandum in Opposition to Motion to Dismiss Counterclaim, Pages 5-6). Defendants further

allege: "Neither LMP nor Investors were made aware of this ten-fold increase in Empire's fees

which was unilaterally imposed by Empire and the Stoneview Entities." (<u>Id.</u> Page 19-20). As

evidenced by the Letter of Commitment dated September 1, 2005 and executed by Defendants, a true

and correct copy of which is attached hereto and incorporated herein as Exhibit "B," the loan amount

was $22,000,000.00 and the origination fee was "1% of the amount of the loan." (Commitment

Letter, Page 3).   Page 6 of the Commitment Letter executed by Defendants provides: "THIS

AGREEMENT WILL SURVIVE CLOSING." It is without question that Exhibit "C" to the

Construction Loan Agreement contained a typographical error, and Defendants acknowledged the

terms of the Commitment Letter and the 1% origination fee.   Accordingly, Defendants fail to allege

facts sufficient to show a joint venture existed or to state a claim that Empire breached any fiduciary

duties or engaged in self-dealing.

7.    **Defendants have failed to state a claim of breach of the implied covenants of good faith and fair dealing, and although Empire did not commit any tortious actions against Lake Martin or Defendants, Empire had no independent duty either in tort or contract to Lake Martin or Defendants to protect them from problems with the builder's work, construction defects, or liens for labor or materials.**

There is no independent cause of action for breach of duty of good faith in performing a

contract governed by the Uniform Commercial Code. Heritage Creek Development Corporation v.

Colonial Bank, et al., 268 Ga.App. 369, 601 S.E.2d 842 (2004). Georgia law does not recognize an

independent cause of action based on the covenant of good faith and fair dealing which could be

asserted separately from a breach of contract claim. Garrett v. Unum Life Insurance Company of

America, 427 F.Supp.2d 1158 (2005); See Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414,

1429 (11th Cir.1990) and Stuart Enterprises International, Inc. v. Peykan, Inc., 252 Ga.App. 231, 234

(555 S.E.2d 881) (2001).

The primary duty of a lending bank is to protect the assets of its members or depositors and

not to protect the assets of its borrowers. Baker v. Campbell, 255 Ga.App. 523 (2002); Lothridge v.

First Nat'l Bank of Gainsville, 217 Ga.App. 711, 715 (458 S.E.2d 887) (1995); Butts v. Atlanta Fed.

Sav. & Loan Assoc., 152 Ga.App. 40, 42-43 (262 S.E.2d 230) (1979). *The construction lender has no independent duty either in tort or contract to the borrower to protect him from problems with the builder's work, construction defects, or liens for labor and materials.* Id. Construction Lender, Inc. v. Sutter, 228 Ga.App. 405, 409-410 (491 S.E.2d 853) (1997); Butts v. Atlanta Fed. Sav. & Loan Ass'n, *supra* at 42. It is the borrower's responsibility to insure that payments for labor and materials are made from any draw, and such duty is not shifted to the lender from the loan agreement alone, absent specific contractual obligations to do so for the benefit of the borrower rather than the lender's own protection. Id. Peterson v. First Clayton Bank & Trust, Co, 214 Ga.App. 94, 99-100 (447 S.E.2d 63) (1994). "'The construction of a contract is a question of law for the court...'" The cardinal rule of construction is to ascertain the intention of the parties. Peterson et al. v. First Clayton Bank & Trust Company, 214 Ga.App. 94; 447 S.E.2d 63 (1994).  "If that intention be clear, and it contravenes no rule of law, and sufficient words be used to arrive at the intention, it shall be enforced, irrespective of all technical or arbitrary rules of construction." Id. Village Enterprises v. Ga.R.Bank & c. Co., 117 Ga.App.773, 774 (161 S.E.2d 901); see also Henderson Mill, Ltd. v. McConnell, 237 Ga. 807, 809 (229 S.E.2d 660). Fidelity Nat. Bank v. Reid, 180 Ga.App. 428, 430 (348 S.E.2d 913).

Section XI of the Construction Loan Agreement executed by Defendants provides:

> "Lender has **no obligations** in connection with the construction of the Project except to advance proceeds of the Loan as herein provided, and Lender shall not be liable for the performance of any contractor, subcontractor, or supplier of materials, fixtures, equipment and any other personal property, or for the quality of workmanship or the quality of such materials, fixtures, equipment and other personal property, or for the failure to construct, complete, protect or insure the improvements, or for the payment of any cost or expenses incurred in connection there with, or for the performance or non-performance or delay in performance of any obligation of Borrower to Lender. *Any inspection by Lender, approval*

> *of Plans and Specifications or other activities in the nature thereof shall only be for the sole benefit of Lender and for the purpose of protecting the security of the Lender*, and the same shall *in no way be construed as a representation* on the part of Lender that there is compliance on the part of Borrower with the Plans and Specifications or that the construction of the improvements is free from faulty material, fixtures, equipment, and other personal property, or workmanship. *The fact that Lender makes such inspections shall not relieve Borrower from its duty to independently ascertain that the Project is being completed in accordance with the Plans and Specifications* and Borrower has *no right to rely* on any procedures required by Lender. (Construction Loan Agreement, Section XI).

It is clear that any obligations between the parties are set forth in the Construction Loan Agreement executed by Defendants and the Guaranty Agreements executed by Defendants. Although Empire did not commit any tortious actions against Lake Martin or Defendants, Empire had no independent duty either in tort or contract to Lake Martin or Defendants to protect them from problems with the builder's work, construction defects, or liens for labor and materials. As Georgia law does not recognize an independent cause of action based on the covenant of good faith and fair dealing which could be asserted separately from a breach of contract claim, Defendants have failed to state a claim of breach of the implied covenants of good faith and fair dealing.

**8.**     **Defendants have failed to state a claim of conversion as Defendants only own a membership interest in the limited liability company constituting Lake Martin, and there is no allegation of a conversion of such membership interest**.

Under Georgia law, conversion involves the unauthorized assumption and exercise of the right of ownership over personalty of another, contrary to the owner's rights. <u>Multimedia Technologies, Inc. v. Wilding</u>,262 Ga.App. 576, 578 (586 S.E.2d 74, 78) (Ga.App.2003). Any act of dominion wrongfully asserted over another's personal property which is in denial of his property rights, or inconsistent with them, is a conversion." <u>Id.</u> (Citations and punctuation omitted.) <u>Pelletier v. Schultz</u>, 157 Ga.App. 64, 65-66(3)(a) (276 S.E.2d 118) (1981).

In Count Four of Defendants' Counterclaim, Defendants allege that "Empire has assumed and exercised the right of control and ownership over the Company's assets." Defendants, however, are merely holders of a membership interest in Lake Martin and have no personal ownership interest in the condominium project. It is the Defendants in the capacity as members of Lake Martin, who authorized the filing of a voluntary Chapter 11 Petition and who authorized the filing of a motion to obtain a post bankruptcy petition date financing to "complete Building 5...and, subject to the to the discretion of Empire, the completion of two other partially completed buildings," as noted in Paragraph 3 of the Final Order Approving Post-Petition Financing Between Debtor and Empire and authorized the entry of the Order by the Bankruptcy Court to grant such motion. There is no question that the loan in the instant case was in default. Upon the default of Lake Martin and Defendants, Empire had two options: (1) to sue on the note and guaranties or (2) to foreclose on the mortgage. It was Defendants as members of Lake Martin who elected to file bankruptcy. Based on the voluntary bankruptcy petition they elected to file, Defendants were bound by the Financing Order of the Court. The DIP Loan and 363 Sale were all voluntary acts of the debtor. Accordingly, Defendants fail to state a claim of conversion.

9. **Defendants fail to state a claim of conspiracy as there can be no liability for civil conspiracy absent an underlying tort, and Defendants have failed to state any underlying tort claims against Empire.**

A conspiracy is a combination of two more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. <u>Mustaqeem-Graydon v. SunTrust Bank</u>, 258 Ga.App. 200 (2002); <u>First Federal Savings Bank v. Hart</u>, 185 Ga.App. 304, 305 (363 S.E.2d 832) (1987). To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting

Case No.1:08-cv-00226-WHA-WC
Page 27

in concert engaged in conduct that constitutes a tort. Id. Savannah College of Art v. School of Visual Arts, 219 Ga.App. 296, 297 (464 S.E.2d 895) (1995).

Absent an underlying tort, there can no liability for civil conspiracy. Id. O'Neal v. Home Town Bank, 237 Ga.App. 325, 330 (514 S.E.2d 669) (1999). In Mustaqeem-Graydon v. Suntrust Bank, 258 Ga.App. 200 (2002), the debtor filed suit against LRA Contractors, Inc. (hereinafter, "LRA") and SunTrust Bank (hereinafter, "SunTrust") and its parent company, SunTrust Banks, Inc., regarding a project to buy and renovate a building. LRA answered and counterclaimed for money owed on the construction contract. SunTrust answered and counterclaimed for money due on a construction loan and an overdrawn checking account. The debtor's allegations against SunTrust were based on the manner of SunTrust's last two disbursements, which the debtor alleged were made without his consent. SunTrust, however, was authorized by the debtor to disburse the funds directly, which was inconsistent with this claim of negligent disbursement. Therefore, the court held the first bank had no liability to the debtor for what it had legal right to do. Because the underlying fraud claim failed, the debtor could not maintain a cause of action for conspiracy to defraud. As Defendants have failed to state any tort claims under Georgia law and against Empire, Defendants have failed to state a claim of conspiracy.

**10.** **Defendants fail to state a claim for "negligent misrepresentation" claim because any obligations between the parties are set forth in the Construction Loan Agreement executed by Defendants and the Guaranty Agreements executed by Defendants, and Defendants have undermined their credibility by falsely representing to the Court that"Profile...purchased the land from Alpharetta Bank out of a bankruptcy" (Response to Motion to Dismiss, Page 4 of 26) and that Empire provided the purchase money loan to enable Lake Martin to purchase the undeveloped land from Profile (Response to Motion to Dismiss, Page 4 of 26).**

In Count Six of Defendants' Counterclaim, Defendants attempt to allege that Empire is liable

for negligent representation. Defendants, however, fail to state a claim for "negligent misrepresentation" claim because any obligations between the parties are set forth in the Construction Loan Agreement executed by Defendants and the Guaranty Agreements executed by Defendants - for example, in  Section XI of the Construction Loan Agreement executed by Defendants.  As acknowledged by Defendants under the Construction Loan Agreement, Empire is not liable for any alleged "negligent misrepresentation."   Accordingly, Defendants fail to state a claim for negligent representation upon which relief can be granted.

Further, Defendants have undermined their credibility by falsely representing to the Court that "Profile...purchased the land from Alpharetta Bank out of a bankruptcy"(Memorandum in Opposition to Motion to Dismiss Counterclaim, Page 4 of 26) and that Empire provided the purchase money loan to enable Lake Martin to purchase the undeveloped land from Profile Id.  As evidenced by the Limited Warranty deed dated January 25, 2005 and recorded on February 4, 2005, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "C," Profile acquired the property from Sunset Cove, LLC.  On the same day (January 25, 2005), Profile conveyed the property to Lake Martin, as evidenced by the Warranty Deed dated January 25, 2005, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "D."  Lake Martin financed the purchase with a purchase money mortgage with The Alpharetta Community Bank in the amount of $4,869,997.00, as evidenced by the Mortgage dated January 14, 2005 and recorded on February 4, 2005, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "E."  As evidenced by the Promissory Note attached as Exhibit "1" to the Complaint and incorporated therein, our loan to Lake Martin occurred on September 26, 2005. It is undisputed that

the loan to Lake Martin originated on September 26, 2006 and the loan was secured by a mortgage

dated September 26, 2005 and recorded in the Office of the Judge of Probate of Tallapoosa County,

Alabama on September 27, 2005, at Card No. 208231, as evidenced by Schedule A of the Title

Insurance Policy, a true and correct copy of which is attached as Exhibit "5" to the Proof of Claim,

filed in the Chapter 11 Case No.07-11470 and attached to the Complaint in the instant case as

Exhibit "4."

For all these reasons, the Defendants' Counterclaim should be dismissed.

WHEREFORE, Plaintiff, Empire Financial Services, Inc., prays this Court to grant its Motion

to Dismiss Defendants' Counterclaim in its entirety and grant to Plaintiff such further and other relief

to which it may be entitled.

　　　　　　　　　　　　/s/ *Robert P. Reynolds*
　　　　　　　　　　　　Robert P. Reynolds
　　　　　　　　　　　　Code No. REY-007
　　　　　　　　　　　　Attorney for Plaintiff, Empire Financial Services, Inc.

OF COUNSEL:
REYNOLDS, REYNOLDS & DUNCAN, LLC
Post Office Box 2863
Tuscaloosa, Alabama 35403
Telephone: (205) 391-0073
E-mail: rreynolds@rrdlaw.com
File No. 358.11-F

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the above and foregoing Reply to Defendants'
Memorandum in Opposition to Motion to Dismiss Defendants' Counterclaim has been made this
23rd day of July, 2008 electronically and/or U.S. Postal Service, First Class, prepaid upon the
following:

Dow T. Huskey, Jr., Esq.
Attorney at Law
Post Office Drawer 550
Dothan, Alabama 36302-0550

Cowin Knowles, Esq.
B. Saxon Main, Esq.
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, Alabama 36102-2148

H. Scott Gregory, Jr., Esq.
Brock, Clay, Calhoun & Rogers, P.C.
49 Atlanta Street
Marietta, Georgia 30060

Michael S. Jackson, Esq.
Ryan W. Shaw, Esq.
Beers, Anderson, Jackson, Patty & Fawal, PC
Post Office Box 1988
Montgomery, Alabama 36102-1988

Benjamin Rosenberg, Esq.
John Allen Roberts, Esq.
T. Christine Pham, Esq.
Rosenberg, Martin, Greenberg, LLP
25 South Charles Street, Suite 2115
Baltimore, Maryland 21201

/s/*Robert P. Reynolds*
Robert P. Reynolds
Of Counsel for Plaintiff

EXHIBIT

A

RECEIVED MAY 0 3 2005

# DEVELOPMENT AGREEMENT

THIS DEVELOPMENT AGREEMENT ("Agreement") made as of the 25th day of January, 2005, by and among STONEVIEW SUMMIT DEVELOPMENT, INC., a Georgia corporation (hereinafter the "Developer"); and LAKE MARTIN PARTNERS, LLC, an Alabama limited liability company (hereinafter the "Owner").

## WITNESSETH, THAT

WHEREAS, Owner shall purchase and acquire approximately 18 acres of real property located in Lake Martin, Alabama, as more particularly described in Exhibit "A" (hereinafter the "Property"), from Profile Group, Inc., a Georgia corporation, for the purchase price of Six Million and No/100 Dollars ($6,000,000.00) and for the purpose of developing the Property into a residential subdivision;

WHEREAS, Owner wishes to engage Developer to provide certain services with respect to the development and sale of residential units on the Property (the "Project");

WHEREAS, Developer wishes to provide the development services to Owner set forth in Section 2.1 of this Agreement;

WHEREAS, Owner and Developer shall split the net proceeds of the sale of the residential units of the Property after Developer has paid certain development and construction costs and has paid any development and/or loans in full, all as more particularly set forth herein;

WHEREAS, Owner and Developer wish to join together to develop the Property, market the Property and sell the residential units on the Property for a profit; and

WHEREAS, the Owner and Developer desire to set forth herein in writing the terms and conditions of this Agreement.

NOW, THEREFORE, for and in consideration of the covenants and agreements hereinafter contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1

## AGREEMENT TO DEVELOP PROJECT

1.1    **Agreement to Develop Project.**  The parties hereby agree to develop the Project in accordance with this Agreement, on the Property located in Lake Martin, Alabama.

1.2    **Development Fee.**  For the services to be performed by Developer hereunder, Developer shall receive a development fee (the "Development Fee") equal to 50% of the net profits available for distribution upon the sale of each residential unit (hereinafter the "Net Proceeds"), as more particularly provided by the Profile Group Pro Forma attached hereto as



Exhibit "B" (hereinafter referred to as "Pro Forma"). For purposes of this Agreement, the amount of Net Proceeds available for distribution to the parties shall be determined as follows:

The gross proceeds received from the sale of each residential unit of the Project shall be allocated and distributed in the following order:

(1)   All trade payables and operating costs for the development of each residential unit (including all expenses incurred by Developer) shall be deducted from the gross proceeds of the sale; then

(2)   Any outstanding principal and interest owed on any loans made by Developer to the Project shall be repaid in full; then

(3)   The Developer shall be entitled to set up any reasonable reserves required for the development of the Project as determined in the sole discretion of the Developer; and then

(4)   The remaining amount of the gross proceeds shall be distributed to Developer and Owner as the Net Proceeds in equal portions (50% to each party) within ten (10) days of the date of the closing on the sale of each of the residential units of the Project. Provided, however, if the actual Net Proceeds are less than the Net Proceeds for the applicable unit set forth on the Pro Forma, the Developer shall receive a reduced distribution equal to the amount remaining of the actual Net Proceeds after the Owner is paid an amount equal to fifty percent (50%) of the Net Proceeds set forth on the Pro Forma for that particular unit. If the actual Net Profits for any sale of a residential unit exceed the Net Proceeds set forth on the Pro Forma for that particular lot the actual Net Profits will be distributed equally among the Owner and Developer.

1.3   **Development Guaranty.** Developer and Owner hereby acknowledge and agree that Developer has guaranteed that Owner will receive Net Proceeds from the Project of a minimum of Five Million Dollars ($5,000,000.00). Notwithstanding the distribution of Net Proceeds set forth in Section 1.2 of this Agreement, to the extent that Net Proceeds received from the Project exceed Five Million Dollars ($5,000,000.00), then Owner shall be entitled to receive the guaranteed minimum amount of Five Million Dollars ($5,000,000.00) regardless of the amount of Net Proceeds distributed to Developer. To the extent that total Net Proceeds received from the Project do not exceed Five Million Dollars ($5,000,000.00), then Owner shall be entitled to receive all actual Net Proceeds received from the development of the Project. Notwithstanding the foregoing, Developer shall not be required to reimburse Owner for any difference or short fall in Net Proceeds in the event the Project does not produce the minimum guaranteed amount of Five Million Dollars ($5,000,000.00).

1.4   **Owner's Responsibilities.** Owner shall provide the Property described in this Agreement for the development of the Project. Further, at the closing of the acquisition of the Property, Owner shall provide working capital in the amount of One Million Two Hundred Thousand and 00/100 Dollars ($1,200,000.00) to the Project. This payment will represent the

total amount of equity required by the Owner. Following the payment of the One Million Two Hundred Thousand and 00/100 Dollars ($1,200,000.00) of such working capital funds, Owner shall not be required to contribute any additional capital to the Project. However, Owner shall be responsible for obtaining loans to fund the development and construction of the Project. Further, Owner shall be responsible for obtaining any additional loans required by the Company for each additional phase of the Project set forth in the Pro Forma. To the extent Owner refuses or is unable to obtain such additional loans for each new phase of the Project in accordance with the Pro Forma, Developer will have the option of purchasing the remaining undeveloped lots of the Property from the Owner. The purchase price for the exercise of this option shall be determined by multiplying the number of units of the Property then subject to the option by One Thousand Dollars ($1,000.00) per unit. The option can only be exercised by the Developer if: all working capital (consisting of the $1,200,000) has been repaid to Owner, and, all loans that are guaranteed by Owner have been repaid, and, all the profit from construction of the units of existing phases has been distributed.

## ARTICLE 2

### DEVELOPMENT PROCEDURE

**2.1    Developer's Responsibilities.** Developer shall be responsible for providing the services set forth in this Agreement required for the supervision and monitoring all aspects of the development and management of the Project in accordance with the terms of the Pro Forma. Developer shall use its best, good faith efforts to assure that all work is completed in accordance with the Pro Forma and all legal requirements, and guarantees the recording of the plat for the Project in a timely manner. Developer shall manage all aspects of the development of the Property including the managing of all employees of the Project, managing of all contractors and subcontractors performing any work on the Project, handling the accounting for the Project, managing of all cash distributions or draws from the lender, marketing of the individual residential lots of the Project, ensuring compliance with all zoning ordinances affecting the Project and the recording of the plat for the Project. Additionally, liability insurance shall be obtained by the Developer as an expense of the Project. The Developer's duties shall not include the preparation or filing of any tax returns for the Owner.

**2.2    No Restrictions.** Nothing contained in this Agreement shall be construed so as to prohibit Developer, or any affiliate of Developer, from owning, operating or investing in any other real estate development wherever located. Owner agrees that Developer or any affiliate of Developer may engage in, or possess an interest in, another business venture or ventures of any nature or description, independently or with others, including but not limited to the ownership, financing, leasing, operating, management, syndication, brokerage and development of real property, and Owner shall not have any right by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

**2.3    Compliance.** Developer shall obtain all necessary zoning permits, licenses and approvals pertaining to the Project and shall ensure that the Project complies with all legal requirements.

3

2.4    **Approved Plans and Specifications.** Developer represents to Owner that the Approved Plans and Specifications is attached hereto as Exhibit "C". The Approved Plans and Specifications conform to all of the applicable requirements of governmental authorities applicable to the Project. Developer further represents to Owner that the improvements, if constructed pursuant to the Approved Plans and Specifications, will conform with all applicable legal requirements. Prior to Project Commencement, and, if necessary, thereafter and during the development of the Project, Developer and Owner shall consult with one another, and use their best good faith efforts to make changes and revisions, as necessary, to the Approved Plans and Specifications.

2.5    **Monitoring Progress.** Developer shall provide regular monitoring of the Approved Plans and Specifications, and shall regularly report to Owner regarding the actual cost and time of the Project in progress and estimates for uncompleted development, identifying variances from the Approved Plans and Specifications.

2.6    **Insurance.** Developer and Owner agree that the Developer shall be required to acquire the following insurance coverage:

(A)    Workers' compensation insurance which shall fully comply with all applicable state and federal statutes;

(B)    Comprehensive general liability insurance;

(C)    Business auto liability insurance;

(D)    Builder's risk coverage on an "All Risk" basis including full replacement value of the Project; and

(E)    Such other coverage as Developer and Owner may reasonably require.

All costs of such insurance coverage shall be considered an expense of the Project. The comprehensive general liability insurance and the excess liability insurance shall name Owner and Developer as additional insureds, shall not be cancelable except upon thirty (30) days written notice to Owner and Developer. Developer and Owner further agree that the Developer shall require any other contractors on the Project to carry similar coverages with limits acceptable to the Developer and shall name the Owner and Developer as additional insureds. Developer shall obtain certificates of insurance from each of the contractors evidencing such coverage.

# ARTICLE 3

# PAYMENT OF DEVELOPMENT COSTS

3.1    **Payment of Costs.**

(A)    Developer shall be reimbursed for its out-of-pocket expenses incurred for the development of the Project. After Project Commencement, engineering, surveying,

4



architectural fees, and other similar fees shall be paid for against the applicable invoice of the contractor.

    (B)    All construction costs of the Project as set forth in the Approved Plans and Specifications shall be paid on the basis of the percentage of completion of the Project as reasonably determined by Developer and the construction lender, and in accordance with the provisions of Section 3.2 hereof and the Construction Contract.

### 3.2    Progress and Final Payments, Accounting Services.

    (A)    Generally, progress and final payments to the contractors will be made in accordance with the terms and conditions of the construction contract and each additional construction contract negotiated with the contractors. Developer shall be responsible for preparing a monthly draw request (each a "Draw Request") for submission to the construction lender, and shall include therein all appropriate applications for payment received from the contractors.

    (B)    In connection with the progress and final payments for the Project, Developer shall provide certain accounting services (the "Accounting Services") to Owner. Owner and Developer shall establish an account (the "Project Account"), at a banking institution approved by Owner, which account shall be administered by Developer. Owner shall cause the funds disbursed by the construction lender under the construction loan to be deposited in the Project Account. One or more agents or employees of Developer, as approved by Owner, shall be the authorized signatories on the Project Account and shall be authorized by Owner to make disbursements from the Project Account in accordance with each Draw Request and other approved disbursements. Developer shall administer the Project Account in accordance with prudent accounting principles and shall at all times maintain accurate books and records for the Project Account. Owner shall have the right, upon reasonable notice to Developer, to review the books and records for the Project Account and Developer agrees to make such books and records available to Owner.

    (C)    With regard to the costs of the Project not covered by an application for payment by the Contractors, including without limitation, fees charged by professionals, other service providers, furniture, fixture and equipment suppliers, and Developer, Developer shall be responsible for collecting appropriate invoices and payment requests and including these in the applicable Draw Request.

### 3.3    Lien Releases.
To the extent permitted by law, the contracts will contain a provision requiring contractors to submit appropriate lien waivers with the applications for payment. If mechanics or materialmen's liens are filed against the Project, the Developer will have such filings discharged as soon as practical. Each application for payment shall include conditional mechanics' lien release(s) from each of the appropriate providers.



# ARTICLE 4

## TERMINATION

**4.1    Events of Termination.**  The following are Events of Termination under this Agreement:

(A)    a party hereto breaches any material term or provision of this Agreement and fails to cure the same after sixty (60) days written notice of breach from the other party; or

(B)    a party, voluntarily or involuntarily, becomes subject to any bankruptcy or insolvency law or a receiver or trustee is appointed for a party or a party's assets.

**4.2    Developer's Rights upon an Event of Termination.**  Upon the commission of an Event of Termination by Owner:

(A)    Developer shall have the right to terminate this Agreement immediately upon the occurrence of such Event of Termination.

(B)    Developer shall be entitled to receive all fees earned and all reimbursable out-of-pocket cost incurred, in accordance with Section 1.2 hereof, through the date of termination.

**4.3    Owner's Rights upon an Event of Termination.**  Upon the commission of an Event of Termination by Developer:

(A)    Owner shall have the right to terminate this Agreement immediately upon the occurrence of such Event of Termination.

(B)    Upon termination pursuant to this Section 4.3, Developer shall be entitled to receive all fees earned and all reimbursable out-of-pocket costs incurred, in accordance with Section 1.2 hereof, through the date of termination.

**4.4    Unavoidable Delays.**  Developer and Owner hereby agree that a default by any subcontractor of the Project under their respective contracts shall not be deemed a default by Developer hereunder.  In the event of such default by one or more subcontractors, the parties hereto shall use their best good faith efforts to minimize the delay caused by such default and obtain suitable replacement subcontractors to perform the work contemplated hereunder.  In addition, in the event of a delay in the Project caused by abnormal or unexpected weather conditions, labor disputes, fire, unusual delays in transportation of materials, unavoidable casualties, a delay in the advance of funds by the lender under the loan, or other delays beyond the control of Developer, Developer shall not be deemed in default hereunder, and Owner and Developer shall use their best good faith efforts to minimize such delays and proceed with the Project.

## ARTICLE 5

## MISCELLANEOUS PROVISIONS

**5.1     Owner's Indemnification.**  Owner agrees to defend and indemnify (including the obligation to retain and pay on a regular and continuing basis qualified legal counsel reasonably approved by Developer) Developer from any action, claim, liability, loss, damage, cost or expense arising from Owner's breach of any term or condition of this Agreement.

**5.2     Developer's Indemnification.**  Developer agrees to defend and indemnify (including the obligation to retain and pay on a regular and continuing basis qualified legal counsel reasonably approved by Owner) Owner from any action, claim, liability, loss, damage, cost or expense arising from Developer's breach of any term or condition of this Agreement.

**5.3     Assignment.**  This Agreement may not be assigned by Developer or Owner without the prior written consent of the other party, which consent shall not be unreasonably withheld.

**5.4     Notices.**  All notices and other communications required or permitted under this Agreement shall be in writing and sent by certified or registered mail, return receipt requested, hand delivered, or delivered by an express mail service such as Federal Express or similar service to the address provided herein and shall be deemed to be given or delivered when personally delivered to the address for notice stated below; or two business days after being mailed to the address provided herein.  The addresses of the parties now designated for purposes of any such notices shall be, until a party designates another address by written notice to all parties as follows:

If to Developer:          Stoneview Summit Development, Inc.
                          5134 North Shores Road
                          Acworth, GA 30101
                          Attn:  John Moore

with a copy to:           Moore, Ingram, Johnson & Steele, LLP
                          192 Anderson Street
                          Marietta, Georgia 30060
                          Attn:  Mr. Clayton Carmack

If to Owner:              Lake Martin Partners, LLC
                          _____
                          _____

with a copy to:           _____
                          _____
                          _____
                          _____

7



**5.5    Integration, Modification, Waiver.** This Agreement constitutes the complete and final expression of the agreement of the parties relating to the subject of this Agreement and supersedes all previous contracts, agreements and understandings of the parties, either oral or written, relating to the subject to this Agreement. This Agreement cannot be modified, or any of the terms hereof waived, except by an instrument in writing (referring specifically to this Agreement) executed by the party against whom enforcement of the modification or waiver is sought. Any waiver by Owner or Developer of any default hereunder shall not constitute a waiver of any future default.

**5.6    Headings, Construction.** The headings used throughout this Agreement do not constitute matters to be used to construe or interpret this Agreement. No principal of law providing for the interpretation of a contract provision against the draftsman shall be applied in interpreting any provision of this Agreement. This Agreement will be construed in accordance with the laws of the State of Georgia. The singular and plural shall include each other.

**5.7    Invalid Provisions.** If any one or more of the provisions of this Agreement shall be held invalid or unenforceable, such provisions shall be modified to the minimum extent necessary, to make it or its application valid or enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provisions shall remain in full force and effect.

**5.8    Signatory Authority.** The persons executing this Agreement in their capacity as a representative of a party hereto do, by such execution, represent and warrant that they have been duly authorized and empowered to execute this Agreement on behalf of that party.

**5.9    Attorneys' Fees.** In the event of any legal proceedings between the parties or any of them, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs in addition to all other relief, including the right to recover attorney's fees and costs incurred in the enforcement of any award or judgment.

**5.10    Binding Effect.** Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Nothing in this Agreement is intended to confer on any person, other than the parties, any rights under this Agreement.

**5.11    Effective Date.** The effective date of this Agreement shall be the date indicated in the first paragraph of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Development Agreement under seal to be effective as of the day and year first above written.

OWNER:                                      LAKE MARTIN PARTNERS, LLC, an
                                            Alabama limited liability company

                                            By: _Samuel E. Lee_____

                                            Title: _Member Pursuant to resolution_

DEVELOPER:                                  STONEVIEW SUMMIT DEVELOPMENT,
                                            INC., a Georgia corporation

                                            By: _____

                                            Title: _PRES._____

F:\CORP\Agreements\Development\CDCA\Hotlanta – Timber Ridge Devedopment Agmt.doc

**EXHIBIT A**

**Legal Description**

9

# EXHIBIT B

## Profile Group Pro Forma

EXHIBIT B1
LAKE MARTIN
DEVELOPMENT COST
JUNE 21, 2005

| ITEM DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPL. PREV APPL | WORK COMPL THIS APPL | STORED MATERIALS | TOTAL COMPL. AND STORED TO DATE | % | BALANCE TO FINISH |
|---|---|---|---|---|---|---|---|
| POOL | $280,000 | $0 | $0 | $0 | $0 | 0% | $280,000 |
| BATHHOUSE | $173,000 | $0 | $0 | $0 | $0 | 0% | $173,000 |
| TRELLIS | $145,000 | $0 | $0 | $0 | $0 | 0% | $145,000 |
| AMPHITHEATER | $230,000 | $0 | $0 | $0 | $0 | 0% | $230,000 |
| PLAYGROUND | $95,000 | $0 | $0 | $0 | $0 | 0% | $95,000 |
| TRAILS | $67,000 | $0 | $0 | $0 | $0 | 0% | $67,000 |
| WALLS | $110,000 | $0 | $0 | $0 | $0 | 0% | $110,000 |
| CLEARING | $90,000 | $0 | $0 | $0 | $0 | 0% | $90,000 |
| GRADING | $180,000 | $0 | $0 | $0 | $0 | 0% | $180,000 |
| PAVING | $50,000 | $0 | $0 | $0 | $0 | 0% | $50,000 |
| SANITARY SEWER | $120,000 | $0 | $0 | $0 | $0 | 0% | $120,000 |
| SITE RETAINING WALLS | $200,000 | $0 | $0 | $0 | $0 | 0% | $200,000 |
| SEWER OUTFALL | $175,000 | $0 | $0 | $0 | $0 | 0% | $175,000 |
| LIFT STATION | $120,000 | $0 | $0 | $0 | $0 | 0% | $120,000 |
| WATER LINES | $260,000 | $0 | $0 | $0 | $0 | 0% | $260,000 |
| PARKING LOTS | $110,000 | $0 | $0 | $0 | $0 | 0% | $110,000 |
| STORM SEWER | $100,000 | $0 | $0 | $0 | $0 | 0% | $100,000 |
| DOCKS | $200,000 | $0 | $0 | $0 | $0 | 0% | $200,000 |
| SEAWALL | $300,000 | $0 | $0 | $0 | $0 | 0% | $300,000 |
| LANDSCAPING | $270,000 | $0 | $0 | $0 | $0 | 0% | $270,000 |
| SIGNAGE | $125,000 | $0 | $0 | $0 | $0 | 0% | $125,000 |
| TOTAL | $3,390,000 | $0 | $0 | $0 | $0 | 0% | $3,390,000 |

EXHIBIT B2
LAKE MARTIN
COST BREAKDOWN - 35 UNIT BUILDING
JUNE 21, 2005



| ITEM DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPL. PREV APPL. | WORK COMPL THIS APPL | STORED MATERIALS | TOTAL COMPL. AND STORED TO DATE | % | BALANCE TO FINISH |
|---|---|---|---|---|---|---|---|
| FOOTINGS AND SLAB | $187,500 | $0 | $0 | $0 | $0 | 0% | $187,500 |
| STEEL FRAME | $825,000 | $0 | $0 | $0 | $0 | 0% | $825,000 |
| CONCRETE FLOORS 2 - 5 | $300,000 | $0 | $0 | $0 | $0 | 0% | $300,000 |
| PORCHES | $97,500 | $0 | $0 | $0 | $0 | 0% | $97,500 |
| ROOFING | $32,500 | $0 | $0 | $0 | $0 | 0% | $32,500 |
| WINDOWS | $52,500 | $0 | $0 | $0 | $0 | 0% | $52,500 |
| EXTERIOR DOORS | $112,500 | $0 | $0 | $0 | $0 | 0% | $112,500 |
| PLUMBING | $97,500 | $0 | $0 | $0 | $0 | 0% | $97,500 |
| ELECTRICAL | $225,000 | $0 | $0 | $0 | $0 | 0% | $225,000 |
| HVAC | $150,000 | $0 | $0 | $0 | $0 | 0% | $150,000 |
| CORNICE/TRIM | $127,500 | $0 | $0 | $0 | $0 | 0% | $127,500 |
| SIDING/VENEER | $180,000 | $0 | $0 | $0 | $0 | 0% | $180,000 |
| INSULATION | $60,000 | $0 | $0 | $0 | $0 | 0% | $60,000 |
| INTERIOR FRAME AND DRYWALL | $112,500 | $0 | $0 | $0 | $0 | 0% | $112,500 |
| SPRINKLER | $1,312,500 | $0 | $0 | $0 | $0 | 0% | $1,312,500 |
| INTERIOR TRIM | $187,500 | $0 | $0 | $0 | $0 | 0% | $187,500 |
| CABINETS | $127,500 | $0 | $0 | $0 | $0 | 0% | $127,500 |
| INTERIOR PAINT | $150,000 | $0 | $0 | $0 | $0 | 0% | $150,000 |
| SAUNA | $127,500 | $0 | $0 | $0 | $0 | 0% | $127,500 |
| EXTERIOR PAINT | $30,000 | $0 | $0 | $0 | $0 | 0% | $30,000 |
| LIGHT FIXTURES | $135,000 | $0 | $0 | $0 | $0 | 0% | $135,000 |
| GUTTERS | $112,500 | $0 | $0 | $0 | $0 | 0% | $112,500 |
| FIREPLACES | $15,000 | $0 | $0 | $0 | $0 | 0% | $15,000 |
| FLOORING | $180,000 | $0 | $0 | $0 | $0 | 0% | $180,000 |
| TILE | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| CLEANUP | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| MIRRORS, SHELVES, ETC | $37,500 | $0 | $0 | $0 | $0 | 0% | $37,500 |
| APPLIANCES | $82,500 | $0 | $0 | $0 | $0 | 0% | $82,500 |
| STAIRS | $142,500 | $0 | $0 | $0 | $0 | 0% | $142,500 |
| TOTAL | $5,400,000 | $0 | $0 | $0 | $0 | 0% | $5,400,000 |

EXHIBIT B3
LAKE MARTIN
COST BREAKDOWN - 25 UNIT BUILDING
JUNE 21, 2005



| ITEM DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPL. PREV. APPL. | WORK COMPL THIS APPL | STORED MATERIALS | TOTAL COMPL AND STORED TO DATE | % | BALANCE TO FINISH |
|---|---|---|---|---|---|---|---|
| FOOTINGS AND SLAB | $125,000 | $0 | $0 | $0 | $0 | 0% | $125,000 |
| STEEL FRAME | $550,000 | $0 | $0 | $0 | $0 | 0% | $550,000 |
| CONCRETE FLOORS 2 - 5 | $200,000 | $0 | $0 | $0 | $0 | 0% | $200,000 |
| PORCHES | $65,000 | $0 | $0 | $0 | $0 | 0% | $65,000 |
| ROOFING | $66,000 | $0 | $0 | $0 | $0 | 0% | $66,000 |
| WINDOWS | $35,000 | $0 | $0 | $0 | $0 | 0% | $35,000 |
| EXTERIOR DOORS | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| PLUMBING | $45,000 | $0 | $0 | $0 | $0 | 0% | $45,000 |
| ELECTRICAL | $150,000 | $0 | $0 | $0 | $0 | 0% | $150,000 |
| HVAC | $100,000 | $0 | $0 | $0 | $0 | 0% | $100,000 |
| CORNICE/TRIM | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| SIDING/VENEER | $40,000 | $0 | $0 | $0 | $0 | 0% | $40,000 |
| INSULATION | $120,000 | $0 | $0 | $0 | $0 | 0% | $120,000 |
| INTERIOR FRAME AND DRYWALL | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| SPRINKLER | $875,000 | $0 | $0 | $0 | $0 | 0% | $875,000 |
| INTERIOR TRIM | $125,000 | $0 | $0 | $0 | $0 | 0% | $125,000 |
| CABINETS | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| INTERIOR PAINT | $100,000 | $0 | $0 | $0 | $0 | 0% | $100,000 |
| SAUNA | $35,000 | $0 | $0 | $0 | $0 | 0% | $35,000 |
| EXTERIOR PAINT | $20,000 | $0 | $0 | $0 | $0 | 0% | $20,000 |
| LIGHT FIXTURES | $90,000 | $0 | $0 | $0 | $0 | 0% | $90,000 |
| GUTTERS | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| FIREPLACES | $10,000 | $0 | $0 | $0 | $0 | 0% | $10,000 |
| FLOORING | $50,000 | $0 | $0 | $0 | $0 | 0% | $50,000 |
| TILE | $120,000 | $0 | $0 | $0 | $0 | 0% | $120,000 |
| CLEANUP | $50,000 | $0 | $0 | $0 | $0 | 0% | $50,000 |
| MIRRORS, SHELVES, ETC | $225,000 | $0 | $0 | $0 | $0 | 0% | $225,000 |
| APPLIANCES | $55,000 | $0 | $0 | $0 | $0 | 0% | $55,000 |
| STAIRS | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| | $95,000 | $0 | $0 | $0 | $0 | 0% | $95,000 |
| TOTAL | $3,800,000 | $0 | $0 | $0 | $0 | | $3,800,000 |




EXHIBIT B4
LAKE MARTIN
COST BREAKDOWN - 25 UNIT BUILDING
JUNE 21, 2005

| ITEM DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPL. PREV APPL | WORK COMPL THIS APPL | STORED MATERIALS | TOTAL COMPL AND STORED TO DATE | % | BALANCE TO FINISH |
|---|---|---|---|---|---|---|---|
| FOOTINGS AND SLAB | $125,000 | $0 | $0 | $0 | $0 | 0% | $125,000 |
| STEEL FRAME | $550,000 | $0 | $0 | $0 | $0 | 0% | $550,000 |
| CONCRETE FLOORS 2 - 5 | $200,000 | $0 | $0 | $0 | $0 | 0% | $200,000 |
| PORCHES | $65,000 | $0 | $0 | $0 | $0 | 0% | $65,000 |
| ROOFING | $35,000 | $0 | $0 | $0 | $0 | 0% | $35,000 |
| WINDOWS | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| EXTERIOR DOORS | $45,000 | $0 | $0 | $0 | $0 | 0% | $45,000 |
| PLUMBING | $150,000 | $0 | $0 | $0 | $0 | 0% | $150,000 |
| ELECTRICAL | $100,000 | $0 | $0 | $0 | $0 | 0% | $100,000 |
| HVAC | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| CORNICE/TRIM | $40,000 | $0 | $0 | $0 | $0 | 0% | $40,000 |
| SIDING/VENEER | $120,000 | $0 | $0 | $0 | $0 | 0% | $120,000 |
| INSULATION | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| INTERIOR FRAME AND DRYWALL | $875,000 | $0 | $0 | $0 | $0 | 0% | $875,000 |
| SPRINKLER | $125,000 | $0 | $0 | $0 | $0 | 0% | $125,000 |
| INTERIOR TRIM | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| CABINETS | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| INTERIOR PAINT | $85,000 | $0 | $0 | $0 | $0 | 0% | $85,000 |
| SAUNA | $20,000 | $0 | $0 | $0 | $0 | 0% | $20,000 |
| EXTERIOR PAINT | $90,000 | $0 | $0 | $0 | $0 | 0% | $90,000 |
| LIGHT FIXTURES | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| GUTTERS | $10,000 | $0 | $0 | $0 | $0 | 0% | $10,000 |
| FIREPLACES | $50,000 | $0 | $0 | $0 | $0 | 0% | $50,000 |
| FLOORING | $120,000 | $0 | $0 | $0 | $0 | 0% | $120,000 |
| TILE | $50,000 | $0 | $0 | $0 | $0 | 0% | $50,000 |
| CLEANUP | $25,000 | $0 | $0 | $0 | $0 | 0% | $25,000 |
| MIRRORS, SHELVES, ETC | $55,000 | $0 | $0 | $0 | $0 | 0% | $55,000 |
| APPLIANCES | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 |
| STAIRS | $95,000 | $0 | $0 | $0 | $0 | 0% | $95,000 |
| TOTAL | $3,600,000 | $0 | $0 | $0 | $0 | 0% | $3,600,000 |

EXHIBIT D

SCHEDULE
STONEVIEW SUMMIT

|  | MONTH 1 | MONTH 2 | MONTH 3 | MONTH 4 | MONTH 5 | MONTH 6 | MONTH 7 | MONTH 8 | MONTH 9 | MONTH 10 | MONTH 11 | MONTH 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MOBILIZATION | XXXXXXXXX | | | | | | | | | | | |
| SITEWORK | | XXXXXXXXXX X XXXXXXX X XXXXXX X XXXXXXX X XXXXXXX X XXXXXXX | | | | | | | | | | |
| BUILDING CONSTRUCTION | | | | | | | | | | | | |
| BUILDING ONE | | | | XXXXXXXX X XXXXXXXX X XXXXXXX X XXXXXXXX X XXXXXX | | | | | | | | |
| BUILDING TWO | | | | | XXXXXXXX X XXXXXXX X XXXXXXX X XXXXXXXX X XXXXXXX | | | | | | | |
| BUILDING THREE | | | | | | XXXXXXXX X XXXXXXX X XXXXXXX X XXXXXXXX X XXXXXXX | | | | | | |
| AMENITIES | | | | | | | | XXXXXXXX X XXXXXXXX X XXXXXXXX X XXXXXXXX | | | | |
| FINAL INSPECTIONS | | | | | | | | | | | XXXXXXXX X XXXXXXXXX | |

EXHIBIT C

Approved Plans and Specifications



Exhibit "C"

DIVISION 1000

GENERAL CONDITIONS:

Owner to provide a final property survey that will include building elevators and horizontal measurements for all buildings and structures. Foundation and slab elevation cirtification, final mortgage as-built survey shall be by Owner.

DIVISION 2000

SITEWORK

SS Inc. shall not be responsible for unknown subsurface or other hidden conditions. Any below grade demolition or environmental hazard is not included and will be removed at Owner's cost. Removal and relocation of any animals is not included.

All site work debris shall be burned if approved by the Fire Marshall, chipped or removed from site. Offsite work is not included.

No special foundation work such as piling or unusual consolidation of subsurface or grouping is included in this bid.

All compaction of road base and building pads to be 95% of a modified proctor. Road sleeves are included. Thermoplastic stripping is not included.
Wetland treatment, mitigation monitoring and plant warranty if required is not included.

Standard tree protection is included. Tree wells and tree pruning is not included. SS, Inc. will use reasonable diligence to protect the trees shown to remain. It can be expected that some trees shown to remain will not survive the stress of construction. Cost to trim or maintain any trees to be saved is not included.

Hardscape, entry signs, amenities, retaining walls, gazebos and other non-housing construction are included as allowances.

Typical termite treatment is included with a one-year warranty. Extended warranty service contract is not included. Alternates will be provided for various termite treatment services and applications if requested.




DIVISION 3000 AND DIVISION 4000

CONCRETE AND MASONRY:

Post-tensioned slabs will be utilized. No thickened edge included on air-conditioning pads. Precast pads may be used at SS, Inc. option.

Ortecrete may be used in lieu of Gyperete at SS, Inc. option. Breezeways floor design by SS, Inc. equal to standard multi-family construction.

DIVISION 5000

METALS:

Stairs to be steel stringers open riser and pre-cast treads with stair handrail on one side of stairs only as shown on plans. Raining (stair, trash compactor) to be aluminum (white or bronze) mechanically fastened standard installation. Post anchor sleeves and handrail, if required are not included.

48" aluminum (white or bronze) pool railing (170') with two gates is included.

DIVISION 6000

CARPENTRY:

All sheathing and decking to be OSB. OSB material to be APA certified but not necessarily manufactured by Georgia Pacific Corporation. Sub flooring material to be ¾" OSB, T&G.

Roof decking to 7/16" OSB with first tow rows edge blocking included if required by building code. One plywood clip will be used between supports at roof sheathing. Wall sheathing to be 7/16" OSB>

House wrap is included on all building behind stucco or cement siding. All fascias to be 2x6 SPF with aluminum wrap.

Cabinets to be Regal Series or equal as manufactured by Canac Kitchens with standard laminate kitchen and vanity countertops. Plastic legs and mica braces for cabinets are not included.



Wood base is utilized in carpet, tile and wood floor areas. Crown moulds, chair rail, and stain grade trim is included per plans.

DIVISION 7000

---

WEATHERPROFFING:

Ceiling insulation to be R-30 blown insulation above air-conditioned areas and batts installed in exterior hallway dormer ceiling. Insulation on to be R-11 batts in exterior frame walls, floors and in fire and sound walls as shown on plans. Plumbing pipe insulation is not included. Ply foam around doors and windows is included.

Gutters and downspouts are included for the apartment buildings.

Wooden cedar shake roofing and 30 lb. felt dry-in is included with aluminum fascia and vinyl soffit. Warranty for roofing workmanship (labor) is 1 year and roofing materials is 5 years for substantial completion date of each building.

Caulking material used will be appropriate for area or conditions used.

DIVISION 8000

---

DOORS, HARDWARE, GLASS AND GLAZING:

Apartment entry doors are 9-panel metal wood frame and 20-minute fire rating with standard thresholds and paint grade hardware. Bedroom and apartment mechanical doors Colonist solid core doors are utilized for closets, pantry, and bathroom doors. Elevator equipment room door is flush metal with standard paint grade hardware.

Door lock hardware by Kwikset or equal in (26D) brushed chrome finish with lever handles. The apartment entry doors to receive a single cylinder deadbolt and passage lever. Unit mechanical doors to be a keyed lever lock. Locks to be contraction keyed WPC to provide three (3) keys per entry door. Key Card Access locks are not included.

All apartment units single glazed aluminum windows with applied muntins – Series 2000 as manufactured by Milco, Inc. or equal are included. Tempered glass is included at breezeway windows. Insulated glass and tinted is not included.

DIVISION 9000

FINISHES:

All stucco at elevator tower to be 3/8" fiber reinforced one coat stucco system with skip trowel finish over self-furring paperback lath, over one layer of building wrap. Stucco to be per manufactures specifications. Manufactured stone and concrete shake siding will be used on all exteriors. Water- resistant board installed behind tubs& showers only. All ceilings to be one layer of drywall as shown on plans.

Paint material to be Sherwin Williams, Glidden or equal Contactor to apply (Maximum or 3) samples of paint in selected colors and workmanship. Any change to colors or additional samples will be done as an extra, quoted and/or time and materials.

Painting specification is as follows: Interior wood trim and doors to receive two (2) coats latex paint with second coat to be semi-gloss. Interior walls will receive one (1) coat of flat latex paint. Ceilings and walls in kitchen and bath to receive one (1) coat latex primer and one (1) coat latex semi-gloss paint.

Paint samples applied to one building only. Exterior in two colors and interior paint in one color. Wall coverings are not included.

All tile to be manufactured by Dal Tile or equal. Floor tile to be " Village Bend" series to be 12x12 in all flooring locations except bathrooms , which are to be 8x8 "Designer" series. 2x2 bath floor tile is not included. Marble thresholds at bath doors are included.

Carpet is equal to specification and is a 25 oz. FHA approved Nylon carpet installed over 4lb rebound cushion pad. An upgrade carpet is provide in the clubhouse. Apartment mechanical room floors to be VCT in lieu of ceramic tile.

DIVISION 10000

An allowance is provided for building, apartment, entry sign, pool, amenity, and street identifying signage and installation.

Postal specialties are included for 85 units. Addressing coordination with Postal Service is not included.

Exposed Screw chrome bath accessories are included. Shower door and enclosures are included.

One fire extinguisher to be clip hung in each apartment.



DIVISION 11000

---

EQUIPMENT:

General Electric  stainless appliances or equal including 22 c.f. refrigerator with icemaker, self clean oven, dishwasher, range hood with microwave, and garbage disposal in each apartment.

DIVISION 12000

---

FURNISHINGS:

Window treatment to be 2" simulated wood blinds on window in apartments.

DIVISION 13000

---

ELEVATORS

2500 lb Elevators are included with a travel speed of 100 fpm. Side opening doors (3.5'x7") with a baked enamel finish. Elevator interior walls to be standard finish plastic laminate. Air conditioning in elevator car is not included. Car riding lanterns in lieu of hall lanterns (position indicators) is included.

DIVISION 14000

---

MECHANICAL:

Plumbing

Plumbing design, pipe sizing and routing to be by contractor per code requirements and not necessarily as per drawings and isometrics. Any revised drawings to be signed and sealed by the Engineer of Record if required by the building jurisdiction. Plumbing layout and risers will meet all local codes.



Plumbing work is based upon local industry standard for multifamily construction and includes PVC wastes, traps, laundry boxes, escutcheons and clean outs per code. PVC will be used in rated assemblies. Water pipe material to be CPVC. Drainage and vent piping to be Schedule 40PVC Coextruded Foam Core Pipe.

All drains, vents, cleanouts, tub waste, water piping, laundry boxes, water heater pans, traps and supply piping under countertops to be plastic. PVC cleanouts at all floor drains with brass strainers. Two brass exterior hose bibs installed on each apartment building at locations shown on plans.

Plastic hangers, plastic strapping and plastic tube nylons will be used in lieu of split ring hangers, malleable iron inserts, rods, beam clamps, etc.

Condensate drywalls are not included. Condensate lines are not insulated. Icemaker lines are included with a shut off valve.

Sub water meter equipment, remote readers, meter yokes and installation with pre-wire are included. A thermal expansion valve, at each building if required is included.

All plumbing fixtures are white. Gravity flush elongated water closets with seats manufactured by church included in the apartments.

Water heaters to be electric 80 gallon with one element by Rheem, A.O. Smith or State with a standard five-year warranty. Pipe insulation on the first 8" of hot and cold water piping at water heater is not included.

Kitchen sinks in the apartments to be stainless steel, Sterling, 33" x 22" x 6" to be considered equal. Lavatories to be pressed steel oval as manufactured by American Standard or equal.

Sterling or equal single lever kitchen and lavatory faucets included. Spray for kitchen sinks are included.

Valley or equal pressure balance shower valves are included. Shower enclosures are included.

Two standard hose bibs are included on front, rear and sides for total of 8 per building.

Expansion tanks, shock arrestors or air chambers, handicap fixtures or accessibility requirements (other than described above) in apartment units, interior sterilization of the water system, NIBCO wall cleanouts, copper piping for water lines, concrete around exterior cleanouts are not included.



HVAC:

HVAC work is based upon local industry standard for multifamily construction. HVAC design and routing to be by contractor per code requirements and not necessarily as per drawings and isometrics. Any revised drawings to be signed and sealed by the Engineer of Record if required by the building jurisdiction. HVAC equipment to be 10:00 S.E.E.R straight cool system designed to meet minimum design criteria.

Work to include PVC condensate lines, steel stamped grills all per minimum code requirements.

Vented bath fans are included in all bathrooms. Ventless range hoods are provided. Vertical vents are not included. Any building code revision to this design shall be at the Owner's expense.

An allowance is provided for programmable thermostats.

DIVISION 16000

Electrical design and routing to be by contractor per code requirements and not necessarily as per drawings and isometrics. Any revised drawings to be signed and sealed by the Engineer of Record if required, by the building jurisdiction.

Contractor to use aluminum wire where allowed by code. Conduit for wiring in the apartment buildings is not included. Light fixtures and wiring devised to be standard apartment grade.

Telephone pre-wire (CAT-3) to home run location telephone interface is included.

Site lighting is included as shown on plans. Landscape lighting is not included.

Satellite Equipment, pre-wire, trim, related services and installation is an Allowance.

Security system and pre-wire is not included.

Primary wiring is by other (KUA). 50" per building of secondary conduit and wire is included.

Lightning Protection is not included.

EXHIBIT B
Blumberg No. 5118

## Empire Financial Services, Inc.

121 EXECUTIVE PARKWAY
MILLEDGEVILLE. GEORGIA 31061  www.empfinserv.com

TELEPHONE 478 453-9415
FAX   478 452-2950

September 1, 2005

Mr. James R. Paxton
Managing Member
Lake Martin Partners, LLC
142 South Woodburn Drive
Dothan, AL  36305

Re: Letter of Commitment

Dear Mr. Paxton;

We are pleased to inform you that our lenders have approved the $22 million financing request for Phase 1 of the Lake Martin, Alabama condominium project.  The following terms and conditions will apply:

BORROWER: Lake Martin Partners, LLC

GUARANTORS: Gary L. Anderson
Daniel Bailey
Michael Brock
Timothy Eakes, M.D.
Julie Howell
Keith LaFerriere, M.D.
Samuel E. Lee
James R. Paxton
C. Wayne Roberts, D.V.M.
Kenneth Todd, M.D.
Rickey Woods

Each guarantor will sign jointly and severally.  The amount of the guarantee will be limited to the outstanding principal amount of this credit facility.

| LOAN TERMS: | | | |
|---|---|---|---|
| | (A) | Loan Amount: | $22,000,000.00 |
| | (B) | Maturity Date: | All unpaid principal and interest shall come due and payable 24 months after the closing date of the loan. |
| | (C) | Interest Rate: | The Prime Rate as shown in the *Wall Street Journal*, Eastern Edition, plus 75 basis points, adjusted annually. |

1

|  | (D) | Initial Interest Rate: | 7.00%. This credit facility shall also have a 7.00% interest rate floor. |
|---|---|---|---|
|  | (E) | Interest-Only Term: | The 24-month term of this credit facility will be on an interest-only basis, with interest due and payable monthly. |

PLANS AND SPECIFICATIONS:    A complete set of final plans and specifications certified by your architect with the seal attached thereto, are to be submitted and approved by Empire Financial Services, Inc., ("Lender") or its designated agent prior to closing. Any deviation from the approved plans and specifications must be approved by Lender in writing.

LOAN DISBURSEMENTS:    Disbursements of the loan proceeds will be made by Lender on a monthly basis during the course of construction. Disbursements shall be made under procedures and title safeguards acceptable to Lender. Prior to any disbursements, the loan must be current in all respects unless otherwise approved by Lender.

CONSTRUCTION PERIOD:    The project must be complete by the maturity date of this credit facility.

CONSTRUCTION INSPECTIONS:    All construction inspections must be approved by USA Inspections. USA has been engaged by Lender to review all draw requests. USA will do a pre-construction review of the plans and the budget. The cost of this service is the borrower's responsibility.

PAYMENT & PERFORMANCE BOND:    All major subcontractors will provide a payment and performance bond as part of their contractual agreement with the general contractor/developer. These bonds will include a dual obligee rider to list Empire Financial Services, Inc. as an additional insured. These major subcontractors will include, but will not necessarily be limited to, the following divisions:

|  |  |
|---|---|
| (1) | Excavation |
| (2) | Concrete Work |
| (3) | Steel Framing |
| (4) | Plumbing |
| (5) | HVAC |
| (6) | Electrical |
| (7) | Elevator |
| (8) | Fire/Sprinkler System |

2

| | |
|---|---|
| RETAINAGE: | During the loan term, Lender will allow a maximum advance of 95% on all draws, thereby maintaining a retainage of 5%. All retainage will be released upon notice from the project architect and USA Inspections that the project has been satisfactorily completed. |
| LATE CHARGE: | 5% of any monthly installment due not received within 15 days after the installment is due. |
| ORIGINATION FEE: | 1.00% of the amount of the loan. |
| CLOSING COSTS: | Only third party costs are to be reimbursed, including, but not limited to, attorney fees, title policy, tax service fees, and recording fees. |
| PREPAYMENT PENALTY: | This loan is not subject to a prepayment penalty. |
| SECURITY: | This loan shall be secured by 17 acres of land located on Sunset Point Drive, Stillwaters, Tallapoosa County, Alabama, and all improvements thereon, including 85 condominium units to be built in two, 25-unit structures and one, 35-unit structure. |

SECURITY AGREEMENT AND FINANCING STATEMENTS: All furniture, fixtures, and equipment owned by the borrower and now contained or hereafter placed in or affixed to the building or buildings now located or hereafter located on the mortgaged premises will be included in the mortgage instrument. As additional collateral for the loan, the borrower shall execute a financing statement and security agreement as may be required by legal counsel, covering all furniture, fixtures, and equipment to be placed in or affixed to the completed facilities. Said financing statement and security agreement shall also encumber accounts receivable, deposits, rents, issues, profits, and income from the property and all franchises, licenses, permits, contracts, leases and contracts for deed and purchase/sale agreements covering all or any part of the encumbered property.

| | |
|---|---|
| HAZARD INSURANCE: | An original policy in the minimum amount of the loan must be available to the Lender at the time of closing. The mortgagee or loss payee clause of the policy must read, "Empire Financial Services, Inc., Its Successors and/or Assigns, 121 Executive Parkway, Milledgeville, Georgia 31061. |
| FLOOD INSURANCE: | If the secured property is determined to be located in a HUD designated flood hazard area, the purchase of flood insurance at the borrower's expense shall be required. |
| TITLE INSURANCE: | Title Insurance protecting the Lender shall be required and will be provided through the closing attorney at the Borrower's expense. Also, if the loan involves a construction period, the |

3

Borrower will be required to furnish the lender with updated title policies whenever the lender deems them necessary.

CONSTRUCTION START DATE: No lienable work is to be done on the site prior to the loan being closed and the loan documents recorded. Any lienable work completed prior to the loan documents being recorded can, at the lender's option, cancel this commitment.

SURVEY: A current Alta survey (or satisfactory equivalent) of the subject property shall be provided prior to closing, showing all existing improvements located on the premises and the location of all easements and rights-of-way abutting, across or serving the said premises. Said survey shall meet all requirements of the title insurer for elimination of the standard survey exception.

AS-BUILT PLAT: Once the footers are poured, a certification letter from a Licensed Surveyor or Professional Engineer stating that the corners of the building(s) are located on the subject property, within required setback lines, and will not encroach on any adjacent property will be required.

CORPORATE AND PARTNERSHIP REQUIREMENTS: If this commitment is issued to a corporation, limited liability company, limited partnership, or general partnership, counsel for such entity must represent and warrant that, on and as of the date of the commitment, and on and as of the date of the closing of the loan:

(1)    Said entity is and will be an entity duly organized and validly existing under the laws of the state in which the loan is originated, or if it has been organized under the laws of any other state, it is and will be qualified to transact business in the state in which the loan is originated.

(2)    Said entity (A) is and will be the bona fide owner of the property to be mortgaged in its own right; or (B) has contracted to purchase the property from the present owner thereof for a good and valuable consideration and will be the bona fide owner thereof on the date of the closing of the loan and execution of the note and mortgage.

(3)    There is not, and will not be, any contract or other obligation providing for or requiring said entity to convey said property or any interest or estate therein to any party, and no party other than said entity has any beneficial or equitable right, title, or interest in said property or any part thereof.

(4)    In the case of a construction loan, the proceeds of the mortgage loan shall be paid directly to said entity, and will be used solely for the proper business purposes of said entity.

(5)    On the date of the closing of the loan, there shall be delivered to us appropriate resolutions and an affidavit by one or more partners, members or officers and stockholders, and such

4

other proof as we shall require, to establish that all of the foregoing representations and warranties are true. If we do not obtain such affidavit and other proof, including, but not limited to, a current certificate of good standing issued by the Secretary of State, we may refuse to make the loan and retain any payments made by the borrower upon acceptance of this commitment.

APPRAISAL: Borrower agrees to furnish Lender with a new appraisal should the loan be classified by any regulatory agency for any reason in the future, at its own expense, if deemed necessary to comply with any law or regulations. The appraiser must be approved by Lender.

FINANCIAL STATEMENTS: All guarantors and endorsers are required to provide annual updated personal financial statements to Lender. In addition, all guarantors and endorsers are required to provide to Lender copies of their annual federal tax return within two weeks of filing.

CONDOMINIUM RIDER: Borrower must obtain Lender's consent prior to filing any plats and/or plans which will result in the creation of a "condominium" as the term is used in the Alabama Uniform Condominium Act of 1991, Sec 35-8A-101 et. seq., Code of Alabama 1975 ("Act").

Borrower will act as the declarant in filing the Declaration of Condominium. Borrower must obtain Lender's approval and consent before filing the Declaration or otherwise subjecting the property to any covenants, restrictions, conditions, limitations, and uses which have or could have the same or similar effect as the creation of a condominium or planned unit development. All structural components and mechanical systems of all buildings must be substantially completed in accordance with plans approved by Lender prior to the filing and recording of the Declaration. Substantial completion must be evidenced by (A) a certificate of completion executed by an independent licensed architect; or (B) a certificate of occupancy issued by the governmental entity authorized to issue such for Tallapoosa County, Alabama. Borrower must submit the plat, plans, the Declaration and Articles of Incorporation and By-Laws for the owner's association to Lender for its approval prior to filing them. Furthermore, prior to filing the Declaration, Borrower at Borrower's expense will provide Lender with an opinion letter from an attorney licensed in the State of Alabama and qualified to render such, confirming that all condominium documents, plats, and plans, owner's association documents, and any amendments thereto are in compliance with the Act.

Lender will release individual condominiums and applicable interest in Common Elements and Limited Common Elements from the lien of the mortgage upon receipt of good funds equal to 80% of the gross sales price of the unit.

5

All purchaser deposits must be held in escrow in the State of Alabama in accounts established for such purpose, by a licensed title insurance company, attorney, licensed real estate broker, or banking institution whose accounts are federally insured.  Borrower shall have no access to any funds on deposit until the sales close in accordance with provisions of the sales contract, the offering statement, and the Act, at which time the deposit amount shall automatically and without the necessity of further action or documentation by Borrower or Lender, become subject to the mortgage and an assignment of fees and income from Borrower to Lender.

RELEASE MECHANISM:    Empire will release individual condominium units from the collateral pool upon the receipt of 80% of the gross selling price of each unit.  Empire reserves the right to approve the selling price of each unit.  Residual land for future phases of development will be released upon the receipt of $11,420 per condominium unit making up said phases.

<u>THIS AGREEMENT WILL SURVIVE CLOSING</u>

Very Truly Yours;

Bill Osborne
Executive Vice President
Empire Financial Services, Inc.

We hereby agree with the above terms and conditions:

Lake Martin Partners, LLC

By: _____    Date: 09/27/05

As its: Managing Member

By: _____    Date: 9-27-05

As its: Managing Member

6

GUARANTORS
Lake Martin Partners, LLC

_____    Date: _09 - 0 ? - 2005_
Gary L. Anderson

_____    Date: _____
Daniel A. Bailey

_____    Date: _____
Michael D. Brock

_____    Date: _____
Timothy L. Eakes, Jr.

_____    Date: _____
Julie G. Howell

_____    Date: _____
Keith A. LaFerriere

_____    Date: _____
Samuel E. Lee

_____    Date: _____
James R. Paxton

_____    Date: _____
C. Wayne Roberts

_____    Date: _____
Kenneth L. Todd

_____    Date: _____
Rickey L. Woods

GUARANTORS
Lake Martin Partners, LLC

_____     Date: _____9/02/05_____
Gary L. Anderson

_____     Date: _____9/02/05_____
Daniel A. Bailey

_____     Date: _____9/02/05_____
Michael D. Brock

_____     Date: _____
Timothy L. Eakes, Jr.

_____     Date: _____
Julie G. Howell

_____     Date: _____
Keith A. LaFerriere

_____     Date: _____
Samuel E. Lee

_____     Date: ___09/02/05_____
James R. Paxton

_____     Date: _____
C. Wayne Roberts

_____     Date: ___09/02/05_____
Kenneth L. Todd

_____     Date: _____
Rickey L. Woods

7

## GUARANTORS
Lake Martin Partners, LLC

_____     Date:_____

Gary L. Anderson

_____     Date:_____

Daniel A. Bailey

_____     Date:_____

Michael D. Brock

*Timothy L. Eakes Jr*
_____     Date: _9-10-05_____

Timothy L. Eakes, Jr.

_____     Date:_____

Julie G. Howell

_____     Date:_____

Keith A. LaFerriere

_____     Date:_____

Samuel E. Lee

_____     Date:_____

James R. Paxton

_____     Date:_____

C. Wayne Roberts

_____     Date:_____

Kenneth L. Todd

_____     Date:_____

Rickey L. Woods

7

GUARANTORS
Lake Martin Partners, LLC

_____    Date:_____
Gary L. Anderson


_____    Date:_____
Daniel A. Bailey


_____    Date:_____
Michael D. Brock


_____    Date:_____
Timothy L. Eakes, Jr.


_____    Date:_____
Julie G. Howell

_____    Date: September 6, 2005
Keith A. LaFerriere


_____    Date:_____
Samuel E. Lee


_____    Date:_____
James R. Paxton


_____    Date:_____
C. Wayne Roberts


_____    Date:_____
Kenneth L. Todd


_____    Date:_____
Rickey L. Woods

7

GUARANTORS
Lake Martin Partners, LLC

_____     Date:_____
Gary L. Anderson


_____     Date:_____
Daniel A. Bailey


_____     Date:_____
Michael D. Brock


_____     Date:_____
Timothy L. Eakes, Jr.


_____     Date:_____
Julie G. Howell


_____     Date:_____
Keith A. LaFerriere


_____     Date:_____
Samuel E. Lee


_____     Date:_____
James R. Paxton


_____     Date:_____
C. Wayne Roberts


_____     Date:_____
Kenneth L. Todd


_____     Date: 7-6-05
Rickey L. Woods

7

EXHIBIT
C

Blumberg No. 5116

RECORDED CARD

**201046**

No. _____

NO. _____
RECEIVED
GLORIA T. SINCLAIR
JUDGE OF PROBATE

2005 FEB -4 PM 1:57

STATE OF ALABAMA
TALLAPOOSA COUNTY
I CERTIFY THIS INSTRUMENT
WAS FILED ON

Return Recorded Document to:
COBB & HYRE
6085 Lake Forrest Drive, Suite 200
Atlanta, GA 30328
Attn: Larry K. Hyre, Esq.

STATE OF GEORGIA

COUNTY OF FULTON

RECORDING FEES
TALLAPOOSA CO. AL
TAX              $
SPEC. FEE        10.00
REC. FEE         20.00
TOTAL            100.00



<u>LIMITED WARRANTY DEED</u>

THIS INDENTURE, Made this 25th day of January 2005 between **SUNSET COVE, LLC, a Georgia limited liability company**, in the State of Georgia (hereinafter the "Grantor"), and **PROFILE GROUP, INC., a Georgia corporation** (hereinafter the "Grantee"), (the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

WITNESSETH: That the Grantor for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS, in hand paid, at and before the sealing and delivery of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto the said Grantee, its successors and assigns, all that tract or parcel of land more particularly described as follows:

All that tract or parcel of land lying and being in Section 1 and 2, Township 20 North, Range 22 East, Tallapoosa County, Alabama, and being more particularly described on <u>Exhibit "A"</u> attached hereto and by this reference made a part hereof.

TO HAVE AND TO HOLD the said tract or parcel of land, with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, to the only proper use, benefit and behoof of the said Grantee, its successors and assigns, forever, in Fee Simple.

AND THE SAID Grantor, for its successors and assigns, will warrant and forever defend the right and title to the above described property, unto the said Grantee, its successors and assigns, against the claims of all persons owning, holding or claiming by, through or under the said party of the first part but not otherwise.

IN WITNESS WHEREOF, the said party of the first part has hereunto set their hands and seals the month, day and year first above written.

Sunset Cove, LLC

Michael H. Horton, Member

Phillip Kauffman, Member

Robert F. Godard, Member/Manager

STATE OF GEORGIA

FULTON COUNTY

I, ~~LEONARD SAMUELIAN~~ a Notary Public in and for said state and county, hereby certify that ~~GODARD~~, whose name as MEMBER of SUNSET COVE, is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this date that being informed of the contents of the conveyance, he, as such officer/member and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and seal this ___ day of January, 2005.

NOTARY PUBLIC

Lots 6b and 7

ALL THAT TRACT or parcel of land lying and being in Section 1 , Township 20 North, Range 22 East, Tallapoosa County, Alabama, being more particularly described as follows:

BEGINNING at the intersection of the southeasterly right-of-way line of Sunset Point Drive (right-of-way varies) and the westerly right-of-way line of Lakeview Drive (right-of-way varies); Run thence along the right-of-way of Lakeview Drive the following two (2) courses and distances:  (1) Along a curve to the right (said curve having a radius of 649.30 feet, a chord direction of South 23°37'49" East, and a chord length of 362.63 feet) 367.52 feet to a Point, and (2) South 07°24'54" East a distance of 326.24 feet to a Point on the property line of Church of the Living Waters; Run thence along the property line of Church of the Living Waters South 40°14'13" West a distance of 215.97 feet to a Point; Continue thence along the property line of Church of the Living Waters South 08°33'16" East a distance of ±197 feet to the edge of Martin Lake;  Run thence along the edge of Martin Lake southwesterly, westerly, and northerly, a distance of 1598 feet to a Point on the property line of Sunset Point Condominium IV Phase 1; Run thence along said property line North 34°24'55" East a distance of ±96 feet to a 1/2" rebar pin with cap; Continue thence along said property line North 10°58'29" East a distance of 96.39 feet to a 1/2" rebar pin with cap on the southerly right-of-way line of Sunset Point Drive; Run thence along said right-of-way line the following eight (8) courses and distances: (1) North 87°51'42" East a distance of 74.40 feet to a Point, (2) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 85°29'42" East, and a chord length of 15.76 feet) 15.76 feet to a Point, (3) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 76°39'35" East, and a chord length of 146.42 feet) 146.89 feet to a Point, (4) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 64°40'05" East, and a chord length of 73.81 feet) 73.87 feet to a Point, (5) along a curve to the right (said curve having a radius of 527.40 feet, a chord direction of North 65°00'56" East, and a chord length of 80.19 feet) 80.27 feet to a Point, (6) along a curve to the right (said curve having a radius of 527.40 feet, a chord direction of North 71°11'32" East, and a chord length of 33.43 feet) 33.44 feet to a Point, (7) along a curve to the left (said curve having a radius of 146.36 feet, a chord direction of North 46°41'25" East, and a chord length of 135.37 feet) 140.73 feet to a Point, and (8) North 19°08'42" East a distance of 99.48 feet to the POINT OF BEGINNING.

Said tract contains ±689,925 square feet or ±15.8 acres, more or less.

This is intended to be the same property as Lot 7 and the portion of Lot 6X east of the 20' drainage easement centerline of Sunset Point Subdivision Phase 4 recorded in Plat Book 10 Page 45 of the Tallapoosa County records.



201046

Lot 1

ALL THAT TRACT or parcel of land lying and being in Section 2, Township 20 North, Range 22 East, Tallapoosa County, Alabama, being more particularly described as follows:

To find the POINT OF BEGINNING, Commence at the southeast corner of Section 2, Township 20 North, Range 22 East; Run thence North 02°47'35" West a distance of 1817.00 feet to a 1/2" rebar found on the northerly right-of-way line of Sunset Point Drive and the POINT OF BEGINNING.

From the POINT OF BEGINNING, run thence along a curve to the right (said curve having a radius of 166.00 feet, a chord direction of North 63°02'17" West, and a chord length of 168.72 feet) 176.99 feet to a Point; Run thence along a curve to the right (said curve having a radius of 358.40 feet, a chord direction of North 21°22'53" West, and a chord length of 142.82 feet) 143.78 feet to a Point; Run thence North 09°53'18" West a distance of 244.81 feet to a Point; Run thence along a curve to the left (said curve having a radius of 285.37 feet, a chord direction of North 31°18'01" West, and a chord length of 208.36 feet) 213.29 feet to a Point; Run thence along a curve to the left (said curve having a radius of 237.84 feet, a chord direction of North 52°54'57" West, and a chord length of 1.65 feet) 1.65 feet to a 1/2" rebar pin found; Run thence North 35°36'31" East a distance of 33.15 feet to a 1/2" rebar pin on the southerly edge of Lake Martin; Run thence along said southerly edge of Lake Martin a distance of ±342 feet to a 1/2" rebar pin found at the property corner of Lot 2, Sunset Point Subdivision Phase 4; Run thence along the property line of Lot 2 South 13°03'22" East a distance of 440.61 feet to the POINT OF BEGINNING.

Said tract contains ±69,855 square feet or ±1.60 acres, more or less.

This is intended to be the same property as Lot 1 of Sunset Point Subdivision Phase 4 recorded in Plat Book 10 Page 45 of the Tallapoosa County records.

EXHIBIT "B"

PERMITTED EXCEPTIONS

1.  Taxes due and payable October 1, 2005, and subsequent years.

2.  Rights of parties in possession.

3.  Possible unfiled mechanic's and materialmen's liens.

4.  Title to all mineral within and underlying the premises together with all mining rights and other rights, privileges and immunities relating thereto.

5.  Any unpaid fire district or residential association assessments.

6.  The Alabama Power Company pursuant to agreements with the Federal Energy Regulatory Commission is required to regulate the use of any real estate below the 490 foot contour line of Lake Martin.

7.  Flood rights of Alabama Power Company up to the 490 foot contour of Lake Martin.

8.  Any adverse claim to any portion of said land which has been created by artificial means or has accreted to any such portion so created.

9.  Rights of other parties, the United States of America or State of Alabama, in and to the shore, littoral or riparian rights to the property herein above described.

10. The property herein described is subject to those easements as reflected on the plat of that subdivision know as Sunset Point Subdivision Phase 4 recorded in Plat Book 10, Page 45, Office of Judge of Probate of Tallapoosa County, Alabama.

11. Declaration of Restrictions and Protective Covenants for Still Waters recorded at Card No. 41595, Card No. 134872 as amended by First Amendment recorded at Card No. 147947, as amended by Second Amendment recorded at Card No. 149969, and Third Amendment as recorded at Card No. 185622 and re-recorded at Card No. 186258, Office of Judge of Probate of Tallapoosa County, Alabama. *and Amendments recorded at 103205, 106307, 108634+134872*

12. Title to that part of the premises described herein lying below a line measured 30 feet horizontally and inland from a contour commonly known as the 490 foot contour of Lake Martin (high Water line) as established and reserved by Alabama Power Company, said 30 foot wide strip being the property of Alabama Power Company.

**EXHIBIT**

**D**

RECORDED CARD

**201047**

No._____

NO._____

RECORDED
GEORGIA _____
_____

20__ FEB -- _____

SPECIAL
I CERTIFY THE _____
WAS FILED ON

Grantee's Address
5312 Saville Drive
Austell, Ga 30010

STATE OF ALABAMA

TALLAPOOSA COUNTY

## WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS, that in consideration of $10.00 to the undersigned

grantor, Profile Group, Inc., a Georgia corporation, in hand paid by the grantee herein, the

receipt whereof is acknowledged, the said Grantor, does by these presents, grant, bargain, sell

and convey unto Lake Martin Partners, LLC, an Alabama limited liability company (herein

referred to as Grantee), the following described real estate, situated in Tallapoosa County,

Alabama, to-wit:

**See attached Exhibit "A" (Legal Description)**

TO HAVE AND TO HOLD unto the said Grantee, its successors and assigns forever.

And Grantor, does for itself, its successors and assigns, covenant with said Grantee, its
successors and assigns, that it is lawfully seized in fee simple of said premises; that they are
free from all encumbrances, unless otherwise stated above; that it has a good right to sell and
convey the same as aforesaid; and that it will, and its successors and assigns shall warrant and
defend the same to the said Grantee, its successors and assigns forever, against the lawful
claims of all persons.

In Witness whereof, the said Grantor has hereunto set its signature by hands and seal, on this
25th day of January, 2005.

Profile Group, Inc., a Georgia corporation

Bruce Snead, President

STATE OF GEORGIA

FULTON COUNTY

RECORDING FEES
TALLAPOOSA CO. AL

| | |
|---|---|
| TAX | 20.00 |
| SPEC. FEE | 10.00 |
| REC. FEE | 14.00 |
| TOTAL | 120.00 |

I, JENNIFER M SHINHOUSER, Notary Public in and for said state and county, hereby certify that
GRANTOR, whose name as President of PROFILE GROUP, is signed to the foregoing conveyance,
and who is known to me, acknowledged before me on this date that being informed of the contents of the
conveyance, he, as such officer/member and with full authority, executed the same voluntarily for and as
the act of said limited liability company.

Given under my hand and seal this 25th day of January, 2005.

NOTARY PUBLIC

JENNIFER M SHINHOUSER
NOTARY
GEORGIA
EXPIRES
AUG. 11, 2007
PUBLIC
FULTON COUNTY

201047

Lots 6b and 7

ALL THAT TRACT or parcel of land lying and being in Section 1 , Township 20 North, Range 22 East, Tallapoosa County, Alabama, being more particularly described as follows:

BEGINNING at the intersection of the southeasterly right-of-way line of Sunset Point Drive (right-of-way varies) and the westerly right-of-way line of Lakeview Drive (right-of-way varies); Run thence along the right-of-way of Lakeview Drive the following two (2) courses and distances: (1) Along a curve to the right (said curve having a radius of 649.30 feet, a chord direction of South 23º37'49" East, and a chord length of 362.63 feet) 367.52 feet to a Point, and (2) South 07º24'54" East a distance of 326.24 feet to a Point on the property line of Church of the Living Waters; Run thence along the property line of Church of the Living Waters South 40º14'13" West a distance of 215.97 feet to a Point; Continue thence along the property line of Church of the Living Waters South 08º33'16" East a distance of ±197 feet to the edge of Martin Lake; Run thence along the edge of Martin Lake southwesterly, westerly, and northerly, a distance of 1598 feet to a Point on the property line of Sunset Point Condominium IV Phase 1; Run thence along said property line North 34º24'55" East a distance of ±96 feet to a 1/2" rebar pin with cap; Continue thence along said property line North 10º58'29" East a distance of 96.39 feet to a 1/2" rebar pin with cap on the southerly right-of-way line of Sunset Point Drive; Run thence along said right-of-way line the following eight (8) courses and distances: (1) North 87º51'42" East a distance of 74.40 feet to a Point, (2) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 85º29'42" East, and a chord length of 15.76 feet) 15.76 feet to a Point, (3) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 76º39'35" East, and a chord length of 146.42 feet) 146.89 feet to a Point, (4) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 64º40'05" East, and a chord length of 73.81 feet) 73.87 feet to a Point, (5) along a curve to the right (said curve having a radius of 527.40 feet, a chord direction of North 65º00'56" East, and a chord length of 80.19 feet) 80.27 feet to a Point, (6) along a curve to the right (said curve having a radius of 527.40 feet, a chord direction of North 71º11'32" East, and a chord length of 33.44 feet) 33.44 feet to a Point, (7) along a curve to the left (said curve having a radius of 146.36 feet, a chord direction of North 46º41'25" East, and a chord length of 135.37 feet) 140.73 feet to a Point, and (8) North 19º08'42" East a distance of 99.48 feet to the POINT OF BEGINNING.

Said tract contains ±689,925 square feet or ±15.8 acres, more or less.

This is intended to be the same property as Lot 7 and the portion of Lot 6b east of the 20' drainage easement centerline of Sunset Point Subdivision Phase 4 recorded in Plat Book 10 Page 45 of the Tallapoosa County records. 

201047

Lot 1

ALL THAT TRACT or parcel of land lying and being in Section 2, Township 20 North, Range 22 East, Tallapoosa County, Alabama, being more particularly described as follows:

To find the POINT OF BEGINNING, Commence at the southeast corner of Section 2, Township 20 North, Range 22 East; Run thence North 02°47'35" West a distance of 1817.00 feet to a 1/2" rebar found on the northerly right-of-way line of Sunset Point Drive and the POINT OF BEGINNING.

From the POINT OF BEGINNING, run thence along a curve to the right (said curve having a radius of 166.00 feet, a chord direction of North 63°02'17" West, and a chord length of 168.72 feet) 176.99 feet to a Point; Run thence along a curve to the right (said curve having a radius of 358.40 feet, a chord direction of North 21°22'53" West, and a chord length of 142.82 feet) 143.78 feet to a Point; Run thence North 09°53'18" West a distance of 244.81 feet to a Point; Run thence along a curve to the left (said curve having a radius of 285.37 feet, a chord direction of North 31°18'01" West, and a chord length of 208.36 feet) 213.29 feet to a Point; Run thence along a curve to the left (said curve having a radius of 237.84 feet, a chord direction of North 52°54'57" West, and a chord length of 1.65 feet) 1.65 feet to a 1/2" rebar pin found; Run thence North 35°36'31" East a distance of 33.15 feet to a 1/2" rebar pin on the southerly edge of Lake Martin; Run thence along said southerly edge of Lake Martin a distance of ±342 feet to a 1/2" rebar pin found at the property corner of Lot 2, Sunset Point Subdivision Phase 4; Run thence along the property line of Lot 2 South 13°03'22" East a distance of 440.61 feet to the POINT OF BEGINNING.

Said tract contains ±69,855 square feet or ±1.60 acres, more or less.

This is intended to be the same property as Lot 1 of Sunset Point Subdivision Phase 4 recorded in Plat Book 10 Page 45 of the Tallapoosa County records.



EXHIBIT "B"

PERMITTED EXCEPTIONS

1.   Taxes due and payable October 1, 2005, and subsequent years.

2.   Rights of parties in possession.

3.   Possible unfiled mechanic's and materialmen's liens.

4.   Title to all mineral within and underlying the premises together with all mining rights and other rights, privileges and immunities relating thereto.

5.   Any unpaid fire district or residential association assessments.

6.   The Alabama Power Company pursuant to agreements with the Federal Energy Regulatory Commission is required to regulate the use of any real estate below the 490 foot contour line of Lake Martin.

7.   Flood rights of Alabama Power Company up to the 490 foot contour of Lake Martin.

8.   Any adverse claim to any portion of said land which has been created by artificial means or has accreted to any such portion so created.

9.   Rights of other parties, the United States of America or State of Alabama, in and to the shore, littoral or riparian rights to the property herein above described.

10.  The property herein described is subject to those easements as reflected on the plat of that subdivision know as Sunset Point Subdivision Phase 4 recorded in Plat Book 10, Page 45, Office of Judge of Probate of Tallapoosa County, Alabama.

11.  Declaration of Restrictions and Protective Covenants for Still Waters recorded at Card No. 41595, Card No. 134872 as amended by First Amendment recorded at Card No. 147947, as amended by Second Amendment recorded at Card No. 149969, and Third Amendment as recorded at Card No. 185622 and re-recorded at Card No. 186258, Office of Judge of Probate of Tallapoosa County, Alabama. *and Amendments recorded at 103205, 106307, 108534, & 134872*

12.  Title to that part of the premises described herein lying below a line measured 30 feet horizontally and inland from a contour commonly known as the 490 foot contour of Lake Martin (high Water line) as established and reserved by Alabama Power Company, said 30 foot wide strip being the property of Alabama Power Company.



EXHIBIT
**E**

THIS INSTRUMENT WAS PREPARED BY:
Cobb & Hyre
6085 Lake Forrest Drive
Suite 200
Atlanta, Georgia 30328

RECORDED CARD

201048

No.

NO.
RECEIVED
GLORIA T. SINCLAIR
JUDGE OF PROBATE

2005 FEB -4  PM 1:50

ST...
TALLAPOOSA ....TY
I CERTIFY THIS ......MENT
WAS FILED ON



RECORDING FEES
TALLAPOOSA CO., AL
TAX                   195.00
SPEC. FEE          10.00
REC. FEE            100.00
TOTAL               215.00

**FUTURE ADVANCE MORTGAGE
ASSIGNMENT OF RENTS AND LEASES
AND SECURITY AGREEMENT
(ALABAMA)**

STATE OF ALABAMA

COUNTY OF TALLAPOOSA

THIS INDENTURE (herein this "**Mortgage**") made this 14TH day of January 2005, between Lake Martin Partners, L.L.C., an Alabama limited liability company (hereinafter called the "**Borrower**", whether one or more) and **The Alpharetta Community Bank**, (hereinafter called "**Bank**"), Mortgagee.

**THIS MORTGAGE IS FILED AS AND SHALL CONSTITUTE A FIXTURE FILING IN ACCORDANCE WITH THE PROVISIONS OF SECTION 7-9-402(6) OF THE CODE OF ALABAMA.**

CHECK IF                    __X__     **THIS MORTGAGE IS A " MORTGAGE" AS DEFINED**
APPLICABLE                            **IN SECTION 7-9-313(1)(C) OF THE CODE OF ALABAMA**

**W I T N E S S E T H :**

**WHEREAS,** Borrower is justly indebted to Bank on a loan (the " **Loan**") in the principal sum of Four Million Eight Hundred Sixty Nine Thousand Nine Hundred Ninety Seven and no/100, DOLLARS ($4,869,997.00), or so much as may from time to time be disbursed thereunder, as evidenced by a promissory note dated January 14, 2005, payable to Bank with interest thereon (the "**Note**") as follows:

CHECK IF              __X__     On July 14, 2005, or such earlier maturity date as provided in
APPLICABLE                       the Note or as provided in any Loan Document as defined below;

                        **If not checked above, then on demand or as otherwise provided in**
the Note; and

Page 1 of 24



WHEREAS, Borrower may hereafter become indebted to Bank or to a subsequent holder of this Mortgage on loans or otherwise (the Bank and any subsequent holder of this Mortgage being referred to herein as "**Lender**"); and

WHEREAS, the parties desire to secure the principal amount of the Note with interest, and all renewals, extensions and modifications thereof, and all refinancings of any part of the Note and any and all other additional indebtedness of Borrower to Lender, now existing or hereafter arising, whether joint or several, due or to become due, absolute or contingent, direct or indirect, liquidated or unliquidated, and any renewals, extensions, modifications and refinancings thereof, and whether incurred or given as maker, endorser, guarantor or otherwise, and whether the same be evidenced by note, open account, assignment, endorsement, guaranty, pledge or otherwise (herein "**Other Indebtedness**").

NOW THEREFORE, the Borrower, in consideration of Lender's making the Loan, and to secure the prompt payment of same, with the interest thereon, and any extensions, renewals, modifications and refinancings of same, and any charges herein incurred by Lender on account of Borrower, including but not limited to attorneys' fees,, and any and all Other Indebtedness as set forth above, and further to secure the performance of the covenants, conditions and agreements hereinafter set forth and set forth in the Note and set forth in all other documents evidencing, securing or executed in connection with the Loan (this Mortgage, the Note and such other documents are sometimes referred to herein as the " **Loan Documents**"), and as may be set forth in instruments evidencing or securing Other Indebtedness (the "**Other Indebtedness Instruments**") has bargained and sold and does hereby grant, bargain, sell, alien and convey unto the Lender, its successors and assigns, the following described land, real estate, estates, buildings, improvements, fixtures, furniture, and personal property (which together with any additional such property in the possession of the Lender or hereafter acquired by the Borrower and subject to the lien of this Mortgage, or intended to be so, as the same may be constituted from time to time is hereinafter sometimes referred to as the "**Mortgaged Property**") to wit:

(a)    All that tract or parcel or parcels of land and estates particularly described on **Exhibit A** attached hereto and made part hereof (the "**Land**");

(b)    All buildings, structures, and improvements of every nature whatsoever now or hereafter situated on the Land, and all fixtures, fittings, building materials, machinery, equipment, furniture and furnishings and personal property of every nature whatsoever now or hereafter owned by the Borrower and used or intended to be used in connection with or with the operation of said property, buildings, structures or other improvements, including all extensions, additions, improvements, betterments, renewals, substitutions, replacements and accessions to any of the foregoing, whether such fixtures, fittings, building materials, machinery, equipment, furniture, furnishings and personal property actually are located on or adjacent to the Land or not, and whether in storage or otherwise, and wheresoever the same may be located (the "**Improvements**");

(c)    All accounts, general intangibles, contracts and contract rights relating to the Land and Improvements, whether now owned or existing or hereafter created, acquired or arising, including without limitation, all construction contracts, architectural services contracts, management contracts, leasing agent contracts,

201048

purchase and sales contracts, put or other option contracts, and all other contracts and agreements relating to the construction of improvements on, or the operation, management and sale of all or any part of the Land and Improvements;

(d) Together with all easements, rights of way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, leases, subleases, licenses, rights, titles, interests, privileges, liberties, tenements, hereditaments, and appurtenances whatsoever, in any way belonging, relating or appertaining to any of the property hereinabove described, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Borrower, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, possession, claim and demand whatsoever at law, as well as in equity, of the Borrower of, in and to the same including but not limited to:

(i) All rents, royalties, profits, issues and revenues of the Land and Improvements from time to time accruing, whether under leases or tenancies now existing or hereafter created; and

(ii) All judgments, awards of damages and settlements hereafter made resulting from condemnation proceedings or the taking of the Land and Improvements or any part thereof under the power of eminent domain, or for any damage (whether caused by such taking or otherwise) to the Land and Improvements or any part thereof, or to any rights appurtenant thereto, including any award for change of grade or streets. Lender hereby is authorized on behalf of and in the name of Borrower to execute and deliver valid acquittances for, and appeal from, any such judgments or awards. Lender may apply all such sums or any part thereof so received, after the payment of all its expenses, including costs and attorneys' fees, on any of the indebtedness secured hereby in such manner as it elects or, at its option, the entire amount or any part thereof so received my be released;

(e) All cash and non-cash proceeds and all products of any of the foregoing items or types of property described in (a), (b), (c) or (d) above, including, but not limited to, all insurance, contract and tort proceeds and claims, and including all inventory, accounts, chattel paper, documents, instruments, equipment, fixtures, consumer goods and general intangibles acquired with cash proceeds of any of the foregoing items of types of property described in (a), (b), (c) or (d) above.

TO HAVE AND TO HOLD the Mortgaged Property and all parts thereof unto the Lender, its successors and assigns forever, subject, however, to the terms and conditions herein;

PROVIDED, HOWEVER, that these presents are upon the condition that, (i) if the Borrower shall fully pay or cause to be fully paid to the Lender the principal and interest payable with respect of the Land and the Note, and any extensions, renewals, modifications and refinancings of same, at the times and in the manner stipulated therein and herein, all without any deduction or credit for taxes or other similar charges paid by the Borrower, and shall pay all charges incurred herein by Lender on account of Borrower, including, but not limited to, attorneys' fees, and shall pay and all other Indebtedness, and shall keep, perform and observe all and singular the covenants, conditions and agreements in this Mortgage, in the Note, in the other Loan Documents, and in the Other Indebtedness Instruments expressed to be kept, performed, and observed by or on the part of the Borrower, all without fraud or delay, and (ii) the Lender shall have no further commitment or agreement to make advances, incur obligations or give value under the Loan, the Note, and any loan Document or any Other Indebtedness Instrument (including without limitation advances, obligations or value relating to future advances, open-end, revolving or other lines of credit or letters of credit), then this Mortgage, and all the properties, interests and rights hereby granted, bargained, sold and conveyed shall cease, terminate and be void, but shall otherwise remain in full force and effect.

AND the borrower further represents, warrants, covenants and agrees with the Lender as follows:

### ARTICLE I
### General

**1.01 Performance of Mortgage, Note and Loan Documents** . The Borrower shall perform, observe and comply with all provisions hereof, of the Note, of the other Loan Documents, and of the Other Indebtedness Instruments, and shall duly and punctually pay to the Lender the sum of money expressed in the Note, with interest thereon, and all other sums required to be paid by the Borrower pursuant to the provisions of this Mortgage, of the Note, of the other Loan Documents, and of the Other Indebtedness, all without any deductions or credit for taxes or other similar charges paid by the Borrower.

**1.02 Warranty of Title.** Borrower hereby warrants that it is lawfully seized of an indefeasible estate in fee simple in the land and real property hereby Mortgaged, or is lawfully seized of such other estate or interest as described on Exhibit A hereto, and has good and absolute title to all existing personal property hereby granted as security, and has good right, full power and lawful authority to sell, convey, mortgage and grant a security interest in the same in the manner and form aforesaid; that the same is free and clear of all grants, reservations, security interests, liens, charges, and encumbrances whatsoever, including, as to the personal property and fixtures, conditional sales contracts, chattel mortgages, security agreements, financing statements, and anything of a similar nature, and that Borrower shall and will warrant and forever defend the title thereto and the quiet use and enjoyment thereof unto the Lender, its successors and assigns, against the lawful claims of all persons whomsoever.

201048

**1.03  Future Advances, Revolving and Open-End Loans, and Other Debts.**    It is expressly understood that this Mortgage is intended to and does secure not only the Loan, but also future advances and any and all Other Indebtedness, obligations and liabilities, direct or contingent, of the Borrower to the Lender, whether now existing or hereafter arising, and any and all extensions, renewals, modifications and refinancing of same, or any part thereof, existing at any time before actual cancellation of this instrument on the probate records of the county or counties where the Mortgaged Property is located, and whether the same be evidenced by note, open account, assignment, endorsement, guaranty, pledge or otherwise. The Loan and the Other Indebtedness may, if provided in the applicable loan instruments, provide for revolving or open-end loans and advances, all of which shall be secured by this Mortgage.

**1.04  Monthly Tax Deposit.**  If required by Lender, Borrower shall pay on the first day of each month one-twelfth (1/12) of the yearly taxes on the Mortgaged Property, as estimated by Lender, in addition to each regular installment of principal and interest. Such sums shall not draw interest and shall not be, nor be deemed to be, trust funds, but may be commingled with the general funds of Lender. Borrower agrees to pay Lender the amount of any deficiency necessary to enable Lender to pay such taxes when due. Such sums may be applied by the Lender to the reduction of the indebtedness secured hereby in any manner selected by Lender if an Event of Default shall occur under this Mortgage or under the Note, any of the other Loan Documents, or any of the Other Indebtedness Instruments, but, unless otherwise agreed by the Lender in writing, no application of tax deposits to the Note, to Other Indebtedness, or to other obligations secured hereby, shall delay, reduce, alter or otherwise affect any regularly scheduled payment with respect to the Loan, the Other Indebtedness, or any such other obligations.

**1.05  Other Taxes, Utilities and Liens.**

  (a)    The Borrower shall pay promptly, when and as due, and, if requested, will exhibit promptly to the Lender receipts for the payment of all taxes, assessments, water rates, utility charges, dues, charges, fines, penalties, costs and other expenses incurred, and impositions of every nature whatsoever imposed, levied or assessed or to be imposed, levied or assessed upon or against the Mortgaged Property or any part thereof or upon the revenues, rents, issues and profits of the Mortgaged Property or arising in respect of the occupancy, use or possession thereof, or upon the interest of the Lender in the Mortgaged Property (other than any of the same for which provision has been made in Paragraph 1.04 of this Article 1), or any charge which, if unpaid, would become a lien or charge upon the Mortgaged Property.

  (b)    The Borrower promptly shall pay and shall not suffer any mechanic's, laborer's, statutory or other lien to be created or to remain outstanding upon any of the Mortgaged Property.

  (c)    In the event of the passage of any state, federal, municipal or other governmental law, order, rule or regulation, subsequent to the date hereof, in any manner changing or modifying the laws now in force governing the taxation of mortgages or debts secured by mortgages or the manner of collecting taxes, then Borrower immediately shall pay any increased taxes if allowed by law, and if Borrower fails to pay such additional taxes, or if Borrower is prohibited form paying such taxes, or if Lender in any way is adversely affected by such law, order, rule or regulation, then in any such events, all indebtedness secured by this

201048

Mortgage and all interest accrued thereon shall without notice become due and payable forthwith at the option of the Lender.

**1.06 Insurance.**

(a) The Borrower shall procure for, deliver to, and maintain for the benefit of the Lender during the term of this Mortgage insurance policies in such amounts as the Lender shall require, insuring the Mortgaged Property against fire, extended coverage, war damage (if available), and such other insurance hazards, casualties and contingencies as the Lender may require. The form of such policies and the companies issuing them shall be acceptable to the Lender, and, unless otherwise agreed by the Lender in writing, shall provide for coverage without coinsurance or deductibles. All policies shall contain a New York standard, non-contributory mortgagee endorsement making losses payable to the Lender, as mortgagee. At least fifteen (15) days prior to the expiration date of all such policies, renewals thereof satisfactory to the Lender shall be delivered to the Lender. The Borrower shall deliver to the Lender receipts evidencing the payment of all such insurance policies and renewals. In the event of the foreclosure of this Mortgage or any transfer of title to the Mortgaged Property in partial or full extinguishment of the indebtedness secured hereby, all right, title and interest of the Borrower, or its assigns, in and to all insurance policies then in force shall pass to the purchaser or grantee.

(b) The Lender hereby is authorized and empowered, at its option, to adjust or compromise any loss under any insurance policies on the Mortgaged Property, and to collect and receive the proceeds from any such policy or policies. Each insurance company hereby is authorized and directed to make payment for all such losses directly to the Lender instead of to the Borrower and Lender jointly. After deducting from said insurance proceeds any expenses incurred by Lender in the collection or handling of said funds, the Lender may apply the net proceeds, at its option, either toward repairing or restoring the improvements on the Mortgaged Property, or as a credit on any portion of the Borrower's indebtedness selected by Lender, whether then matured or to mature in the future, or at the option of the Lender, such sums either wholly or in part may be used to repair such improvements, or to build new improvements in their place or for any other purpose and in a manner satisfactory to the Lender, all without affecting the lien of this Mortgage for the full amount secured hereby before such payment took place. Lender shall not be liable to Borrower or otherwise responsible for any failure to collect any insurance proceeds due under the terms of any policy regardless of the cause of such failure.

(c) If required by the Lender, the Borrower shall pay on the first day of each month, in addition to any regular installment of principal and interest and other charges with respect to indebtedness secured hereby, and the monthly tax deposit provided for in Paragraph 1.04 hereof, one-twelfth (1/12) of the yearly premiums for insurance maintained pursuant to the provisions of this Paragraph 1.06. Such amount shall be used by Lender to pay such insurance premiums when due. Such added payments shall not be, nor be deemed to be, trust funds, but may be commingled with the general funds of the Lender, and no interest shall be payable in respect thereof. Upon demand of the Lender, the Borrower agrees to deliver to the Lender such additional moneys as are necessary to make up any deficiencies in the amounts deposited by Borrower with Lender pursuant to this Paragraph 1.06 to enable the Lender to pay

such insurance premiums when due. In the event of an Event of Default hereunder or of a default by Borrower under the Note, any other Loan Documents, or any Other Indebtedness Instruments, the Lender may apply such sums to the reduction of the indebtedness secured hereby in any manner selected by Lender, but, unless otherwise agreed by the Lender in writing, no application of insurance proceeds to the Loan, to Other Indebtedness, or to other obligations secured hereby, shall delay, reduce, alter or otherwise affect any regularly scheduled payment with respect to the Loan, the Other Indebtedness, or any such other obligations.

**1.07 Condemnation.** If all or any part of the Mortgaged Property shall be damaged or taken through condemnation (which term when used in this Mortgage shall include any damage or taking by any governmental or private authority, and any transfer by private sale in lieu thereof), either temporarily or permanently, the entire indebtedness secured hereby shall at the option of the Lender become immediately due and payable. The Lender shall be entitled to all compensation, awards, and other payments or relief for any condemnation and hereby is authorized, at its option to commence, appear in and prosecute, in its own or the Borrower's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith. All such compensation, awards, damages, claims, rights of action and proceeds and the right thereto are hereby assigned by the Borrower to the Lender, which, after deducting therefrom all its expenses, including attorney's fees, may release any moneys so received by it without affecting the lien of this Mortgage or may apply the same in such manner as the Lender shall determine to the reduction of the indebtedness secured hereby, and any balance of such moneys remaining shall be paid to the Borrower. The Borrower agrees to execute such further assignments of any compensations, awards, damages, claims, rights of action and proceeds as the Lender may require. The Borrower promptly shall notify the Lender in the event of the institution of any condemnation or eminent domain proceeding or in the event of any threat thereof. The Lender shall be entitled to retain, at the expense of the Borrower, its own legal counsel in connection with any such proceedings or threatened proceedings. Lender shall be under no obligation to the Borrower or to any other person to determine the sufficiency or legality of any condemnation award and may accept any such award without question or further inquiry.

**1.08 Care of the Property.**

   (a)    The Borrower will preserve and maintain the Mortgaged Property in good condition and repair, and shall not commit or suffer any waste and shall not do or suffer to be done anything which will increase the risk of fire or other hazard to the Mortgaged Property or any part thereof.

   (b)    Except as otherwise provided herein, no buildings, fixtures, personal property, or other part of the Mortgaged Property shall be removed, demolished or substantially altered without the prior written consent of the Lender. The Borrower may sell or otherwise dispose of, free from the lien of this Mortgage, furniture, furnishings, equipment, tools, appliances, machinery or appurtenances, subject to the lien hereof which may become worn out, undesirable, obsolete, disused or unnecessary for use in the operation of the Mortgaged Property, not exceeding in value at the time of disposition thereof Five Thousand Dollars ($5,000.00) for any single transaction, or total of Twenty Thousand Dollars ($20,000.00) in any one year, upon replacing the same with, or substituting for the same, free and clear of all liens and security interests except those created by the Loan Documents or Other Indebtedness

Instruments, other furniture, furnishings, equipment, tools, appliances, machinery or appurtenances not necessarily of the same character, but of at least equal value and of equal or greater utility in the operation of the Mortgaged Property, and costing not less then the amount realized from the property sold or otherwise disposed of. Such substitute furniture, furnishings, equipment, tools, appliances, machinery and appurtenances shall forthwith become, without further action, subject to the provisions of this Mortgage.

(c) If the Mortgaged Property or any part thereof is damaged by fire or any other cause, the Borrower shall give immediate written notice of the same to the Lender.

(d) The Lender hereby is authorized to enter upon and inspect the Mortgaged Property, and to inspect the Borrower's or Borrower's agent's records with respect to the ownership, use, management and operation of the Mortgaged Property, at any time during normal business hours.

(e) If all or any part of the Mortgaged Property shall be damaged by fire or other casualty, the Borrower promptly shall restore the Mortgaged Property to the equivalent of its original condition, regardless of whether or not there shall be any insurance proceeds therefor; provided, however, that if there are insurance proceeds, the Borrower shall not be required to restore the Mortgaged Property as aforesaid unless the Lender shall apply any net proceeds from the casualty in question and held by Lender, as allowed under Paragraph 1.06, toward restoring the damaged improvements. If a part of the Mortgaged Property shall be physically damaged through condemnation, the Borrower promptly shall restore, repair or alter the remaining property in a manner satisfactory to the Lender; provided, however, that if there are condemnation proceeds or awards, the Borrower shall not be required to restore the Mortgaged Property as aforesaid unless the Lender shall apply any net proceeds or awards from the condemnation and held by Lender, as provided in paragraph 1.07, toward restoring the damaged improvements.

**1.09 Further Assurances; After-Acquired Property.**

(a) At any time, and from time to time, upon request by the Lender, the Borrower, at Borrower's expense, will make, execute and deliver or cause to be made, executed and delivered to the Lender and, where appropriate, to cause to be recorded and/or filed and from time to time thereafter to be re-recorded and/or refiled at such time and in such offices and places as shall be deemed desirable by the Lender any and all such other and further mortgages, instruments of further assurance, certificates and other documents as may, in the opinion of the Lender, be necessary or desirable in order to effectuate, complete, or perfect, or to continue and preserve the obligation of the Borrower under the Note and this Mortgage, and the priority of this Mortgage as a first and prior lien upon all of the Mortgaged Property, whether now owned or hereafter acquired by the Borrower. Upon any failure by the Borrower so to do, the Lender may make, execute, and record any and all such mortgages, instruments, certificates, and documents for and in the name of the Borrower, and Borrower hereby irrevocably appoints the Lender the agent and attorney-in-fact of the Borrower so to do. The lien and rights hereunder automatically will attach, without further act, to all after-acquired property (except consumer goods, other than accessions, not acquired within (10) days after the Lender has given value under the Note) attached to and/or used in the operation of the Mortgaged Property or any part thereof.

**(b)**    Without limitation to the generality of the other provisions of this Mortgage, including subparagraph (a) of this paragraph 1.09, it hereby expressly is covenanted, agreed and acknowledged that the lien and rights hereunder automatically will attach to any further, greater, additional, or different estate, rights, titles or interests in or to any of the Mortgaged Property at any time acquired by the Borrower by whatsoever means, including that in the event the Borrower is the owner of an estate or interest in the Mortgaged Property or any part thereof (such as, for example, as the lessee or tenant) other than as the fee simple owner thereof, and prior to the satisfaction of record of this Mortgage the Borrower obtains or otherwise acquires such fee simple or other estate, then such further, greater, additional, or different estate in the Mortgaged Property, or a part thereof, shall automatically, and without any further action or filing or recording on the part of the Borrower or the Lender or any other person or entity, be and become subject to this Mortgage and the lien hereof. In consideration of Lender's making the Loan as aforesaid, and to secure the Loan, the Other Indebtedness and obligations set forth above, Borrower hereby grants, bargains, sells and conveys to Lender, on the same terms as set forth in this Mortgage and intended to be a part hereof, all such after-acquired property and estates.

**1.10 Additional Security.**    The Lender also shall have and hereby is granted a security interest in all monies, securities and other property of the Borrower, now or hereafter assigned, held, received, or coming into the possession, control, or custody of the Lender by or for the account of the Borrower (including indebtedness due from the Lender to the Borrower, and any and all claims of Borrower against Lender, at any time existing) whether expressly as collateral security, custody, pledge, transmission, collection or for any other purpose, and also upon any and all deposit balances, including any dividends declared, or interest accruing thereon, and proceeds thereof. On an Event of Default, the Lender may, in addition to any other rights provided by this Mortgage or any of the other Loan Documents, but shall not be obligated to, apply to the payment of the Loan or Other Indebtedness secured hereby, and in such manner as the Lender may determine, any such monies, securities or other property held or controlled by the Lender. No such application of funds shall, unless otherwise expressly agreed by the Lender in writing, reduce, alter, delay or otherwise affect any regularly scheduled payment with respect to the Loan or such Other Indebtedness or obligations.

**1.11 Leases Affecting Mortgaged Property.**    The Borrower shall comply with and observe its obligations as landlord or tenant under all leases affecting the Mortgaged Property or any part thereof. If requested by Lender, Borrower shall furnish Lender with executed copies of all leases now or hereafter existing on the Mortgaged Property; and leases now or hereafter entered into will be in form and substance subject to the approval of Lender. Borrower shall not accept payment of rent more than one (1) month in advance without the express written consent of Lender. If requested by the Lender, the Borrower shall execute and deliver to Lender, as additional security, such other documents as may be requested by Lender to evidence further the assignment to Lender hereunder, and to assign any and all such leases whether now existing or hereafter created, including, without limitation, all rents, royalties, issues and profits of the Mortgaged Property from time to time accruing. The Borrower shall not cancel, surrender or modify any lease affecting the Mortgaged Property or any part thereof without the written consent of the Lender.

**1.12 Expenses.** The Borrower shall pay or reimburse the Lender for all reasonable attorney's fees, costs and expenses incurred by the Lender in connection with the collection of the

indebtedness secured hereby or the enforcement of any rights or remedies provided for in this Mortgage, in any of the other Loan Documents or the Other Indebtedness Instruments, or as may otherwise be provided by law, or incurred by Lender in any proceeding involving the estate of a decedent or an insolvent, or in any action, proceeding or dispute of any kind in which the Lender is made a party, or appears as party plaintiff or defendant, affecting this Mortgage, the Note, any of the other Loan Documents, any of the Other Indebtedness Instruments, Borrower or the Mortgaged Property, including but not limited to the foreclosure of this Mortgage, any condemnation action involving the Mortgaged Property, any environmental condition of or affecting the Mortgaged Property, or any action to protect the security hereof; any such amounts paid or incurred by the lender shall be added to the indebtedness secured hereby and shall be further secured by this Mortgage.

**1.13  Performance by Lender of Defaults by Borrower.**   If the Borrower shall default in the payment of any tax, lien, assessment or charge levied or assessed against the Mortgaged Property, or otherwise described in Paragraphs 1.04 and 1.05 hereof; in the payment of any utility charge, whether public or private; in the payment of insurance premiums; in the procurement of insurance premiums; in the procurement of insurance coverage and the delivery of the insurance policies required hereunder; or in the performance or observance of any other covenant, condition or term of this Mortgage, of the Note, of any of the other Loan Documents, or of any of the Other Indebtedness Instruments, then the Lender, at its option, may perform or observe the same; and all payments made for costs or expenses incurred by the Lender in connection therewith shall be secured hereby and shall be, without demand, immediately repaid by the Borrower to the Lender with interest thereon calculated in the manner set forth in the Note, and at the default interest rate specified in the Note, or, if no default interest rate is specified, then at the rate set forth in the note, plus two percentage points (2%). The Lender shall be the sole judge of the legality, validity and priority of any such tax, lien, assessment, charge, claim and premium, of the necessity for any such actions and of the amount necessary to be paid in satisfaction thereof.   The Lender hereby is empowered to enter and to authorize others to enter upon the Mortgaged Property or any part thereof for the purpose of performing or observing any such defaulted covenant, condition or term, without thereby becoming liable to the Borrower or any person in possession holding under the Borrower for trespass or otherwise.

**1.14  Books and Records.**   The Borrower shall keep and maintain at all time full, true and accurate books of accounts and records, adequate to reflect correctly the results of the operation of the Mortgaged Property. Upon request of the Lender, the Borrower shall furnish to the Lender (i) within ninety (90) days after the end of the Borrower's fiscal year a balance sheet and a statement of income and expenses, both in reasonable detail and form satisfactory to Lender and certified by a Certified Public Accountant, and (ii) within ten (10) days after request therefor from Lender, a rent schedule of the Mortgaged Property, certified by the Borrower, showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date and the rent paid.

**1.15  Estoppel Affidavits.**   The Borrower within ten (10) days after written request from the Lender shall furnish a written statement, duly acknowledged, setting forth the unpaid principal of and interest on the Loan and Other Indebtedness and whether or not any offsets or defenses exist against any principal and interest.

**1.16 Alienation or Sale of Mortgaged Property.** The Borrower shall not sell, assign, mortgage, encumber, grant a security interest in or otherwise convey all or any part of the Mortgaged Property without obtaining the express written consent of the Lender at least thirty (30) days prior to such conveyance. If Borrower should sell, assign, mortgage, encumber, grant a security interest in or convey all, or any part, of the Mortgaged Property without such consent by Lender, then, in such event, the entire balance of the indebtedness (including the Loan and all Other Indebtedness) secured by this Mortgage and all interest accrued thereon (or such parts as Lender may elect) shall without notice become due and payable forthwith at the option of the Lender.

**1.17 Environmental and Compliance Matters.** Borrower represents, warrants and covenants as follows:

(a) No Hazardous Materials (hereinafter denied) have been, are, or will be, while any part of the indebtedness secured by this Mortgage remains unpaid, contained in, treated, stored, handled, generated, located on, discharged from, or disposed of on, or constitute a part of, the Mortgaged Property. As used herein, the term " **Hazardous Materials**" includes, without limitation, any asbestos, urea formaldehyde foam insulation, flammable explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, or related or unrelated substances or materials defined, regulated, controlled, limited or prohibited in the Comprehensive Environmental Response Compensation and Liability Act of 1980 ( **"CERCLA"**) (42 U.S.C. Sections 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Sections 1801, et seq.), the Resource Conservation and Recovery Act ( **"RCRA"**) (42 U.S.C. Sections 6901, et seq.), the Clean Water Act (33 U.S.C. Sections 1251, et seq.), the Clean Air Act (42 U.S.C. Sections 7401, et seq.), the Toxic Substances Control Act (15 U.S.C. Sections 2601, et seq.), each such Act as amended from time to time, and in the rules and regulations adopted and publications promulgated pursuant thereto, and in the rules and regulations of the Occupational Safety and Health Administration ("OSHA") pertaining to occupational exposure to asbestos, as amended from time to time, or in any other federal, state or local environmental law, ordinance, rule, or regulation now or hereafter in effect;

(b) No underground storage tanks, whether in use or not in use, are located in, on or under any part of the Mortgaged Property;

(c) All of the Mortgaged Property complies and will comply in all respects with applicable environmental laws, rules, regulations, and court or administrative orders;

(d) There are no pending claims or threats of claims by private or governmental or administrative authorities relating to environmental impairment, conditions, or regulatory requirements with respect to the Mortgaged Property;

(e) The Borrower promptly shall comply with all present and future laws, ordinances, rules, regulations, orders and decrees of any governmental authority affecting the Mortgaged Property or any part thereof. Without limiting the foregoing, the Borrower represents and covenants that the Mortgaged Property is in present compliance with, and in the future shall comply with, as applicable, the Americans With Disabilities Act of 1990, ("ADA" (42 U.S.C. Sections 12101, et seq.) and the Rehabilitation Act of 1973 (**"Rehabilitation Act"**) (29 U.S.C. Sections 749, et seq.), each such Act as amended from time to time, and in the rules and regulations adopted and publications promulgated pursuant thereto.

(f)    Borrower shall give immediate oral and written notice to Lender of its receipt of any notice of a violation of any law, rule or regulation covered by this Paragraph 1.17, or of any notice of other claim relating to the environmental or physical condition of the Mortgaged Property, or of its discovery of any matter which would make the representations, warranties and/or covenants herein to be inaccurate or misleading in any respect.

Borrower agrees to and does hereby indemnify and hold Lender harmless from all loss, cost, damage, claim and expense incurred by Lender on account of (i) the violation of any representation or warranty set forth in this Paragraph 1.17, (ii) Borrower's failure to perform any obligations of this paragraph 1.17, (iii) Borrower's or the Mortgaged Property's failure to fully comply with all environmental laws, rules and regulations, with all occupational health and safety laws, rules and regulations, with the ADA or the Rehabilitation Act, as applicable, or (iv) any other matter related to environmental or physical conditions on, under or affecting the Mortgaged Property. This indemnification shall survive the closing of the loan, payment of the Loan, the exercise of any right or remedy under any Loan Document, and any subsequent sale or transfer of the Mortgaged Property, and all similar or related events or occurrences. However, this indemnification shall not apply to any new Hazardous Materials first stored, generated or placed on the Mortgaged Property after the acquisition of title to the mortgaged Property by Lender through foreclosure or deed in lieu of foreclosure or purchase from a third party after the Loan has been paid in full.

**1.18 Inspection Rights and Easements.** In addition to other inspection rights of Lender, the Borrower shall and hereby does grant and convey to the Lender, its agents, representatives, contractors, and employees, to be exercised by Lender following an Event of Default hereunder or under any of the other Loan Documents, an easement and license to enter on the Mortgaged Property at any time and from time to time for the purpose of making such audits, tests, inspections, and examinations, including, without limitation, inspection of buildings and improvements, subsurface exploration and testing and groundwater testing (herein **"Inspections"**), as the Lender, in its sole discretion, deems necessary, convenient, or proper to determine the condition and use of the Mortgaged Property, to make an inventory of the Mortgaged Property, and to determine whether the ownership, use and operation of the Mortgaged Property are in compliance with all federal, state, and local laws, ordinances, rules, and regulations, including, without limitation, environmental laws, health and public accommodation laws, the ADA and the Rehabilitation Act, as applicable, and ordinances, rules and regulations relating thereto. Notwithstanding the grant of the above easement and license to the Lender, the Lender shall have no obligation to perform any such Inspections, or to take any remedial action. All the costs and expenses incurred by the Lender with respect to any Inspections which the Lender may conduct or take pursuant to this Paragraph 1.18, including, without limitation, the fees of any engineers, laboratories, and contractors, shall be repaid by the Borrower, with interest, and shall be secured by this Mortgage and the other Loan Documents.

**ARTICLE II**
**ASSIGNMENT OF RENTS AND LEASES**

Page 12 of 24

**2.01  Assignment.**  Borrower, in consideration of Lender's making the Loan as aforesaid and for other good and valuable consideration, and to secure the prompt payment of same, with the interest thereon, and any extensions, renewals, modifications and refinancing of same, and any charges herein incurred by Lender on account of Borrower, including but not limited to attorney's fees, and any and all Other Indebtedness, and further to secure the performance of the covenants, conditions and agreements hereinafter set forth in the Note, in the other Loan Documents, and in the Other Indebtedness Instruments, does hereby sell, assign and transfer unto the Lender all leases, subleases and lease guaranties of or relating to all or part of the Mortgaged Property, whether now existing or hereafter created or arising, including without limitation those certain leases, if any, specifically described on an exhibit to this Mortgage, and all the rents, issues and profits now due and which may hereafter become due under or by virtue of any such lease, whether written or verbal, or any letting of, or of any agreement for the use or occupancy of the Mortgaged Property or any part thereof, which may have been heretofore or may be hereafter made or agreed to or which may be made or agreed to by the Lender under the powers herein granted, it being the intention of the parties to hereby establish an absolute transfer and assignment of all the said leases, subleases, lease guaranties and agreements, and all the avails thereof, to the Lender, and the Borrower does hereby appoint irrevocably the Lender its true and lawful attorney in its name and stead (with or without taking possession of the aforesaid Mortgaged Property as hereinafter provided), to rent, lease or let all or any portion of the Mortgaged Property to any party or parties at such rental and upon such term, in its discretion as it may determine, and to collect all of said avails, rents, issues and profits arising from or accruing at any time hereafter, and all now due, or that may hereafter become due under each and all of the leases, subleases, lease guaranties and agreements, written or verbal, or other tenancy existing or which may hereafter exist on the Mortgaged Property, with the same rights and powers and taking possession of the Mortgaged Property pursuant to the provisions hereinafter set forth.

**2.02  Prepayment of Rent.**  The Borrower represents and agrees that no rent has been or will be paid by any person in possession of any portion of the Mortgaged Property for more than one installment in advance and that the payment of none of the rents to accrue for any portion of said Mortgaged Property has been or will be waived, released, reduced, or discounted, or otherwise discharged or compromised by the Borrower. The Borrower waives any right of setoff against any person in possession of any portion of the Mortgaged Property. The Borrower agrees that it will not assign any of the rents or profits except to the purchaser or grantee of the Mortgaged Property.

**2.03  Not Mortgagee in Possession; No Liability.**  Nothing herein contained shall be construed as constituting the Lender as "mortgagee in possession" in the absence of the taking of actual possession of the Mortgaged Property by the Lender pursuant to the provisions hereinafter contained.  In the exercise of the powers herein granted the Lender, no liability shall be asserted or enforced against the Lender, all such liability being expressly waived and released by the Borrower.

**2.04  Present Assignment.**  It is the intention of the parties that this assignment of rents and leases shall be a present assignment; however, it is expressly understood and agreed, anything herein contained to the contrary notwithstanding, that Borrower shall have the right to collect the rents so long as there exists no Event of Default under this Mortgage, and provided further, that Borrower's right to collect such rents shall terminate and cease automatically upon the

occurrence of any such Event of Default without the necessity of any notice or other action whatsoever by Lender.

**2.05 No Obligation of Lender Under Leases.** The Lender shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under any leases, subleases or rental agreements relating to the Mortgaged Property, and the Borrower shall and does hereby agree to indemnify and hold the Lender harmless to and from any and all liability, loss or damage which it may or might incur under any leases, subleases or agreements or under or by reason of the assignment thereof and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in said leases, subleases or agreements. Should the Lender incur any claims or demands asserted against the Lender in connection with any one or more of said leases, subleases or agreements, the Borrower agrees to reimburse the Lender for the amount thereof, including costs, expenses and reasonable attorneys' fees immediately upon demand, and until the same are fully reimbursed by the Borrower, all such costs, expenses and attorney's fees shall be secured by the assignment hereunder and by this Mortgage.

**2.06 Instruction to Lessees.** The Borrower does further specifically authorize and instruct each and every present and future lessee, tenant, sublessee or subtenant of the whole or any part of the Mortgaged Property to pay all unpaid rental agreed upon in any lease, sublease or tenancy to the Lender upon receipt of demand from said Lender to pay the same.

**2.07 Default (Assignment).** Upon the occurrence of any Event of Default, as described in Paragraph 4.0 of this Mortgage, then, in addition to the right to demand and collect directly from tenants rents accruing from leases of the Mortgaged Property, Lender shall have all rights and remedies set forth in Article IV or elsewhere in this Mortgage.

### ARTICLE III
### SECURITY AGREEMENT

**3.01 Grant of Security Interest.** Borrower (the "debtor" for purposes of the Uniform Commercial Code), in consideration of Lender's (the "secured party" for purposes of the Uniform Commercial Code) making the Loan as aforesaid and for other good and valuable consideration, and to secure the prompt payment of same, with the interest thereon, and any extensions, renewals, modifications and refinancing of same, and any charges herein incurred by Lender on account of Borrower, including but not limited to attorneys' fees, and any and all Other Indebtedness, and further to secure the performance of the covenants, conditions and agreements hereinafter set forth in the Note, in the other Loan Documents, and in the Other Indebtedness Instruments, does hereby assign and grant to Lender title to and a security interest in such portions of the Mortgaged Property the security interest in and disposition of which is governed by the Uniform Commercial Code (the "**Collateral**").

**3.02 Definitions.** All terms used herein which are defined in the Alabama Uniform Commercial Code (the "**Uniform Commercial Code**") shall have the same meaning herein as in the Uniform Commercial Code unless otherwise indicated herein.

**3.03 Financing Statements.** No financing statement covering any Collateral or any proceeds thereof is on file in any public office, except for financing statements specifically set forth on an

addendum attached hereto, if any, and except for the financing statements executed by Borrower and Lender. At the Lender's request, the borrower will join with Lender in executing one or more financing statements pursuant to the Uniform Commercial Code in form satisfactory to the Lender, and will pay the cost of filing the same in all public offices wherever filing is deemed by the Lender to be necessary or desirable. The Borrower authorizes the Lender to prepare and to file financing statements covering the Collateral signed only by the Lender and to sign the Borrower's signature to such financing statements in jurisdictions where Borrower's signature is required. The Borrower promises to pay to the Lender the fees incurred in filing the financing statements, including but not limited to mortgage recording taxes payable in connection with filings on fixtures, which fees shall become part of the indebtedness secured hereby.

**3.04  Representations of Borrower (Collateral).**    With respect to all of the Collateral, Borrower represents and warrants that:

    (a)    The Collateral is used or bought primarily for business purposes;

    (b)    If the Loan is a construction loan, the Collateral is being acquired and/or installed with the proceeds of the Note which Lender may disburse directly to the seller, contractor, or subcontractor;

    (c)    All the Collateral will be kept at the address of Borrower shown in Paragraph 5.08 (a) or, if not, at the real property described in Exhibit A hereto. Borrower promptly shall notify Lender of any change in the location of the Collateral. Except for transactions in the ordinary course of Borrower's business, Borrower, its agents or employees, will not remove the Collateral from said location without the prior written consent of the Lender;

    (d)    If certificates of title are issued or outstanding with respect to any of the Collateral, the borrower shall cause the Lender's interest to be properly noted thereon; and

    (e)    Borrower's name has always been as set forth on the first page of this Mortgage, except as otherwise disclosed in writing to the Lender. Borrower promptly shall advise the Lender in writing of any change in Borrower's name.

**3.05  Assignment of Liabilities.**    If at any time or times by sale, assignment, negotiation, pledge, or otherwise, Lender transfers any or all of the indebtedness or instruments secured hereby, such transfer shall, unless otherwise specified in writing, carry with it Lender's rights and remedies hereunder with respect to such indebtedness or instruments transferred, and the transferee shall become vested with such rights and remedies whether or not they are specifically referred to in the transfer. If and to the extent Lender retains any of such indebtedness or instruments, Lender shall continue to have the rights and remedies herein set forth with respect thereto.

**3.06  No Obligation of Lender Under Assigned Contracts.**    The Lender shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under any contracts or agreements relating to the Mortgaged Property, and the Borrower shall and does hereby agree to indemnify and hold the Lender harmless of and from any and all liability, loss or damage which it may or might incur under any such contracts or agreements or under or by reason of the assignment thereof and of and from any and all claims

201078

and demands whatsoever which may be asserted against it by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in said contracts or agreements. Should the Lender incur any such liability, loss or damage, under said contracts or agreements or under or by reason of the assignment thereof, or in the defense of any claims or demands asserted against the Lender in connection with any one or more of said contracts or agreements, the Borrower agrees to reimburse the Lender for the amount thereof, including costs, expenses and reasonable attorneys' fees immediately upon demand, and until the same are fully reimbursed by the Borrower, all such costs, expenses and attorneys' fees shall be secured by the assignment hereunder and by this Mortgage.

**3.07 Default (Security Agreement).**    Upon the occurrence of any Event of Default, as described in Paragraph 4.01 of this Mortgage, the Lender shall have all rights and remedies set forth in Article IV or elsewhere in this Mortgage.

**ARTICLE IV**
**EVENTS OF DEFAULT AND REMEDIES**

**4.01 Event of Default.** The term **"Event of Default,"** wherever used in this Mortgage, shall mean the occurrence or existence of any one or more of the following events or circumstances:

(a)    Failure by the Borrower to pay as and when due and payable any installment of principal, interest or escrow deposit, or other charge payable under the Note, this Mortgage or under any other Loan Document; or

(b)    Failure by the Borrower to duly observe any other covenant, condition or agreement of this Mortgage, of the Note, of any of the other Loan Documents, or of any of the Other Indebtedness Instruments, and the continuance of such failure for ten (10) days or more, or the occurrence of any other Event of Default under any of the other Loan Documents or Other Indebtedness Instruments; or

(c)    The filing by the Borrower or any guarantor of any indebtedness secured hereby or of any of Borrower's obligations hereunder, of a voluntary petition in bankruptcy or the Borrower's or any such guarantor's adjudication as a bankrupt or insolvent, or the filing by the Borrower or any such guarantor of any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or the Borrower's or any such guarantor's seeking or consenting to or acquiescence in the appointment of any trustee, receiver or liquidator of the Borrower or any such guarantor or of all or any substantial part of the Mortgaged Property or of any or all of the rents, revenues, issues, earnings, profits or income thereof, or of any interest or estate therein, or the making of any general assignment for the benefit of creditors or the admission in writing of its inability to pay its debts generally as they become due; or

(d)    The entry by a court of competent jurisdiction or any order, judgment, or decree approving a petition filed against the Borrower or any guarantor of any of the indebtedness

Page 16 of 24

secured hereby or of any of Borrower's obligations hereunder, seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for an aggregate of thirty (30) days (whether or not consecutive) from the date of entry thereof, or the appointment of any trustee, receiver or liquidator of the Borrower or any such guarantor or of all or any substantial part of the Mortgaged Property or of any or all of the rents, revenues, issues, earnings, profits or income thereof, or of any interest or estate therein, without the consent or acquiescence of the Borrower and/or any such guarantor which appointment shall remain unvacated and unstayed for an aggregate of thirty (30) days (whether or not consecutive); or

(e)    The filing or enforcement of any other mortgage, lien or encumbrance on the Mortgaged Property or any party thereof, or of any interest or estate therein; or

(f)    If any portion of the Mortgaged Property is a leasehold estate, the occurrence of a default under such lease or other instrument creating the estate.

**4.02  Acceleration of Maturity.**    If an event of default shall have occurred, then the entire balance of the indebtedness (including but not limited to the Loan and Other Indebtedness) secured hereby (or such parts as Lender may elect) with interest accrued thereon (or such parts as Lender may elect) shall, at the option of the Lender, become due and payable without notice or demand, time being of the essence. Any omission on the part of the Lender to exercise such option when entitled to do so shall not be considered as a waiver of such right.

**4.03  Right of Lender to Enter and Take Possession.**

(a)    If an event of Default shall have occurred and be continuing, the Borrower, upon demand of the Lender, shall forthwith surrender to the Lender the actual possession of the Mortgaged Property, and if and to the extent permitted by law, the Lender or its agents may enter and take and maintain possession of all the Mortgaged Property, together with all the documents, books, records, papers and accounts of the Borrower or then owner of the Mortgaged Property relating thereto, and may exclude the Borrower and its agents and employees wholly therefrom.

(b)    Upon every such entering upon or taking of possession, the Lender, as attorney-in-fact or agent of the Borrower, or in its own name as mortgagee and under the powers herein granted, may hold, store, use, operate, manage and control the Mortgaged Property (or any portion thereof selected by Lender) and conduct the business thereof either personally or by its agents, and, from time to time (i) make all necessary and proper maintenance, repairs, renewals, replacements, additions, betterments, and improvements thereto and thereon and purchase or otherwise acquire additional fixtures, personalty and other property; (ii) insure or keep the Mortgaged Property (or any portion thereof selected by Lender) insured (iii) manage and operate the Mortgaged Property (or any portion thereof selected by Lender) and exercise all the rights and powers of the Borrower in its name or otherwise, with respect to the same, including legal actions for the recovery of rent, legal dispossessory actions against tenants holding over and legal actions in distress of rent, and with full power and authority to cancel or terminate any lease or sublease for any cause or on any ground which would entitle the Borrower to cancel the same, and to elect to disaffirm any lease or sublease made subsequent

to this Mortgage or subordinated to the lien hereof; (iv) enter into any and all agreements with respect to the exercise by others of any of the powers herein granted the Lender, all as the Lender from time to time may determine to be to its best advantage; and the Lender may collect and receive all the income, revenues, rents, issues and profits of the Mortgaged Property (or any portion thereof selected by Lender), including those past due as well as those accruing thereafter, and, after deducting (aa) all expenses of taking, holding, managing, and operating the Mortgaged Property (including compensation for the services of all persons employed for such purposes), (bb) the cost of all such maintenance, repairs, renewals, replacements, additions, betterments, improvements and purchases and acquisitions, (cc) the cost of such insurance, (dd) such taxes, assessments and other charges prior to this Mortgage as the Lender may determine to pay, (ee) other proper charges upon the Mortgaged Property or any part thereof, and (ff) the reasonable compensation, expenses and disbursements of the attorneys and agents of the Lender, Lender shall apply the remainder of the moneys so received by the Lender, first to the payment of accrued interest under the Note; second to the payment of tax deposits required in Paragraph 1.04; third to the payment of any other sums required to be paid by Borrower under this Mortgage or under the other Loan Documents; fourth to the payment of overdue installments of principal on the Note; fifth to the payment of any sums due under Other Indebtedness Instruments, whether principal, interest or otherwise; and the balance, if any, as otherwise required by law.

(c)     Whenever all such Events of Default have been cured and satisfied, the Lender may, at its option, surrender possession of the Mortgaged Property to the Borrower, or to whomsoever shall be entitled to possession of the Mortgaged Property as a matter of law. The same right of taking possession, however, shall exist if any subsequent Event of Default shall occur and be continuing.

**4.04  Receiver.**

(a)     If an Event of Default shall have occurred and be continuing, the Lender, upon application to a court of competent jurisdiction, shall be entitled, without notice and without regard to the adequacy of any security for the indebtedness hereby secured or the solvency of any party bound for its payment, to the appointment of a receiver to take possession of and to operate the Mortgaged Property and to collect the rents, profits, issues, royalties and revenues thereof.

(b)     The Borrower shall pay to the Lender upon demand all costs and expenses, including receiver's fees, attorneys' fees, costs and agent's compensation, incurred pursuant to the provisions contained in this Paragraph 4.04; and all such expenses shall be secured by this Mortgage.

**4.05  Lender's Power of Enforcement.**     If an Event of Default shall have occurred and be continuing, the Lender may, either with or without entry or taking possession as hereinabove provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (a) to enforce payment of the Loan; (b) to foreclosure this Mortgage; (c) to enforce or exercise any right under any Other Indebtedness Instrument; and (d) to pursue any other remedy available to Lender, all as the Lender may elect.

**4.06  Rights of a Secured Party.**     Upon the occurrence of an Event of Default, the Lender, in addition to any and all remedies it may have or exercise under this Mortgage, the Note, any of

20/08

the other Loan Documents, the Other Indebtedness Instruments or under applicable law, may immediately and without demand exercise any and all of the rights of a secured party upon default under the Uniform Commercial Code, all of which shall be cumulative. Such rights shall include, without limitation:

(a)    The right to take possession of the Collateral without judicial process and to enter upon any premises where the Collateral may be located for the purposes of taking possession of securing, removing, and/or disposing of the Collateral without interference from Borrower and without any liability for rent, storage, utilities or other sums;

(b)    The right to sell, lease, or otherwise dispose of any or all of the Collateral, whether in its then condition or after further processing or preparation, at public or private sell; and unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give to Borrower at least ten (10) days prior notice of the time and place of any public sale of the Collateral or of the time after which any private sale or other intended disposition of the Collateral is to be made, all of which Borrower agrees shall be reasonable notice of any sale or disposition of the Collateral;

(c)    The right to require Borrower, upon request of Lender, to assemble and make the Collateral available to Lender at a place reasonably convenient to Borrower and Lender; and

(d)    The right to notify account debtors, and demand and receive payment therefrom.

To effectuate the rights and remedies of Lender upon default, Borrower does hereby irrevocably appoint Lender attorney-in-fact for Borrower, with full power of substitution to sign, execute, and deliver any and all instruments and documents and do all acts and things to the same extent as Borrower could do, and to sell, assign, and transfer any collateral to Lender or any other party.

**4.07  Power of Sale.**  If an Event of Default shall have occurred, Lender may sell the Mortgaged Property to the highest bidder at public auction in front of the courthouse door in the county or counties, as may be required, where the Mortgaged Property is located, wither in person or by auctioneer, after having first given notice of the time, place and terms of sale, together with a description of the property to be sold, by publication once a week for three (3) successive weeks prior to said sale in some newspaper published in said county or counties, as may be required, and, upon payment of the purchase money, Lender or any person conducting the sale for Lender is authorized to execute to the purchaser at said sale a deed to the mortgaged Property so purchased. Lender may bid at said sale and purchase the Mortgaged Property, or any part thereof, if the highest bidder therefor. At the foreclosure sale the Mortgaged Property may be offered for sale and sold as a whole without first offering it in any other manner or may be offered for sale and sold in any other manner as Lender may elect. The provisions of paragraph 4.06 of this Mortgage shall apply with respect to Lender's enforcement of rights or interest in personal property which constitutes Mortgaged Property hereunder.

**4.08  Application of Foreclosure or Sale Proceeds.**    The proceeds of any foreclosure sale pursuant to Paragraph 4.07, or any sale pursuant to Paragraph 4.06, shall be applied as follows:

(a)     First, to the costs and expenses of (i) retaking, holding, storing and processing the Collateral and preparing the Collateral or the Mortgaged Property (as the case may be) for sale, and (ii) making the sale, including a reasonable attorneys' fee for such services as may be necessary in the collection of the indebtedness secured by this Mortgage or the foreclosure of this Mortgage;

(b)     Second, to the repayment of any money, with interest thereon to the date of sale at the applicable rate or rates specified in the Note, this Mortgage, the other Loan Documents or the Other Indebtedness Instruments, as applicable, which Lender may have paid, or become liable to pay, or which it may then be necessary to pay for taxes, insurance, assessments or other charges, liens, or debts as hereinabove provided, and as may be provided in the Note or the other Loan Documents, such repayment to be applied in the manner determined by Lender;

(c)     Third, to the payment of the indebtedness (including but not limited to the Loan and the Other Indebtedness) secured hereby, with interest to date of sale at the applicable rate or rates specified in the Note, this Mortgage, the other Loan Documents or the Other Indebtedness Instruments, as applicable, whether or not all of such indebtedness is then due;

(d)     Fourth, the balance, if any, shall be paid as provided by law.

**4.09  Lender's Option on Foreclosure.**    At the option of the Lender, this Mortgage may be foreclosed as provided by law or in equity, in which event a reasonable attorneys' fee shall, among other costs and expenses, be allowed and paid out of the proceeds of the sale. In the event Lender exercises its option to foreclose this Mortgage in equity, Lender may, at its option, foreclose this Mortgage subject to the rights of any tenants of the Mortgaged Property, and the failure to make any such tenants parties defendants to any such foreclosure proceeding and to foreclose their rights will not be, nor be asserted to be by the Borrower, a defense to any proceedings instituted by the Lender to collect the sums secured hereby, or to collect any deficiency remaining unpaid after the foreclosure sale of the Mortgaged Property.

**4.10  Waiver of Exemption.**    Borrower waives all rights of exemption pertaining to real or personal property as to any indebtedness secured by or that may be secured by this Mortgage, and Borrower waives the benefit of any statute regulating the obtaining of a deficiency judgment or requiring that the value of the Mortgaged Property be set off against any part of the indebtedness secured hereby.

**4.11  Suits to Protect the Mortgaged Property.**    The Lender shall have power (a) to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Mortgaged Property by any acts which may be unlawful or in violation of this Mortgage; (b) to preserve or protect its interest in the Mortgaged Property and in the income, revenues, rents and profits arising therefrom; and (c) to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would impair the security hereunder or be prejudicial to the interest of the Lender.

**4.12  Borrower to Pay the Note on any Default in Payment; Application of Moneys by Lender.**    If default shall occur in the payment of any amount due under this Mortgage, the Note, any of the other Loan Documents or any of the Other Indebtedness Instruments, or if any other Event of Default shall occur under this Mortgage, then, upon demand of the Lender, the



Borrower shall pay to the Lender the whole amount due and payable under the Note and under all Other Indebtedness Instruments; and in case the Borrower shall fail to pay the same forthwith upon such demand, the Lender shall be entitled to sue for and to recover judgment for the whole amount so due and unpaid together with costs, which shall include the reasonable compensation, expenses and disbursements of the Lender's agents and attorneys.

**4.13  Delay or Omission No Waiver.**    No delay or omission of the Lender or of any holder of the Note to exercise any right, power or remedy accruing upon any default shall exhaust or impair any such right, power or remedy or shall be construed to be a waiver of any such default, or acquiescence therein; and every right, power and remedy given by the Note, this Mortgage, any of the other Loan Documents, or the Other Indebtedness Instruments to the Lender may be exercised from time to time and as often as may be deemed expedient by the Lender.

**4.14  No Waiver of One Default to Affect Another.**    No waiver of any default hereunder, under any of the other Loan Documents, or under any of the Other Indebtedness Instruments shall extend to or shall affect any subsequent or any other then existing default or shall impair any rights, powers or remedies consequent thereon.

If the Lender (a) grants forbearance or any extension of time for the payment of any indebtedness secured hereby; (b) takes other or additional security for the payment thereof; (c) waives or does not exercise any right granted herein, in the Note, in any of the other Loan Documents, or in any of the Other Indebtedness Instruments; (d) releases any part of the Mortgaged Property from this Mortgage or otherwise changes any of the terms of this Mortgage, the Note, any of the other Loan Documents or the Other Indebtedness Instruments; (e) consents to the filing of any map, plat, or replat or consents to the granting of any easement on, all or any part of the Mortgaged Property; or (f) makes or consents to any agreement subordinating the priority of this Mortgage, any such act or omission shall not release, discharge, modify, change or affect the original liability under this Mortgage, the Note, the other Loan Documents, or the Other Indebtedness Instruments of the Borrower or any subsequent purchaser of the Mortgaged Property or any part thereof, or any maker, co-signer, endorser, surety or guarantor; nor shall any such act or omission preclude the Lender from exercising any right, power or privilege herein granted or intended to be granted in the event of any other default then made or of any subsequent default, nor except as otherwise expressly provided in an instrument or instruments executed by the Lender shall the provisions of this Mortgage be altered thereby.  In the event of the sale or transfer by operation of law or otherwise of all or any part of the Mortgaged Property, the Lender, without notice to any person, corporation or other entity (except notice shall be given to Borrower so long as Borrower remains liable under the Note, this Mortgage or any of the other Loan Documents) hereby is authorized and empowered to deal with any such vendee or transferee with reference to the Mortgaged Property or the indebtedness secured hereby, or with reference to any of the terms or conditions hereof, or of the other Loan Documents, as fully and to the same extent as it might deal with the original parties hereto and without in any way releasing or discharging any of the liabilities or undertakings hereunder.

**4.15  Discontinuance of Proceedings  - Position of Parties Restored**.  In case the Lender shall have proceeded to enforce any right or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Lender, then and in every such case the

200048

Borrower and the Lender shall be restored to their former positions and rights hereunder, and all rights, powers and remedies of the Lender shall continue as if no such proceeding had been taken.

**4.16  Remedies Cumulative.**  No right, power or remedy conferred upon or reserved to the Lender by this Mortgage is intended to be exclusive of any other right, power or remedy, but each and every such right, power and remedy shall be cumulative and concurrent and shall be in addition to any other right, power and remedy given hereunder, or under the Note, any of the Loan Documents, the Other Indebtedness Instruments or now or hereafter existing at law or in equity or by statute.

**4.17  Notice of Defaults Under the Loan Documents and Other Credit Arrangements.**  Borrower shall give prompt notice to Lender of any defaults by Borrower under this Mortgage or any of the other Loan Documents, and of any notice of default received by Borrower under any other credit arrangement of Borrower.

**ARTICLE V**
**MISCELLANEOUS**

**5.01  Binding Effect.**  Wherever in this Mortgage one of the parties hereto is named or referred to, the heirs, administrators, executors, successors, assigns, distributees, and legal and personal representatives of such party shall be included, and all covenants and agreements contained in this Mortgage by or on behalf of the Borrower or by or on behalf of Lender shall bind and inure to the benefit of their respective heirs, administrators, executors, successors, assigns, distributees, and legal and personal representatives, whether so expressed or not. Notwithstanding the foregoing, the Borrower shall not be entitled to assign any of its rights, titles, and interests hereunder, or to delegate any of its obligations, liabilities, duties, or responsibilities hereunder, and will not permit any such assignment or delegation to occur (voluntarily or involuntarily, or directly or indirectly), without the prior written consent of the Lender.

**5.02  Headings.**  The headings of the articles, sections, paragraphs and subdivisions of this Mortgage are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof. "Herein," "hereby," "hereunder," "hereof," and other equivalent words or phrases refer to this Mortgage and not solely to the particular portion thereof in which any such word or phrase is used, unless otherwise clearly indicated by the context.

**5.03  Gender; Number** .  Whenever the context so requires, the masculine includes the feminine and neuter, the singular the plural, and the plural includes the singular.

**5.04  Invalid Provisions to Affect No Others.**  In case any one or more of the covenants, agreements, terms or provisions contained in this Mortgage, in the Note, in any of the other Loan Documents, or in the Other Indebtedness Instruments shall be invalid, illegal or unenforceable in any respect, the validity of the remaining covenants, agreements, terms or provisions contained herein, and in the Note, in the other Loan Documents and in the Other Indebtedness Instruments shall be in no way affected, prejudiced or disturbed thereby.

Page 22 of 24

**5.05 Loan Documents.** Wherever reference is made herein to this Mortgage, the Note, the Loan Documents, or the Other Indebtedness Instruments, such reference shall include all renewals, extensions, modifications and refinancings thereof.

**5.06 Conflict in Loan Documents.** In the event of conflict in the terms of any provisions in this Mortgage, the Note, any of the other Loan Documents, or the Other Indebtedness Instruments, the terms of the provision most favorable to the Lender shall apply.

**5.07 Instrument Under Seal.** This Mortgage is given under the seal of all parties hereto, and it is intended that this Mortgage is and shall constitute and have the effect of a sealed instrument according to law.

**5.08 Addresses and Other Information.** The following information is provided in order that this Mortgage shall comply with the requirements of the Uniform Commercial Code, as enacted in the State of Alabama, for instruments to be filed as financing statements:

| | | |
|---|---|---|
| (a) | Name of Borrower (Debtor) | Lake Martin Partners, L.L.C., an Alabama limited liability company |
| | Address of Borrower: | 38 Foxchase Drive Dothan, Al 36305 |
| (b) | Name of Lender (Secured Party): | The Alpharetta Community Bank |
| | Address of Lender: | 11800 Amber Park Drive, Suite 130 Alpharetta, Georgia 30004 |
| | | Attention:Lou Douglas |
| (c) | Record Owner of Real Estate described on Exhibit A hereto: | Lake Martin Partners, L.L.C., an Alabama limited liability company |

**5.09 Rider.** Additional provisions of this Mortgage, if any are set forth below or on a Rider attached hereto and made a part hereof.

N/A

**IN WITNESS WHEREOF**, Borrower has caused this Mortgage to be executed and effective as of the day and year first above written, although actually executed on the date or dates reflected below.

20/048

BORROWER (Mortgagor, Debtor):

ATTEST:

Lake Martin Partners, LLC, an Alabama limited
liability company

By: _____

By: Samuel E. Lee
Its: Member
Executed: 1/14/05

WITNESS:

Date Executed: 1/14/05

Date Executed: 1/14/05

Page 24 of 24

20/048

**CORPORATE OR PARTNERSHIP ACKNOWLEDGMENT**

STATE OF GEORGIA
COUNTY OF FULTON

I, JENNIFER M SHINHOLSTER a notary public in and for said county in said state, hereby certify that SAMUEL CEE whose name as cmthbingllc of LAKEVIEW PTNY PARTNERS LLC, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, wictor as such _____ and with full authority, executed the same voluntarily for and as the act of said _____

Given under my hand and official seal this 4th day of JANUARY 2005.

[Notary seal: JENNIFER M. SHINHOLSTER, NOTARY, EXPIRES, GEORGIA, AUG. 11, 2007, FULTON COUNTY]

[Notarial Seal]

Notary Public
Commission Expires: 8 11 07

**INDIVIDUAL ACKNOWLEDGMENTS**

STATE OF _____
COUNTY OF _____

I, _____, a notary public in and for said county in said state, hereby certify that _____, whose name _____ signed to the foregoing instrument and who \_\_\_\_ known to me, acknowledged before me on this day, that, being informed of the contents of such instrument, _____ executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this _____ day of _____.

_____

Notary Public
Commission Expires: _____

[Notarial Seal]

20/248

Lots 6b and 7

ALL THAT TRACT or parcel of land lying and being in Section 1 , Township 20 North, Range 22 East, Tallapoosa County, Alabama, being more particularly described as follows:

BEGINNING at the intersection of the southeasterly right-of-way line of Sunset Point Drive (right-of-way varies) and the westerly right-of-way line of Lakeview Drive (right-of-way varies); Run thence along the right-of-way line of Lakeview Drive the following two (2) courses and distances:  (1) Along a curve to the right (said curve having a radius of 649.30 feet, a chord direction of South 23°37'49" East, and a chord length of 362.63 feet) 367.52 feet to a Point, and (2) South 07°24'54" East a distance of 326.24 feet to a Point on the property line of Church of the Living Waters; Run thence along the property line of Church of the Living Waters South 40°14'13" West a distance of 215.97 feet to a Point; Continue thence along the property line of Church of the Living Waters South 08°33'16" East a distance of ±197 feet to the edge of Martin Lake;  Run thence along the edge of Martin Lake southwesterly, westerly, and northerly, a distance of 1598 feet to a Point on the property line of Sunset Point Condominium IV Phase 1; Run thence along said property line North 34°24'55" East a distance of ±96 feet to a 1/2" rebar pin with cap; Continue thence along said property line North 10°58'29" East a distance of 96.39 feet to a 1/2" rebar pin with cap on the southerly right-of-way line of Sunset Point Drive; Run thence along said right-of-way line the following eight (8) courses and distances: (1) North 87°51'42" East a distance of 74.40 feet to a Point, (2) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 85°29'42" East, and a chord length of 15.76 feet) 15.76 feet to a Point, (3) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 76°39'35" East, and a chord length of 146.42 feet) 146.89 feet to a Point, (4) along a curve to the left (said curve having a radius of 527.40 feet, a chord direction of North 64°40'05" East, and a chord length of 73.81 feet) 73.87 feet to a Point, (5) along a curve to the right (said curve having a radius of 527.40 feet, a chord direction of North 65°00'56" East, and a chord length of 80.19 feet) 80.27 feet to a Point, (6) along a curve to the right (said curve having a radius of 527.40 feet, a chord direction of North 71°11'32" East, and a chord length of 33.43 feet) 33.44 feet to a Point, (7) along a curve to the left (said curve having a radius of 146.36 feet, a chord direction of North 46°41'25" East, and a chord length of 135.37 feet) 140.73 feet to a Point, and (8) North 19°08'42" East a distance of 99.48 feet to the POINT OF BEGINNING.

Said tract contains ±689,925 square feet or ±15.8 acres, more or less.

This is intended to be the same property as Lot 7 and the portion of Lot 6b east of the 20' drainage easement centerline of Sunset Point Subdivision Phase 4 recorded in Plat Book 10 Page 45 of the Tallapoosa County records.

201048

Lot 1

ALL THAT TRACT or parcel of land lying and being in Section 2, Township 20 North, Range 22 East, Tallapoosa County, Alabama, being more particularly described as follows:

To find the POINT OF BEGINNING, Commence at the southeast corner of Section 2, Township 20 North, Range 22 East; Run thence North 02°47'35" West a distance of 1817.00 feet to a 1/2" rebar found on the northerly right-of-way line of Sunset Point Drive and the POINT OF BEGINNING.

From the POINT OF BEGINNING, run thence along a curve to the right (said curve having a radius of 166.00 feet, a chord direction of North 63°02'17" West, and a chord length of 168.72 feet) 176.99 feet to a Point; Run thence along a curve to the right (said curve having a radius of 358.40 feet, a chord direction of North 21°22'53" West, and a chord length of 142.82 feet) 143.78 feet to a Point; Run thence North 09°53'18" West a distance of 244.81 feet to a Point; Run thence along a curve to the left (said curve having a radius of 285.37 feet, a chord direction of North 31°18'01" West, and a chord length of 208.36 feet) 213.29 feet to a Point; Run thence along a curve to the left (said curve having a radius of 237.84 feet, a chord direction of North 52°54'57" West, and a chord length of 1.65 feet) 1.65 feet to a 1/2" rebar pin found; Run thence North 35°36'31" East a distance of 33.15 feet to a 1/2" rebar pin on the southerly edge of Lake Martin; Run thence along said southerly edge of Lake Martin a distance of ±342 feet to a 1/2" rebar pin found at the property corner of Lot 2, Sunset Point Subdivision Phase 4; Run thence along the property line of Lot 2 South 13°03'22" East a distance of 440.61 feet to the POINT OF BEGINNING.

Said tract contains ±69,855 square feet or ±1.60 acres, more or less.

This is intended to be the same property as Lot 1 of Sunset Point Subdivision Phase 4 recorded in Plat Book 10 Page 45 of the Tallapoosa County records.